**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., | ) | |
| HAND HELD PRODUCTS, INC., and | ) | |
| METROLOGIC INSTRUMENTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:21-cv-00506 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| OPTO ELECTRONICS CO., LTD., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND**
**LEGAL DETERMINATIONS REGARDING CONTRACTUAL INTERPRETATION**

i

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................... 1

     A.   Procedural History ......................................................................... 1

     B.   Relevant Barcode Symbols ............................................................ 4

          1.    Undisputed 2D Symbols ...................................................... 4
          2.    Undisputed 1D Symbols ...................................................... 6
          3.    Disputed Symbols ................................................................ 7

III. LEGAL STANDARD .............................................................................. 11

IV. HONEYWELL MISCONSTRUES THE AGREEMENT ....................... 12

     A.   The Agreement's Disputed Definition of "2D Barcode Products" ......................... 12

          1.    Honeywell's interpretation results in an ambiguous contract ................... 12
          2.    Section 1.4 unambiguously defines "2D Barcode Products" ................... 15

     B.   The Audit Was a Condition Precedent to Recovery Under Section 5.1 ................ 21

V.   CONCLUSION ........................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Jack Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248 (1986) .........................................................................................11

*John J. Babcock, et al. v. City of Newton*
977 N.E.2d 105 (Mass. App. Ct. 2012) ..............................................................17, 18

*County of Suffolk v. Robert Alcorn, et al.*
266 F.3d 131, 138 (2d Cir. 2001) .............................................................................16

*DCV Holdings, Inc. v. ConAgra, Inc., et al.*
889 A.2d 954, 961 (Del. 2005) .................................................................................16

*Eastman Kodak Company v. Steve and Alice Bostic*
No. 91-Civ-1797, 1991 WL 243378 (S.D.N.Y. Nov. 14, 1991).........................23, 24

*Imation Corp. v. Koninklijke Phillips Electronics N.V., et al.*
586 F.3d 980 (Fed. Cir. 2009).................................................................................18

*Jon Jones, et al. v. Eric T. Schneiderman, et al.*
974 F. Supp. 2d 322, 346-47 (S.D.N.Y. 2013) ......................................................18

*MBIA Insurance Corporation, et al. v. Royal Indemnity Company*
426 F.3d 204 (3d Cir. 2005)....................................................................................12

*Mylan Inc., et al. v. SmithKline Beecham Corporation, et al.*
723 F.3d 413 (3d Cir. 2013).....................................................................................11

*In re NextMedia Group., Inc.*
440 B.R. 76 (Bankr. D. Del. 2010) ...........................................................21, 22, 23, 24

*The News and Observer Publishing Company. v. Raleigh-Durham Airport Authority*
597 F.3d 570 (4th Cir. 2010) ..................................................................................11

*Shintom Co., Ltd. v. Audiovox Corporation*
888 A.2d 225 (Del. 2005) ...................................................................................18, 19

*State ex rel. Hirst v. Black, et al.*
83 A.2d 678 (Del. Super. 1951)................................................................................13

*TQ Delta, LLC v. Adtran, Inc.*
No. 1:14-CV-00954, 2018 WL 2298342 (D. Del. May 18, 2018) ...........................17

*Richard W. Vague v. Bank One Corporation, et al.*
No. 18741, 2006 WL 290299 (Del. Ch. Feb. 1, 2006) ........................................................24

*Zenith Radio Corporation v. Hazeltine Research, Inc., et al.*
395 U.S. 100, 135 (1969)..........................................................................................................18

**Other Authorities**

Federal Rules of Civil Procedure Rule 56(a) ..............................................................................11

## I.    INTRODUCTION

In their Memorandum in Support of Motion for Summary Judgment, Plaintiffs (collectively "Honeywell") assert misguided interpretations of the Parties' Settlement and License Agreement ("the Agreement"). Honeywell's asserted interpretation of the three-sentence definition of royalty-bearing "2D Barcode Products" results in two independent definitions of "2D Barcode Products"—a broad general definition and a narrow exception to that broad definition, both of which are ambiguous and should be rejected. Reading the three sentences of the definition together, as OPTO advocates, results in the correct unambiguous definition of "2D Barcode Products," which conforms to the parties' intent as shown by the intrinsic evidence.

Also, Honeywell's assertions that the express procedures prescribed in the Agreement by which Honeywell could obtain a remedy for alleged defects in OPTO's ██████████ ████████████████████ sales of "2D Barcode Products" ███████████ ████████████████ The Agreement is clear that Honeywell ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Under applicable Delaware law, such conditions are strictly enforced.



## II.    FACTUAL BACKGROUND

### A.    Procedural History

The Agreement at issue in this case settled prior litigation between the Parties. On May 31, 2019, Honeywell initiated two actions against OPTO. The first litigation was filed in U.S. District Court for the District of Delaware, which was stayed pending the outcome of the second action filed at the U.S. International Trade Commission ("ITC"), wherein Honeywell sought exclusion of OPTO's product imports into the U.S. based on allegations of patent infringement.

