# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Plaintiffs*,

v.

OPTO ELECTRONICS CO., LTD.,

      *Defendant and*
      *Counterclaim Plaintiff*,

v.

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Counterclaim Defendants*.

CIVIL ACTION NO. 3:21-cv-00506

**PUBLIC VERSION (REDACTED)**

**HONEYWELL'S RESPONSE IN OPPOSITION TO OPTO'S**
**MOTION FOR SUMMARY JUDGMENT**
**(Dkt. 133)**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.    THE UNDERLYING PATENT INFRINGEMENT LITIGATION ........................................ 2

II.   THE AGREEMENT AND OPTO'S BREACH OF CONTRACT .......................................... 3

LEGAL STANDARD ...................................................................................................... 5

I.    SUMMARY JUDGMENT ........................................................................................... 5

II.   THE COURT'S ROLE IN INTERPRETATION .................................................................. 5

III.  CONTRACTUAL INTERPRETATION – THE OBJECTIVE THEORY OF
      CONTRACTS ........................................................................................................... 6

ARGUMENT ................................................................................................................... 7

I.    OPTO'S BREACH OF THE PARTIES' AGREEMENT ...................................................... 7

      A. The Agreement Unambiguously Defines "2D Barcode Products" ..................... 8

         1.    The First Sentence of Section 1.4 .............................................................. 8

         2.    The Second Sentence of Section 1.4 ........................................................ 10

         3.    The Third Sentence of Section 1.4 ........................................................... 12

         4.    Section 1.4 Speaks for Itself ................................................................... 15

      B. OPTO Attempts to Re-Write the Parties' Agreement ..................................... 16

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcoa World Alumina LLC v. Glencore Ltd.*,
No. N15C-08-032, 2016 WL 521193 (Del. Super. Ct. Feb. 8, 2016)
(unpublished) ...................................................................................................................5, 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................................5

*Arwood v. AW Site Servs., LLC*,
No. 2019-0904, 2022 WL 973441 (Del. Ch. Mar. 31, 2022) (unpublished) ..........................14

*Babcock v. City of Newton*,
977 N.E.2d 105 (Mass. App. Ct. 2012) ...................................................................................14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................................................................5

*Continental Warranty, Inc. v. Warner*,
108 F. Supp. 3d 256 (D. Del. 2015) .........................................................................................8

*Greenstar IH Rep, LLC v. Tutor Perini Corp.*,
No. 12885, 2019 WL 6525206 (Del. Ch. Dec. 4, 2019) (unpublished) ...................................6

*Jones v. Schneiderman*,
974 F. Supp. 2d 322 (S.D.N.Y. 2013) .....................................................................................14

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
903 A.2d 728 (Del. 2006) .........................................................................................................6

*Nw. Nat'l Ins. Co. v. Esmark, Inc.*,
672 A.2d 41 (Del. 1996) ...........................................................................................................5

*O'Brien v. Progressive N. Ins. Co.*,
785 A.2d 281 (Del. 2001) .........................................................................................................6

*Estate of Osborn v. Kemp*,
991 A.2d 1153 (Del. 2010) ..................................................................................................6, 11

*Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*,
616 A.2d 1192 (Del. 1992) ................................................................................................5, 6, 7

*TQ Delta, LLC v. Adtran, Inc.*,
  Civil Action No. 1:14-cv-00954-RGA, 2018 U.S. Dist. LEXIS 84667 (D. Del.
  May 18, 2018)........................................................................................................................15

*USH Ventures v. Glob. Telesystems Grp., Inc.*,
  796 A.2d 7 (Del. Super. Ct. 2000) .........................................................................................6

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
  No. 12874, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018) (unpublished) .................................6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019).......................................................................................14

Fed. R. Civ. P. 56(a) .....................................................................................................................5

# INTRODUCTION

The parties' License and Settlement Agreement (the "Agreement") establishes two categories of products and *two categories of products only*: (1) those that are operable to decode at least one two-dimensional barcode symbology and (2) those that are operable only to decode one-dimensional barcode symbologies. The former, "2D Barcode Products" are royalty-bearing products and formed the basis of OPTO's ███████████████████████████████████████████████████████████████████████. The latter, "1D Barcode Products," ███████████████████████████████████████████████████████ ███.