1

The ITC Complaint accused OPTO's products of infringing seven patents. Ex. 1, ITC Compl. Shortly after filing the Complaint, Honeywell dropped one patent, narrowing the case to six asserted patents. Ex. 2, ITC Order Terminating Certain Claims. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ A 2D image sensor receives light focused through a lens and captures and stores an electronic image of the subject matter within the lens's field of view.

2D image sensors are used in imaging devices such as digital cameras and smart phones. Current, state-of-the-art, barcode readers use a 2D image sensor to capture two-dimensional images of barcode symbols. The devices' software analyzes the captured images to decode the barcode symbols. ████████████████████████████████████████████████████

████████████████████████████████████████████████ Those products are referred to herein as "OPTO's 2D imaging products."

The sixth Honeywell patent asserted in the ITC case was U.S. Patent No. 7,159,783 ("the '783 patent"). *See* Ex. 1, ITC Compl. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

The second group of OPTO products uses a horizontally-scanning laser to project a beam of laser light across the surface of the alternating bars and spaces. The light intensities reflected from the symbol are measured: less light is reflected from the symbol's black vertical bars than

from the intervening white spaces. The light intensities and scanning speeds are used to measure the horizontal widths of the bars and spaces. Those measurements are in turn used to decode the symbol. These products are referred to herein as OPTO's "laser scanning products."

The third group of OPTO products uses a 1D image sensor to decode barcode symbols with alternating vertical black bars and white spaces like laser scanning products. Unlike a 2D image sensor that photographs the entire symbol, a 1D image sensor captures a thin horizontal line of image data across the symbol's surface to measure the widths of the bars and spaces. For convenience, OPTO's laser scanning products and 1D image sensor products are referred to herein collectively as "laser scanning products."

On November 8, 2019, the presiding Administrative Law Judge in the ITC case ordered Honeywell to narrow the number of asserted patents to only four patents. Ex. 3, ITC Order and Honeywell's Response. Honeywell responded by dropping the '783 patent. ██████ ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████.

Before dropping the '783 patent, Honeywell produced patent "claim charts" purporting to map each patent claim element on to the features of OPTO's products. *See* Ex. 4, Claim Chart Excerpts. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ *Id.*

On January 22, 2020, the Parties signed the Agreement and settled the case. Dkt. 118-2. Under its terms, OPTO agreed to pay royalties on ongoing sales of "2D Barcode Products" in the United States as defined in Section 1.4. *Id.* Reflecting the posture of the case at the time of

settlement, ████████████████████████████████████████████

████████████████████ as defined in Section 1.5. *Id.* Finally, ██████████

████████████████████████████████████████████████████████

████ *Id.*

OPTO understood "2D Barcode Products" to mean OPTO 2D imaging products and paid all royalties due on those products. But Honeywell asserts that OPTO must also pay royalties on its laser scanning products because those products were operable to decode multi-row linear barcode symbols, which Honeywell wrongly asserts are two-dimensional symbologies. Thus, there is a genuine dispute about whether the multi-row symbols are "two-dimensional" symbols.

**B.      Relevant Barcode Symbols**

**1.      Undisputed 2D Symbols**

The "Data Matrix" symbol below is an example of an undisputed two-dimensional barcode symbol:



Like computers, these 2D symbols store "binary" data where each "bit" of data is reflected as either a "0" or "1" in a base 2 numeral system. Computer systems group bits into units called a "byte" with a set number of bits. Each bit within the byte has an exponentially increasing value potential, e.g., 1, 2, 4, 8, 16, 32, 64, and 128. A byte's value is determined by the number of bits turned "on" with a value of "1" and the number of bits turned "off" with a value of "0."

Data Matrix is an 8-bit encoding system. The 8-bit unit is referred to, not as a "byte," but as a "symbol character." A bit in a symbol character is turned "on" or has a value of "1" when its designated square-box area within the symbol is black and is turned "off" or has a value of "0"

when its square-box area within the symbol is white. The following depicts Data Matrix's "Utah" shaped 8-bit symbol characters encoding the word "OPTO."



The first blank symbol character on the left above depicts the $n^2$ values of each of the eight bits. The four symbol characters to the right encode the ASCII values for the letters "OPTO" by turning "on" certain bits with blackened squares.

QR Code is another prominent, non-disputed, 2D barcode symbology, and its symbol characters' structure and placement are depicted below.



Figure 19 — Symbol character arrangement in version 2-M symbol

QR Code also uses an 8-bit symbol character which has six different structures and arrangements (depicted to the right above) depending on their placement within the symbol.

Importantly, the symbol character components of Data Matrix and QR Code are not arranged in a continuous linear manner but are instead arranged two-dimensionally within a matrix. In other words, the symbology is non-continuous, and the "symbol must, therefore, be analyzed two-dimensionally before it can be decoded." Ex. 5, ISO/IEC 15415 at vi. That two-dimensional analysis is performed on a captured two-dimensional image of the symbol on which the location of each data bit can be mapped within the matrix and evaluated as either "on" or "off." *Id.* at 11-24. Data Matrix and QR Code symbol characters, therefore, are indisputably "two-dimensional

5

barcode symbology" because each symbol character must be analyzed two-dimensionally. Honeywell's own publications acknowledge that "[u]nlike the 1D barcode that is read horizontally, the 2D (two-dimensional) barcode, looking like a square or rectangle, stores information both horizontally and vertically, thus it is read in two dimensions." Ex. 6, Honeywell Website.