There is *no dispute* that OPTO did not account for sales of certain products in its representation and warranty calculation and royalty payments. Honeywell contends those unaccounted products are "2D Barcode Products" (because they are operable to decode at least one two-dimensional barcode symbology) and OPTO contends they are not. OPTO runs through every excuse as to why those products are not 2D Barcode Products, but none of its excuses holds water, legally or factually. For example, OPTO contends that 2D Barcode Products must have a "2D image sensor" or that they must output "2D images of sufficient quality." But under the plain language of the Agreement, the hardware and the algorithm used for decoding cannot take a product outside the explicit definition, and the Court should decline any invitation to re-write the Agreement otherwise.

OPTO cannot continue to run from the Agreement's plain language, and at some point OPTO must face reality. The Agreement requires *nothing more* than the operability to decode a two-dimensional barcode symbology for a product to be royalty-bearing. Because OPTO did not account for all products that are operable to decode two-dimensional barcode symbologies in its representation and warranty and royalty payments, it has breached the parties' Agreement.

Thus, Honeywell respectfully requests that the Court deny OPTO's motion for summary judgment of no-breach.

## BACKGROUND

### I.     The Underlying Patent Infringement Litigation

On May 31, 2019, Honeywell filed a complaint for patent infringement against OPTO in the Delaware District Court and a complaint under Section 337 of the Tariff Act of 1930 at the U.S. International Trade Commission ("ITC"), asking the Commission to prohibit entry of certain OPTO products into the United States on the basis that the products infringed certain Honeywell patents. Each of these actions involved patent infringement claims directed to OPTO's entire suite of barcode scanner products.

On July 1, 2019, during the pendency of the Delaware and ITC actions, Honeywell sent a letter to OPTO explaining how OPTO's barcode scanner products infringe 69 additional U.S. patents as well as numerous European and Japanese patents. Dkt. 118-3. Honeywell requested that OPTO cease its infringement immediately and informed OPTO that, unless the infringement ceased, Honeywell would be left with no option but to bring additional actions for patent infringement. *Id*. at p. 10.

On January 22, 2020, counsel for Honeywell and counsel for OPTO, along with corporate representatives from both parties, met for an all-day mediation to attempt to resolve all of Honeywell's claims against OPTO in both the Delaware action and the investigation instituted by the ITC. At the end of the day, the parties set forth terms for a license and settlement agreement (exempting certain foreign rights). During the weeks following the mediation, the parties continued to negotiate the terms and resolve disputes regarding the bounds of the settlement. Ultimately, both parties executed the Agreement, which resolved all past liability and all of the allegations in the Delaware and ITC actions. In all, the Agreement is a product of weeks of

negotiation between two sophisticated parties, a world-renowned patent mediator, and law firms well versed in patent litigation (OPTO was represented by Quinn Emanual Urquhart & Sullivan LLP).

## II.   The Agreement and OPTO's Breach of Contract

The parties agreed to ███████████ in consideration for the past release and dismissal of the Delaware and ITC actions. Dkt. 118-2 at Section 4.2. OPTO was to make, and did in fact make, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████.

OPTO made a ████████████████████████████████████████████ ██████████████████████████████████. Specifically, in Section 5.1 of the Agreement, OPTO represented that ████████████████████████████████████ ██████████████████████████████████████. Dkt. 118-2 at  Section  5.1.  Additionally,  Section  5.1 ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████. *Id.*

The Agreement also set forth the terms of an █████████████████████. Specifically, OPTO received a ████████████████████████████████████████████████. Dkt. 118-2 at Section 4.3. In exchange for the ██████████████████████████████████ ████████████████████████████████████████████████████████.

*Id.*

It took OPTO nearly *nine months after* the Effective Date of the Agreement to provide the required ████████████. But when Honeywell's counsel received the ████████████, it appeared that

certain products were missing altogether from that report. As a result, Honeywell invoked the audit provision and hired an independent Japanese-based accounting firm at its own expense. Unsurprisingly, the audit confirmed Honeywell's suspicion—OPTO had significantly under-represented its sales of 2D Barcode Products in the Agreement. This underrepresentation was the result of OPTO failing to account for sales of products that OPTO's own literature confirm are capable of decoding several two-dimensional symbologies and thus squarely qualify as "2D Barcode Products." As just one example, OPTO failed to account for sales of its MDL-2001 product even though its own published documentation for this product confirms that it decodes multiple 2D barcode symbologies:



Dkt. 117-4 (OPTO's MDL-2001 Product Datasheet, then-current at time of the Agreement, annotated).