None of this is controversial. Honeywell's litigation counsel *in this case* drafted the ITC Complaint in the prior litigation. The lawyers wrote, "*Early barcode scanners were designed only to read linear, one-dimensional (1D) barcodes*. 1D barcodes use a series of lines and spaces and variable lengths ***to encode data***." Ex. 1, ITC Compl., at 10 (emphasis added). They further explained, "As a result, various two-dimensional (2D) barcodes, which use shapes, as opposed to lines, to encode data were designed. Because data can be encoded *based both on a vertical and horizontal arrangement of shapes*, 2D barcodes can encode exponentially more data in the same amount of space compared to their 1D counterparts." *Id.* (emphasis added). In other words, according to Honeywell's lawyers' the 1D or 2D nature of a barcode symbol is defined by the manner in which the symbol ***encodes*** data—(1) linear bar-space encoding for 1D symbols and (2) vertical and horizontal arrangement of shapes for encoding 2D symbols. Industry standards define how each barcode symbol ***encodes*** data.

### 2. Undisputed 1D Symbols

The "GS1 DataBar" symbol depicted below is encoded horizontally in one dimension using vertical bar-space symbology and is an example of an undisputed one-dimensional barcode symbol.



The depicted GS1 DataBar symbol has two symbol characters (1 and 3) with an overall width of 16 equal units comprised of four bars and four spaces. The two interior symbol characters (2 and 4) are likewise comprised of four bars and four spaces but have an overall width of 15 equal units. A single four bar-space symbol character is depicted below.



A laser scans the face of the symbol character to generate a "scan reflectance profile" (depicted to the right) based on reflected light intensities. The symbol character's black bars correspond to the valleys, and the white spaces correspond to the peaks. Scan speed and modulating light intensity are used to compute the horizontal width values of the bars and spaces.

Unlike 2D symbol characters that encode data using $n^2$ bit values, data is encoded into continuous bar-space symbol characters by adjusting the widths of the bars and spaces. Width values are like letters in the alphabet that can be variously combined to form words with predetermined meaning. All symbols like GS1 DataBar that can be decoded by laser scanners encode data using continuous one-dimensional bar-space symbol characters. OPTO's laser scanning products are operable **only** to decode such symbols.

### 3.      Disputed Symbols

Single-row linear barcode symbols like GS1 DataBar have limited data capacity. To increase capacity, multi-row "stacked" linear barcode symbols were developed. For example, the single-row GS1 DataBar symbol below encodes data representing the value "(01)00012345678905" within its bar-space symbol character symbology.

7



**Figure 4 — GS1 DataBar Truncated symbol representing (01)00012345678905**

By way of comparison, the GS1 DataBar symbol below is a two-row "stacked" symbol that encodes the same data value as the symbol shown above.



**Figure 5 — GS1 DataBar Stacked symbol representing (01)00012345678905**

The two barcode symbols encode the same data value because they both have the same bar-space width sequence. In fact, the second two-row symbol was created by cutting the first symbol in half and stacking the first half of the symbol on top of the second half of the symbol.

According to Honeywell, the first symbol is a one-dimensional symbology, and the second is a two-dimensional symbology. It is true that the second symbol appears as a "two-dimensional" multi-row presentation of data to the human eye, but a laser scanner "sees" nothing but continuous one-dimensional bar-space symbol characters. The only difference is that the laser scanner decodes the second symbol with *two* scans instead of only *one* scan for the first symbol.

On September 7, 1993, before adoption of modern 2D imaging readers, U.S. Patent No. 5,243,655 ("the '655 patent") was issued to Symbol Technologies, Inc. (*not Honeywell*). Ex. 7, Symbol Tech. '655 Patent. Although expired,[1] the disclosed invention, the "PDF417" barcode symbol, greatly expanded the amount of multi-row data that could be decoded **using laser scanning devices**. A PDF417 barcode is depicted below with an expanded view of one of its one-dimensional bar-space symbol characters indicated by the red arrow.

---

[1]    Honeywell's patents directed to multi-row stacked linear barcode decoding have likewise expired, which is the basis of OPTO's patent misuse counterclaim against Honeywell—for attempting to extract royalties on products that perform multi-row stacked linear barcode decoding without valid patent claims to that function.



"PDF" means "portable data file," and "417" corresponds to the symbol character's four ("4") bars and spaces, and its overall "17" module width as shown above. Importantly, PDF417 uses the same one-dimensional bar-space symbology as GS1 DataBar and other linear barcodes to encode data—its barcode symbology was not novel. Instead, the novelty of PDF417 was the purposeful encoding of each row with codeword values that share a unique mathematical relationship with its row number—the codeword values in a given row all have the same "cluster value" $((b_1–b_2+b_3–b_4+9) \bmod 9$ (where $b_n$ are bar values)) as their row number ($[(R-1) \bmod 3] \times 3$ (where R is row number)) which helps the laser scanner track its position during multiple scans.