Honeywell informed OPTO of the outcome of the audit and its underpayment on May 21, 2021. Despite Honeywell's efforts to resolve the discrepancy without litigation, OPTO refused to comply with the terms of the Agreement. Accordingly, on September 24, 2021, Honeywell was forced to file this breach of contract suit against OPTO for OPTO's breach of its representation regarding its sales of and its underpayment of royalties for OPTO's 2D Barcode Products.

OPTO's defense to this claim seems to be entirely based on a strained reading of the Agreement that is inconsistent with the ordinary understanding of the plain language of the Agreement.

## LEGAL STANDARD

### I.     Summary Judgment

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, and admissions on file, altogether with the affidavits, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249.

### II.    The Court's Role in Interpretation

Under Delaware law, contract interpretation is a question of law. *See, e.g.*, *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). When interpreting a contract, the court must first determine whether there is any ambiguity in the contract. *See, e.g.*, *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996). Thus, it is the court's role, as a matter of law, to determine whether a contract is ambiguous or unambiguous, and if unambiguous to provide an interpretation. *Alcoa World Alumina LLC v. Glencore Ltd.*, No. N15C-08-032, 2016 WL 521193, at *6 (Del. Super. Ct. Feb. 8, 2016) (unpublished) ("Under Delaware law, the Court generally interprets a contract as a matter of law."). "The court may interpret an unambiguous contract as a matter of law by giving clear and unambiguous terms their plain and ordinary meaning." *Id.* Delaware courts will interpret a contract "as a whole and [] will give each provision

and term effect, so as not to render any part of the contract mere surplusage" and "will not read a contract to render a provision or term meaningless or illusory." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196. Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id*. In determining whether ambiguity exists, "Delaware courts are obligated to confine themselves to the language of the document and not to look to extrinsic evidence to find ambiguity." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001).

## III.   Contractual Interpretation – The Objective Theory of Contracts

Delaware courts adhere to the "objective" theory of contracts, meaning that a contract's construction should be that which would be "understood by an objective, and reasonable third party." *Estate of Osborn*, 991 A.2d at 1159. Thus, "the true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (internal quotation marks and citation omitted).

In Delaware, a "contract's express terms provide the starting point in approaching a contract dispute." *Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874, 2018 WL 6177174, at *10 (Del. Ch. Nov. 26, 2018) (unpublished) (internal quotation marks and citation omitted). These express terms "are to be read, understood and interpreted according to the plain and ordinary meaning and import of the language employed in them." *USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 23–24 (Del. Super. Ct. 2000) (internal citations omitted). Indeed, in interpreting a contract "the court's first and often last stop is the contract itself." *Greenstar IH*

*Rep, LLC v. Tutor Perini Corp.*, No. 12885, 2019 WL 6525206, at *9 (Del. Ch. Dec. 4, 2019) (unpublished). "Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it." *Rhone-Poulenc*, 616 A.2d at 1195.

## ARGUMENT

### I.      OPTO's Breach of the Parties' Agreement

To determine if OPTO breached the parties' Agreement, the question is not "whether the definition of 2D Barcode Products encompasses OPTO's laser scanning products" as OPTO suggests, but rather, whether the definition encompasses "any device or article of manufacture that is operable to decode one or more two-dimensional barcode symbologies into human-readable text" (as *quoted* from Section 1.4 of the Agreement). Based on the plain language of the Agreement, this is a straightforward inquiry. OPTO must account for, and pay the prescribed royalties on, *any device* that is able to decode a two-dimensional barcode symbology. Nothing more and nothing less.

OPTO's contractual representation and warranty—which was used as the basis to arrive at the amount of the lump-sum payments—was therefore incorrect, as it omitted certain of its products that are operable to decode two-dimensional barcode symbologies. Because OPTO has not properly accounted for and made payment on all products that are operable to decode two-dimensional barcode symbologies, it has breached the Agreement.

Accordingly, the Court should deny OPTO's motion for summary judgment.

## A. The Agreement Unambiguously Defines "2D Barcode Products"

The Agreement provides an explicit, unambiguous definition of "2D Barcode Products.[1]" Honeywell suggests that the words are clear and provide an explicit definition. OPTO, on the other hand, wants the Court to re-write the definition of "2D Barcode Products" to absolve it of payment obligations to which it agreed.