Honeywell seizes upon language in an industry standard document describing the "code type" of PDF417 as "continuous, multi-row two-dimensional" as definitive proof that PDF417 is a two-dimensional barcode symbology. *See* Ex. 8, ISO/IEC 15438, at 5; *see also* Dkt. 118, at 10 n.2. Yet, the same document specifies that data in PDF417 is ***encoded*** into one-dimensional bar-space symbol characters as depicted above, which is the same bar-space symbology used in GS1 DataBar and other symbols that are indisputably one-dimensional. Annex J of the standard document provides the decode algorithm which specifies:



*Id.* at 80-81.

In other words, each symbol character of PDF417 is decoded by solving the bar-space width values ("$e_n$") as subunits of the symbol character's overall width ("p"). No y-axis measurement is made to decode the symbol character. Moreover, the same standards organization confirms that multi-row symbols such as PDF417 are decoded as 1D symbologies:

> Multi-row bar code symbols are constructed graphically as a series of rows of symbol characters, representing data and overhead components, placed in a defined vertical arrangement to form a (normally) rectangular symbol, which contains a single data message. ***Each symbol character has the characteristics of a linear bar code symbol character and each row has those of a linear bar code symbol; each row, therefore, may be read by linear symbol scanning techniques***, but the data from all the rows in the symbol must be read before the message can be transferred to the application software.

Ex. 5, ISO/IEC 15415, at vi (emphasis added).

PDF417 can be read by linear scanning techniques because it was purposefully developed for use with laser scanners that are operable only to make one-dimensional measurements of bars and spaces. For this reason, knowledgeable commenters describe PDF417 as "a stacked linear code; it looks like a two-dimensional barcode, but it isn't. 2D codes store data in both the X and Y coordinates. Linear codes contain data in one dimension." Ex. 9, Accurate Data.

Honeywell's technical support page also acknowledges that Honeywell's laser scanning products "cannot read 2D symbologies because [their] scan engine is a laser engine capable of decoding only 1D symbologies." Ex. 10, Honeywell Tech Support Page. This is, in fact, how Honeywell categorizes its own product line as shown below:





N4300 Series 1D Scan Engines

Only laser engine with built-in object detection for hands-free applications. Achieves highest reading accuracy among available laser scanner engines.

N4680 Series Compact, Decoded 2D Scan Engines

One-piece design, fully decoded 2D scan engine that utilizes Honeywell's latest imaging and decoding technology.

Honeywell categorizes its N4300 laser scan engine as a "1D Scan Engine" because, as its technical support page makes clear, laser scanners are only "capable of decoding 1D symbologies." *Id.* This is fully consistent with Honeywell's categorization of OPTO's laser scanning products as "1D Products" and OPTO's 2D imaging products "2D Products" on the ████████████ in the ITC case.

Laser scanners are "1D" because they project horizontal measurement lines that do one thing—measure widths of bars and spaces—whether in a single laser scan for single-row symbols or repetitive laser scans for multi-row symbols such as PDF417. 2D imaging scanners are "2D" because they capture two-dimensional images of barcode symbols and can decode barcode symbology that arranges data bits in two-dimensional matrices. The Agreement's definition of "2D Barcode Products" is fully consistent with and reflect this common usage in the industry. But Honeywell distorts the plain meaning of this definition by adding words and changing the meaning of the words used in the definition and by refusing to read the three-sentence definition as a whole.

## III. LEGAL STANDARD

Summary judgment is appropriate if the movant shows there is no genuine dispute of material fact. Lack of a dispute entitles the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it could impact the case's outcome. *News Observer Pub. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A genuine dispute of material fact exists when there is evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.,* subject to only one reasonable interpretation." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (quotation omitted). "Unambiguous written agreements should be enforced according to their terms, without using

extrinsic evidence to interpret the intent of the parties, to vary the terms of the contract, or to create

an ambiguity." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) (citing

*Eagle Indus., Inc. v. DeVilbliss Health Care, Inc*., 702 A.2d 1228, 1231 (Del. 1997)).

## IV.    HONEYWELL MISCONSTRUES THE AGREEMENT

### A.    The Agreement's Disputed Definition of "2D Barcode Products"

The parties dispute the definition of "2D Barcode Products" in Section 1.4 of the

Agreement, which reads as follows:

> The term '2D Barcode Products' shall mean any device or article of manufacture
> that is operable to decode at least one or more two-dimensional barcode
> symbologies into human-readable text. Two-dimensional ('2D') barcode
> symbologies include, but are not limited to, any two-dimensional barcode
> symbology defined by one or more standards settings organizations such as the
> International Organization for Standardization (ISO), International
> Electrotechnical Commission (IEC), and the Association for Automatic
> Identification and Mobility (AIM). For the avoidance of doubt, the term '2D
> Barcode Product' shall include Engines and other products that include a 2D image
> sensor and are capable of outputting a 2D image that may be used to decode a 2D
> barcode symbology into human-readable text.

Dkt. 118-2 at § 1.4.

### 1.    Honeywell's interpretation results in an ambiguous contract

Honeywell's interpretation of Section 1.4 is fundamentally flawed because it results in an

ambiguous definition of royalty-bearing "2D Barcode Products." Honeywell wrongly asserts that

the first sentence of Section 1.4 fully and completely defines "2D Barcode Products" as "any

device or article of manufacture that is operable to decode at least one or more ***two-dimensional***

***barcode symbologies*** into human-readable text." *See* Dkt. 118; *see also* Dkt. 118-2 at § 1.4

(emphasis added). If the first sentence alone defines "2D Barcode Products" as Honeywell

contends, then the definition is ambiguous because the term "two-dimensional barcode

symbologies" is defined neither in Section 1.4 nor anywhere within the four corners of the

Agreement.