Section 1.4 of the Agreement explicitly defines "2D Barcode Products" as follows:

> **1.4 <u>2D Barcode Products.</u>** The term "2D Barcode Products" shall mean any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text. Two-dimensional ("2D") barcode symbologies include, but are not limited to, any two-dimensional barcode symbology defined by one or more standards setting organizations such as the International Organization for Standardization (ISO), International Electrotechnical Commission (IEC), and the Association for Automatic Identification and Mobility (AIM). For the avoidance of doubt, the term "2D Barcode Products" shall include Engines and other products that include a 2D image sensor and are capable of outputting a 2D image that may be used to decode a 2D barcode symbology into human-readable text.

Dkt. 118-2 at Section 1.4. When parties explicitly agree to a definition in a contract, that definition should govern. *See Continental Warranty, Inc. v. Warner*, 108 F. Supp. 3d 256, 259 (D. Del. 2015) ("Contract terms are held to be clear and unambiguous 'when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'") (internal citation omitted).

### 1. The First Sentence of Section 1.4

The first sentence begins the definition of "2D Barcode Products." Specifically, it states: "The term '2D Barcode Products' shall mean any device or article of manufacture that is operable

---

[1]     The parties also agreed that "This Agreement shall be construed as if equally drafted by the Parties hereto." Dkt. 118-2 at Section 9.4.

to decode at least one or more two-dimensional barcode symbologies into human-readable text." Dkt. 118-2 at Section 1.4.

The ordinary understanding of the first sentence is that any device that is operable to decode a two-dimensional barcode symbology is a "2D Barcode Product." This is not ambiguous. OPTO argues, however, that the first sentence is ambiguous because it "leaves unanswered questions regarding the quantum of product structure and extent of the '*operab[ility] to decod*e' function necessary to satisfy the definition." Dkt. 133 at 15 (emphasis added). OPTO's reading of the first sentence focuses on a contorted understanding of the word "operable" that is inconsistent with the plain and ordinary meaning of that term. And the plain and ordinary understanding *must govern* under Delaware law. *See Alcoa World*, 2016 WL 521193, at *6 ("The court may interpret an unambiguous contract as a matter of law by giving clear and unambiguous terms their plain and ordinary meaning.").

The ordinary understanding of the word "operable" does not require a particular "quantum of product structure" it simply requires the "ability to" perform an act. *See, e.g.*, Operable, Meriam-Webster (Online, 2023) (defining "operable" as "fit, possible, or desirable to use: practicable"); Operable, Cambridge Dictionary (Online, 2023) (defining "operable" as "able to be used"). It does not matter how or what a device uses to decode a two-dimensional barcode symbology, it must just simply be *operable or able* to decode a two-dimensional barcode symbology. The ordinary understanding of "operable" is agnostic to product structure. Unsurprisingly, OPTO fails to point to even the slightest scintilla of evidence to support its strained reading of the term "operable" or the phrase "operable to decode."

In sum, the first sentence unambiguously states that a "2D Barcode Product" includes any device or article of manufacture that is able to decode a two-dimensional barcode symbology.

## 2. The Second Sentence of Section 1.4

The second sentence guides how to determine whether a barcode symbology is a "two-dimensional ('2D') barcode symbology[y]."

OPTO is correct that the second sentence does not use the words "shall mean" thereby definitively defining a "two-dimensional ('2D') barcode symbology" and that it does not specifically incorporate a particular industry standard by reference. But it does explain how to determine if a particular barcode symbology is a "two-dimensional barcode symbology." By its plain language, the second sentence provides an explicit example of what is included within the ambit of a two-dimensional symbology: "Two-dimensional barcode symbologies include, but are not limited to, any two-dimensional barcode symbology defined by one or more standards setting organizations such as the International Organization for Standardization (ISO), International Electrotechnical Commission (IEC), and the Association for Automatic Identification and Mobility (AIM)." Dkt. 118-2 at Section 1.4.

This language is inclusive; it does not limit the Agreement to *only* industry standards or any particular industry standard. The language is clear that if a particular symbology is defined by one of the referenced organizations as two-dimensional, then that symbology is also a two-dimensional symbology for purposes of the Agreement. Furthermore, in addition to industry standards, the Agreement allows for a party to look to other sources such as: (1) past marketing materials (Dkt. 117-4), (2) current marketing materials (Ex. A), (3) the understanding of its employees (Dkt. 144-4), or (4) patents (Ex. B) to understand what is commonly understood as a "two-dimensional barcode symbology.[2]"

---

[2] Each of these materials confirms that OPTO historically and currently classifies PDF417 as two-dimensional (contrary to its position with respect to this litigation).