Honeywell wrongly argues that the second sentence of Section 1.4 defines "two-dimensional barcode symbologies." Dkt. 118, at 10. It does not. The second sentence merely says, "Two-dimensional ('2D') barcode symbologies include, but are not limited to, any two-dimensional barcode symbology defined by one or more standards setting organizations. . . ." *Id*. The second sentence itself neither defines the term "two-dimensional barcode symbologies" nor incorporates any extrinsic definition of "two-dimensional barcode symbologies" by reference. *See State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951) (extrinsic documents must be "specifically set forth or identified by reference" in the contract). The Agreement's integration clause underscores this point: "This Agreement and its Exhibits, constitute and contain the entire agreement among the Parties respecting the subject matter hereof. . .." Dkt. 118-2, at § 9.2. None of the Exhibits to the Agreement is an industry standard or other document defining "two-dimensional barcode symbologies."

The term "two-dimensional barcode symbologies" is therefore an undefined term, and Honeywell's asserted interpretation accordingly results in an ambiguous definition of "2D Barcode Products." Honeywell's interpretation is fundamentally flawed and should be rejected for that reason alone. Nevertheless, even if the first sentence alone (or combined with the second sentence) were assumed for purposes of argument to provide an independent definition of "2D Barcode Products" and Honeywell's interpretation were assumed reasonable (it is not), Honeywell's interpretation must be rejected on summary judgment because the first sentence, standing alone, is susceptible to more than one reasonable interpretation.

Honeywell alleges, without citation or proof, that a "PDF417" barcode symbol "is recognized as a two-dimensional barcode symbology by the standards-setting organizations ISO and IEC." Dkt. 118, at 10 n.2. But as shown by the evidence discussed above, the same standards-

13

setting organizations make clear that multi-row symbols such as PDF417 are decoded using linear one-dimensional scanning techniques—underscoring the ambiguity inherent in Honeywell's proposed interpretation of Section 1.4.

PDF417 is decoded using linear scanning techniques because it was developed for use with laser scanners, and it ***encodes*** data using one-dimensional bar-space symbology that can be decoded by laser scanners. The one-dimensional symbology in each row of PDF417 is ultimately decoded through a series of multiple laser scans—one-dimensional laser measurements across the symbol's rows. PDF417 may be described as a two-dimensional presentation of data due to its stacking of multiple rows of linear barcode data (such as in OPTO's product brochures), but the ***decoding operation*** called out in the first sentence of Section 1.4 makes clear that PDF417 is one-dimensional. *See* Dkt. 118-2, at § 1.4.

The "operable to decode" language in the first sentence has meaning and obviously denotes the operation or functioning of the device when decoding a barcode symbology. Honeywell fails to give due weight and emphasis to the term "operable to decode" in the first sentence and wrongly focuses only on barcode symbology definition. Repetitive scanning does not alter the operation of a laser scanner—it is operable to do one thing—scan bars and spaces and output their width measurements. That is why Honeywell categorizes its own laser scan engines as "1D scan engines" and why Honeywell's lawyers categorized OPTO's laser scanning products as "1D products" ■ ██████████████████████████████ in the ITC case. There is only one "symbology" that a laser scanner is operable to decode—a symbology that ***encodes*** data using bar-space symbol characters. Laser scanners cannot decode any other type of symbology. Their operation is the same whether decoding bar-space symbol characters in single-row GS1 DataBar or decoding bar-space symbol characters in multi-row PDF417.

The first sentence's reference to "two-dimensional barcode symbologies" cannot be read in isolation. The issue is not whether the aggregation of data in a barcode symbol results in a two-dimensional presentation to the human eye (such as multi-row PDF417). The issue presented by the first sentence is the "symbology" that a device is "operable to decode." There really should be no dispute that laser scanners are "operable to decode" only bar-space symbology which is decoded in one dimension only—whether in a single row or repetitively in multiple rows.

Although disputed by Honeywell, OPTO's interpretation of the first sentence of Section 1.4 as excluding laser scanning products from the definition of "2D Barcode Products" is a reasonable interpretation—especially in the absence of a definition of the term "two-dimensional barcode symbologies." OPTO's interpretation is also consistent with how Honeywell's lawyers themselves distinguish 1D and 2D symbologies based on how data is *encoded* within a symbol—encoding methods which are defined and can be objectively confirmed by industry standards. Therefore, Honeywell's asserted definition of "2D Barcode Products" based on the first sentence (or even the first two sentences) of Section 1.4 cannot be adopted on summary judgment, because OPTO's interpretation of the first two sentences is a reasonable alternative interpretation.