OPTO goes to great lengths to identify case law it contends supports its position that industry standards are meaningless under the Agreement and cannot be properly relied upon. As an initial point, much of the case law is inapplicable because Honeywell does not contend that the Agreement sought to incorporate industry standards by reference. Furthermore, nearly all of the case law OPTO cites is inapplicable because, among several reasons, the cases are not applying Delaware contract law.

Moreover, OPTO's position would render the second sentence surplusage and nonsensical. OPTO attempts to rely on a standard integration clause (Section 9.2 of the Agreement) in arguing that "[t]he parties [] *intended* that industry standards play *no* role in defining either the term 'two-dimensional barcode symbologies' or the term '2D Barcode Products.'" Dkt. 133 at 13 (emphasis in original). Why would the parties have included an explanation of how to determine whether a symbology is a two-dimensional barcode symbology and then point to the industry standards if the parties intended that those same industry standards were to play no role? This can't be right. OPTO was represented by an experienced law firm known for its patent litigation and licensing expertise. It is illogical to contend that two highly sophisticated patent law firms would include a reference to industry standards if they intended for those standards to play no role in the Agreement. Furthermore, to say that the parties intended industry standards play no role would render the second sentence surplusage, and Delaware law does not allow for a provision or a term to be read to render it mere surplusage or illusory. *See Estate of Osborn*, 991 A.2d at 1159. The more reasonable interpretation is that the parties intended for the integration clause to include the four corners of the Agreement, of which Section 1.4 points to industry standards for purposes of providing non-limiting examples of two-dimensional ('2D') barcode symbologies.

In short, the ordinary understanding of the second sentence is that industry standards are a non-limiting example of where a party may turn to determine if a barcode symbology is two-dimensional.

### 3. The Third Sentence of Section 1.4

The third and final sentence is not a *mere appendage nor an exception* to the definition of "2D Barcode Products." Nor is it the glue that holds the entire definition of "2D Barcode Products" together as OPTO suggests. Rather, it ensures that a niche area of products that may escape the ambit of the first sentence is nevertheless covered specifically by the definition of "2D Barcode Products" and, more broadly, by the terms of the Agreement.

The third sentence states: "For the avoidance of doubt, the term '2D Barcode Products' shall include Engines and other products that include a 2D image sensor and are capable of outputting a 2D image that may be used to decode a 2D barcode symbology into human-readable text." Dkt. 118-2 at Section 1.4. OPTO asks the Court to treat this sentence as limiting. But OPTO's litigation inspired position is divorced from reality for several reasons.

First, as Honeywell has explained time and again[3], the third sentence was included to specifically ensure that a *specific type of product* was included within the scope of royalty bearing products—undecoded engines. For context, traditional scan engines are "decoded," which means they include an imager (*i.e.*, a camera) and a decoder (*i.e.*, a processor with specific software that is configured to decode barcodes). This is shown below with respect to OPTO's MDI-4050.

---

[3]    Mr. Jeremy Whitley, Chief Intellectual Property Counsel at Honeywell, was designated to testify on behalf of Honeywell as to the License and Settlement Agreement. During his deposition, he was questioned on the third sentence and explained that the third sentence was included to ensure that undecoded engines were included in the definition of 2D Barcode Products. Dkt. 118-4 at 48:15-50:1. *OPTO has provided no corporate testimony in this litigation contradicting Mr. Whitley's explanation*.



Dkt. 143-5 (annotated). As shown, the imager (left) and the decoder (right) are physically and electrically connected. An "undecoded engine," in contrast, only includes the imager. The undecoded engine outputs an image and *must rely on other external decoding hardware or software to decode a barcode*. The undecoded engine by itself is not able to decode *anything* but is paired with separate hardware/software that performs the final decoding step. Undecoded engines are frequently found in modern barcode scanning products such as mobile computers and PDAs, which have preexisting hardware that can handle the decoding process.