### 2. Section 1.4 unambiguously defines "2D Barcode Products"[2]

According to Honeywell, the third sentence of Section 1.4 contributes nothing of substance to the general definition of "2D Barcode Products" found in the first and second sentences. Apparently, the third sentence is a mere appendage operating independently of the first two sentences to "ensure that the definition of 2D Barcode Products also includes, but is not limited to,

---

[2]     Concurrent with this Response to Honeywell's Motion for Partial Summary Judgment, OPTO filed its own affirmative Motion for Summary Judgment and Memorandum in Support, which sets forth fully the reasons why Section 1.4 has only one reasonable interpretation that unambiguously defines "2D Barcode Products." OPTO refers the Court to OPTO's Memorandum and expressly incorporates it by reference herein. *See* Dkt. 135.

components such as 'Engines and other products that include a 2D image sensor and are capable of outputting a 2D image that may be used to decode a 2D barcode symbology . . .'" Dkt. 118, at 10.

Significantly, Honeywell admits that in the context of its asserted interpretation of Section 1.4, "the third sentence is included to explain that this niche area of ***components that would otherwise not strictly fall within the Agreement's definition of a 2D Barcode Product*** is in fact included." *Id*. at n.3 (emphasis added). The "niche" products referenced in the third sentence would not fall within Honeywell's professed definition of "2D Barcode Products" because the so-called niche products are not operable to decode ***any*** barcode symbology—let alone a 2D barcode symbology. Those products merely output 2D images. The third sentence, therefore, ***states an exception*** to Honeywell's alleged interpretation of "2D Barcode Products."

As an exception, therefore, one would expect the third sentence to begin with the words, "Notwithstanding the foregoing . . ." or other such similar words acknowledging a conflict with the preceding definition and purporting to provide an exception or alternative to the prior definition. The third sentence begins with no such signal.

Instead, the third sentence begins with the words, "For the avoidance of doubt. . . ," signaling, not conflict with the preceding sentences, but rather clarification of the two preceding sentences. In other words, the third sentence is not a separate or different definition of "2D Barcode Products" but is instead a ***detailed refinement*** of the general definitional concepts presented in the preceding two sentences. Under Delaware contract law, "specific language in a contract controls over general language." *DCV Holdings, Inc. v. ConAgra, Inc., et al*, 889 A.2d 954, 961 (Del. 2005); *see also Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 138 (2d Cir. 2001). And "courts construing contracts must give specific terms and exact terms greater weight than general language." *Id.*

This is especially true where, as here, the first two sentences, by themselves, would result in an ambiguous definition of "2D Barcode Products." Delaware courts have recognized that where ambiguous general language in a contract is followed by clarifying specific language such as the "[f]or the avoidance of doubt" sentence, then those sentences must be read together as a whole to interpret the meaning of the contract provision. *See TQ Delta, LLC v. Adtran, Inc*., No. 1:14-CV-00954, 2018 WL 2298342, at *9-*10 (D. Del. May 18, 2018) (contract ruled not ambiguous when ambiguous patent "carve out" sentence was read together with the next sentence beginning with the words, "For clarity. . ..").

Honeywell goes to great lengths to sever the third sentence of Section 1.4 from the preceding two sentences. Honeywell emphasized, "As explained *supra*, this [third] sentence was included to explain that '2D Barcode Products' '*shall include*,' but not be limited to, . . ." Dkt. 118, at 11 (underlining added). In doing so, Honeywell materially misquotes the third sentence. The underlined words, "but not be limited to," do not appear in the third sentence—those are words added by Honeywell. Honeywell further resorts to Black's Law Dictionary for definitions of "include" and "including" as "a term of enlargement" but the operative term in the third sentence is "*shall include*." *Id.* at 12. Honeywell also points out that the term "including" is defined by Section 9.4 as meaning "including without limitation" but again failed to acknowledge that the term "shall include" itself is an undefined term. *Id.*

This latter point concerning usage of "including" in the Agreement informs the correct interpretation of "shall include" in the third sentence of Section 1.4 as limiting and exhaustive. The Parties obviously knew how to specify an intended enlargement of a term such as "including" by providing an express definition. Similarly, in other parts of the contract where the word "include"

appears, it is followed by the words "but are not limited to" in the same sentence. *See, e.g.*, Dkt. 118-2, at § 1.4. The second sentence of Section 1.4 is one such example.

The absence of the phrase "but are not limited to" or other similar words used in conjunction with "shall include" is conspicuous and compels that the phrase "shall include" be given its imperative and exhaustive meaning. *See Babcock v. City of Newton*, 977 N.E.2d 105 (Mass. App. Ct. 2012) ("It is undisputed that lawyers for both sides negotiated and then cosigned the agreement. The omission of the phrase 'not limited to,' or similar language, is meaningful."); *see also Jones v. Schneiderman*, 974 F. Supp. 2d 322, 346-47 (S.D.N.Y. 2013) (interpretation of "shall include" as exhaustive "is bolstered by the . . . later use of the phrase 'shall include but are not limited to'"); *Imation Corp. v. Koninklijke Phillips Elec. N.V.*, 586 F.3d 980, 990 (Fed. Cir. 2009) ("[P]roper interpretation of a contract generally assumes consistent usage of terms throughout the Agreement.").