The parties included the final sentence of Section 1.4, *which explicitly refers to "Engines,"* simply to ensure that if OPTO switched any of its products from decoded engines to undecoded engines, OPTO would continue to owe Honeywell a royalty so long as the undecoded engine continued to use Honeywell's patented technology. This sentence thus prevents OPTO from attempting to avoid paying royalties simply by reconfiguring its products and selling these components separately. OPTO seems to acknowledge this by stating that "[i]f 'operable to decode' were interpreted to mean that the device itself must be operable to perform all of the decoding functions, then such a scan engine sold separately to a third-party manufacturer would escape the definition of 2D Barcode Products, and no royalty would be due on that sale." Dkt. 133

at 15. As seemingly acknowledged by OPTO, the inclusion of the third sentence, thus, ensures that OPTO cannot manipulate how it packages its products in order to avoid paying royalties.

Second, OPTO asks the Court to read the language of the third sentence as limiting. Specifically, OPTO asks the court to define the words "shall include" to mean "shall be limited to." OPTO's position is plainly inconsistent with the Agreement. Indeed, the Agreement's construction clause, Section 9.4, clearly states that "[t]he term 'including' means 'including without limitation'"; thus, this language cannot be viewed as being restrictive. Dkt. 118-2 at Section 9.4. Even more, OPTO's position is inconsistent with the plain meaning of "include." The plain meaning of "include" is to include without limitation. *See* Black's Law Dictionary (11th ed. 2019) ("to contain as a part of something. . . But some drafters use phrases such as *including without limitation and including but not limited to* — which mean the same thing.") (emphasis in original); *see also Arwood v. AW Site Servs., LLC*, No. 2019-0904, 2022 WL 973441, at *2 (Del. Ch. Mar. 31, 2022) (unpublished) ("Delaware courts similar[ to Black's Law Dictionary] view 'including' as 'a term of enlargement, and not of limitation.'"). No objective and reasonable third party could understand the third sentence to limit the first two.

OPTO relies on several cases in support of its limiting position, however, those cases are inapplicable to the present agreement as those cases have markedly different facts than the present. In *Babcock v. City of Newton*, 977 N.E.2d 105 (Table) (Mass. App. Ct. 2012), the court applied Massachusetts law to a contract that did not contain an express provision defining the term "including" to mean "including without limitation." *Compare id.* at *8–10, *with* Dkt. 118-2 at Section 9.4. And in *Jones v. Schneiderman*, the court interpreted a New York statute that likewise did not contain a definition of the term "including." 974 F. Supp. 2d 322, 346–47 (S.D.N.Y. 2013). Thus, OPTO's cases are not applicable to the parties' Agreement.

Third, OPTO relies on *TQ Delta, LLC v. Adtran, Inc.*, Civil Action No. 1:14-cv-00954-RGA, 2018 U.S. Dist. LEXIS 84667 (D. Del. May 18, 2018) for the proposition that the third sentence of Section 1.4 "clarifies" the two previous sentences. *TQ Delta*, however, does not stand for the proposition, as OPTO contends, that a clarifying provision overrules preceding language. In fact, the Court's analysis in *TQ Delta* is consistent with the interpretation advanced by Honeywell here. The clarifying provision in that case ensured that products which may otherwise not be understood to be included within the ambit of the preceding sentence were nevertheless included in the patent license. The third sentence, much like the clarifying provision in *TQ Delta*, ensures that products that might otherwise be understood to not be in the ambit of the first two sentences are nevertheless included in the definition of 2D Barcode Products.

Lastly, immediately following its analysis of *TQ Delta*, OPTO relies on another line of cases to argue that Section 1.4 consists of two statements of general language, followed by a statement of specific language that controls. This is consistent with OPTO's general approach of presenting numerous (and sometimes inconsistent arguments) that do not comport with the plain meaning of the Agreement. To be clear, Honeywell does not disagree that the three sentences of Section 1.4 should be read together to inform the definition of "2D Barcode Products." But Section 1.4 simply employs the third sentence to ensure that a specific type of product is within the definition's ambit.

In short, the third sentence simply ensures that a niche area of products that may escape the ambit of the first sentence is nevertheless included.

### 4. Section 1.4 Speaks for Itself

Taken together, there can be no dispute that Section 1.4 of the Agreement defines "2D Barcode Products" by whether or not they are able to decode two-dimensional barcode

symbologies[4]. Section 1.4 requires nothing more. It does not require particular hardware, nor does it require use of a particular method or algorithm of decoding. Thus, the Court should reject OPTO's litigation inspired reading of Section 1.4 in favor the explicit definition provided in the parties' Agreement.