As the term "shall include" commands, the specific product structures and operations identified in the third sentence are integral and limiting elements of the definition of "2D Barcode Products." Without the limitations provided by the third sentence, the first two sentences would be irreparably ambiguous as a definition of "2D Barcode Products." And without the first two sentences, the third sentence acting alone as a definition of "2D Barcode Products," as Honeywell insists that it does, would also be ambiguous and result in an overly broad definition of "2D Barcode Products" that would impermissibly include ordinary imaging devices such as digital cameras—rendering the Agreement susceptible to invalidation due to patent misuse. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 135 (1969) (patent license requiring royalties on products that do not use the teaching of the patent is a patent misuse).

The three sentences of Section 1.4 necessarily work together to unambiguously define royalty-bearing "2D Barcode Products." The first sentence avoids the patent misuse problem by providing a product category definition of "2D Barcode Products" making clear that the term is directed to products intended for use in two-dimensional barcode decoding. *See Shintom Co., Ltd. v. Audiovox Corp.*, 888 A.2d 225, 230 (Del. 2005) ("[T]e expression of one thing is the exclusion of another . . ..."). The first sentence provides a necessary but incomplete definition.

The third sentence defines the minimum product operations and structures relevant to "operable to decode two-dimensional barcode symbologies"—a "2D Barcode Product" need not be a fully-assembled product operable to perform all decoding steps. The term "operable to decode" is satisfied by a device equipped with a 2D image sensor "capable of outputting a 2D image that may be used to decode a 2D barcode symbology into human-readable text." This explains why it was not necessary to define the term "two-dimensional barcode symbologies"—the only operation required of a "2D Barcode Product" is output of a 2D image of sufficient quality that it "may be used to decode a 2D barcode symbology"—***any*** 2D barcode symbology.

The key issue then is only one of 2D image quality—not the definition of the intended barcode symbology. The second sentence therefore is a garden-variety "without limitation" provision clarifying that the definition of "2D Barcode Products" does not depend on a device's capability to output a 2D image of ***any particular kind*** of two-dimensional barcode symbology. The second sentence makes clear that if a product has the defined minimum, necessary operations and structures ***that are generally relevant to decoding any type of two-dimensional barcode symbology***, then a dispute over the applicability of any particular barcode symbology definition would be unwarranted because Section 1.4 expansively contemplates ***all conceivable definitions***. Ironically, the second sentence was included in Section 1.4 to prevent the very dispute at the heart

of this litigation—arguments about whether or not certain industry standards define certain barcode symbologies as "two-dimensional."

Honeywell is, therefore, incorrect in asserting that "Section 1.4 does not require a particular type of underlying scanning technology (such as an image sensor, laser, or CCD sensor), nor does it require any particular method of decoding." Dkt. 118, at 11. Section 1.4 could not have been more precise in defining "2D Barcode Products" as products that minimally "include a 2D image sensor" and that "are capable of outputting a 2D image" of sufficient quality for 2D barcode symbol decoding. In fact, the **only** product structures and operations discussed at all in the Agreement concern only 2D imaging products. *See* Dkt. 118-2, at §§ 1.4 & 1.3 (definition of "Engine" as a device "which generates an electronic image of a barcode"). The Parties obviously knew how to define "2D Barcode Products" based on specific product structures and operations, and if laser scanning products had been intended to fall within the definition, their minimum product structures and operations would likewise have been defined.

There is only one reasonable unambiguous definition of "2D Barcode Products" in Section 1.4, which is understood by reading its three sentences together. Succinctly stated, a 2D Barcode Product is any device operable to decode two-dimensional barcode symbologies of any type by outputting 2D images of 2D barcode symbols that may be used to decode the symbols.

Finally, there is no conflict with Section 1.5's definition of "1D Barcode Products." As discussed, Section 1.4 clarifies that the term "operable to decode two-dimensional barcode symbologies" means "capable of outputting a 2D image of a barcode that may be used to decode a 2D barcode symbology." Dkt. 118-2, at § 1.4 That definition applies with equal force to the use of the term "operable to decode two-dimensional barcode symbologies" in Section 1.5. *See id.* at § 1.5. OPTO's laser scanning products can only be "1D Barcode Products"—like leopards, they

do not change their spots. Section 1.5 further includes the product category definition "operable to decode one-dimensional barcode symbologies" as protection for Honeywell. *Id.* Under the Agreement, 1D Barcode Products ████████████████████████████████████████ Section 1.5's product category definition ensures that any non-barcode reading OPTO product falls outside ████████████████

**B.      The Audit Was a Condition Precedent to Recovery Under Section 5.1**

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████    ██████████████████████
████████████████████████████████████████████████
██████████████████████████████

Under Delaware law, "[n]o particular words are required to create a condition; however, terms such as 'if,' 'provided that,' 'on the condition that,' or other phrases that restrict performance generally connote the parties' intention to create a condition, rather than a promise." *In re NextMedia Grp., Inc.*, 440 B.R. 76, 80 (Bankr. D. Del. 2010), *aff'd*, *CBS Outdoor Inc. v. NextMedia Grp., Inc.*, Civ. No. 10-1109, 2011 WL 4711997 (D. Del. Oct. 6, 2011). ████████████

███████████████████████████████████████████████████████████████

████████████████████████████ *See* Dkt. 118, at 16.