### B. OPTO Attempts to Re-Write the Parties' Agreement

Instead of adhering to the language of the Agreement, OPTO asks the Court to re-write the Agreement so that it may avoid liability for its breach. Specifically, OPTO asks the Court to create three product categories: (1) "2D imaging products"; (2) "laser scanning products"; and (3) "1D image sensor products." Dkt. 133 at 1–3. OPTO can create *as many categories for its products as it may wish*, but that does not change the fact that the Agreement *contains two categories of products and two categories of products only*: 2D Barcode Products and 1D Barcode Products.

The terms 1D Barcode Products and 2D Barcode Products are both defined by their operability or inoperability to decode two-dimensional barcode symbologies. Specifically, a 1D Barcode Product is "any device or article of manufacture that is operable to decode at least one or more 1D barcode symbologies into human-readable text *but not operable to decode a 2D barcode symbology into human-readable text (and specifically excludes 2D Barcode Products)* sold by a party." Dkt. 118-2 at Section 1.5 (emphasis added). A 2D Barcode Product is "any device or manufacture that *is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text*." Dkt. 118-2 at Section 1.4 (emphasis added).

---

[4]     OPTO suggests that Honeywell's understanding of Section 1.4 results in patent misuse and that the Court should adopt OPTO's understanding to avoid patent misuse. To state Honeywell's position clearly, whether the Court adopts Honeywell's or OPTO's understanding of Section 1.4, *there is no patent misuse*.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Dkt. 118-2 at Section 5.1. ████████████

████████████████████████████████ Dkt. 118-2 at Section 4.3. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ Dkt. 118-2 at Section 2.4.

████████████████████████████████████████████ it omitted products

that can decode two-dimensional barcode symbologies. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ *See* Dkt. 144-2 at 10–19 ████████████████████

████████████████████████████████████████████████████████████████

████████████████████ OPTO contends those products are not 2D Barcode Products even though they are able to decode two-dimensional barcode symbologies. Thus, the primary dispute in this litigation boils down to one question: Which of the two categories of products in the Agreement does a device fall into when it is able to decode *one or more two-dimensional barcode symbologies*?

This should be an easy inquiry. The Agreement tells us that it must be a 2D Barcode Product. This is because any device that is operable to decode a two-dimensional barcode symbology is a "2D Barcode Product." It certainly can't be a "1D Barcode Product" because the Agreement tells us that 1D Barcode Products specifically are "not operable to decode 2D barcode symbology[ies]." Dkt. 118-2 at Section 1.5.

To OPTO this is apparently not so simple. OPTO asks the Court to go beyond this language and look at the type of scanning hardware contained within a device to solve this inquiry. That is, *even if a device is able to decode one or more two-dimensional barcode symbologies, it cannot be a 2D Barcode Product if it uses CCD-based or laser scanning hardware*. OPTO contends they are 1D Barcode Products. But under the Agreement this simply can't be because *they are able to decode two-dimensional symbologies*. Those products must be "2D Barcode Products," and should have been included in OPTO's representation and warranty calculation.

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████. Ex. C at 14. ██████████████

███████████████████████████ Honeywell tried to resolve this discrepancy out of court, but OPTO refused to pay. This is a clear and unequivocal breach of OPTO's representation and warranty and the royalty provision.

In the spotlight of this litigation, OPTO may wish the Agreement says something other than it does, but that's not what Delaware law allows. The law does not allow for OPTO or the Court to rewrite an explicit definition from an Agreement. Rewriting the parties' express definition would defeat the entire purpose of the parties' Agreement and would inappropriately allow OPTO to evade liability. OPTO cannot continue to run from the fact that it got caught misrepresenting it sales.

Accordingly, OPTO's averments should be denied. The plain language and ordinary understanding of the Agreement confirms that OPTO breached the License and Settlement Agreement.

## **CONCLUSION**

For the foregoing reasons, Honeywell respectfully requests that OPTO's motion for summary judgment be denied.

Dated: March 22, 2023

Respectfully submitted,

*/s/ S. Benjamin Pleune*
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Mark T. Calloway (NC Bar No. 10822)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Lauren N. Griffin (NC Bar No. 54766)
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim*
*Defendants Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 22, 2023, a copy of the foregoing was served on counsel of record by filing the same with the Court's ECF system.

*/s/ S. Benjamin Pleune*
S. Benjamin Pleune