The concluding phrase of the quotation on that page states that Honeywell ████████

███████ ██████ █████ ██████ █████ █████ █████ ███ █████ ██ ████████

███████████████████████████████████████████████████████████████

███████████████████████████ *Id.* The cropped sentence continues: ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ Dkt. 118-2, at § 5.1

(emphasis added).

Honeywell's audit of OPTO was, therefore, conditioned, *inter alia*, on conducting the audit

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████



*Id.* (emphasis added).

Section 5.1 makes clear that Honeywell's ████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* The express language of

Section 5.1 establishes that ████████████████████████████████████

██████████████████████████████████████

█████████████ Under Delaware law, express conditions such as these must be strictly and literally performed. *See In re NextMedia Group, Inc*., 440 B.R. at 80. ***Substantial compliance is not sufficient***. *Id*.

The facts of *NextMedia* are closely analogous to the issues here and the *NextMedia* court's discussion is particularly instructive. In that case, CBS Outdoor Inc. purchased certain business assets from NextMedia for the fixed sum of $72 million. 440 B.R. at 78. The purchase agreement acknowledged that cash flow accounting might later show that CBS overpaid for certain assets and therefore provided that "[o]n or prior to the date that is eighteen (18) months from the Closing Date," CBS could provide a "True-up Schedule" regarding the affected assets and that NextMedia would pay CBS "the Cash Flow Differential for items that are appropriately scheduled on the True-up Schedule." *Id*. at 78.

CBS provided a True-up Schedule approximately seven months *after* the 18-month post-closing deadline, arguing that it was entitled to payment under the contract. *Id*. at 79. The court disagreed, ruling that the relief was limited by the contract and that "only items scheduled in the manner required by [the contract] would be paid." *Id*. at 83. The court further ruled that the 18-month deadline for providing the True-up Schedule "was a condition to NextMedia's obligation to pay." *Id*. The court commented that CBS, as Honeywell is here, "is a sophisticated contract party that was aware of its contractual obligations" and that "[u]nfortunately for CBS, the Court cannot rewrite the Agreement to provide CBS with contractual rights for which CBS itself did not bargain." *Id*. at 84.

The court in *NextMedia* relied on *Eastman Kodak Co. v. Bostic*, No. 91-Civ-1797, 1991 WL 243378 (S.D.N.Y. Nov. 14, 1991), noting the similarity of facts—which, as here, involved

relief conditioned on conducting an audit. *See id.* at 81. In *Eastman,* Kodak bought minority shares of two companies owned by Bostic. 1991 WL 243378, at *1. Kodak gave Bostic a put option that, if exercised, would require Kodak to purchase all remaining shares in the companies based on values reflected in the companies' unaudited balance sheets. *Id.* The agreement provided that "[a]s soon as possible" after closing the put options, the parties could procure audits of the balance sheets through the companies' independent auditors. *Id.* If the audited balance sheets showed that the company valuations were in error, the parties would make retroactive adjustments in the purchase price. *Id. Three years after closing* the put options, Kodak attempted to enforce the audit provision of the contract. *Id.* The court ruled against Kodak stating, "The obvious intention of [the contract] was to make certification of the final balance sheet a condition precedent to any obligation to pay" and that ***"[c]onditions precedent are strictly enforced***, in order to implement the parties' express agreement." *Id*. at *2-*3 (emphasis added).

Similarly, Section 5.1 of the Agreement imposed strict conditions on ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ That was the bargained for procedure ███████████████████████████ ████████████████████████████, and that procedure must be strictly enforced.

Finally, Honeywell wrongly argues, without citation to any authority, that "[b]ecause the right to perform an audit was *optional*, an audit is not a condition precedent to suit for breach of OPTO's representation and warranty." Dkt. 118, at 14 (emphasis in original). The court in *NextMedia* cited *Vague v. Bank One Corp*., No. 18741, 2006 WL 290299 (Del. Ch. Feb. 1, 2006) as a further "example[] of courts strictly construing express conditions and resulting forfeitures." *NextMedia Group, Inc*., 440 B.R. at 81. The *Vague* case literally involved an "options" agreement.

2006 WL 29099, at *1. Prior to retirement, Mr. Vague's employer, Bank One, gave Mr. Vague two option contracts to acquire Bank One stock. *Id.* Under their express terms, however, the options would expire six months after Mr. Vague's retirement. *Id.* at *1. Mr. Vague attempted to exercise the options several years after retiring, and Bank One refused to honor the options. Even though exercising the options was entirely *optional*, the court refused to "allow[] Vague to escape the clear terms of his option agreements and the consequences of missing the deadline for exercise of the options." *Id.*

Of course, Honeywell had the option to not conduct an audit of OPTO under Section 5.1. However, ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████

## V. CONCLUSION

For the foregoing reasons, OPTO respectfully requests that the Court deny Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation.

Dated: March 8, 2023

Respectfully submitted,

**MCGUIREWOODS LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202

25

Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
MCGUIREWOODS LLP
Texas Tower, Ste 2400
845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

York M. Faulkner
YORKMOODYFAULKNER
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

**CERTIFICATE OF SERVICE**

     I hereby certify that on March 8, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court for the Western District of North Carolina by using the CM/ECF system. Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Robert A. Muckenfuss*
Robert A. Muckenfuss