# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.; AND METROLOGIC INSTRUMENTS, INC., | |
| Plaintiffs, | |
| v. | **ORDER** |
| OPTO ELECTRONICS CO., LTD., | |
| Defendant. | |

**THIS MATTER** is before the Court on Plaintiffs' (collectively "Honeywell") and Defendant OPTO Electronics Co., LTD's ("OPTO"): (1) cross motions for Summary Judgment and Partial Summary Judgment on Plaintiff's claims (Doc. Nos. 116, 132); (2) cross motions for Summary Judgment on Defendant's patent misuse counterclaim (Doc. Nos. 161, 168); (3) Motions to Strike and exclude the testimony of one of each side's expert witnesses (Doc. Nos. 137, 173); and (4) discovery objections not resolved by the Court's recent Order (Doc. No. 154). The Court has carefully considered these motions, the parties' briefs and exhibits, and oral argument on the motions from the parties' counsel on April 13, 2023. In the manner and for the reasons discussed below, the Court will in part **GRANT** and in part **DENY** the motions for summary judgment, in part **GRANT** and in part **DENY** the Motions to Strike and affirm the discovery objections (Issues Nos. 6 and 8).

1

Applying governing Delaware law to the construction and interpretation of the parties' patent licensing agreement ("Agreement"), the Court finds that the disputed Section 1.4 definition of "2D Barcode Products" (on which the obligation to pay royalties depends) and the terms of Honeywell's entitlement to additional payments for pre-Agreement sales under Section 5.1 are not ambiguous. More particularly, the Court finds that Honeywell's reading of Section 1.4 of the Agreement is correct and partial summary judgment will be entered so construing the Agreement. With respect to Section 5.1, however, the Court finds that the Agreement should be construed as argued by OPTO. The additional payments on pre-Agreement sales described in Section 5.1 must be determined by an audit that must be "conducted" within one year of the "Effective Date" of the Agreement. There can be no genuine dispute that the audit performed here occurred, in whole or in part, outside the one-year period. Therefore, OPTO will be granted summary judgment on Plaintiffs' claim under Section 5.1.

Regarding the parties' cross motions for summary judgment on OPTO's patent misuse counterclaims, the Court will deny both motions. The Court finds that no party is entitled to summary judgment in their favor because there is neither the presence of patent misuse *per se* nor the absence of patent misuse as a matter of law on the disputed record before the Court. Therefore, the Court must decide the merits of OPTO's patent misuse counterclaim at trial.

As to the Motions to Strike, the Court finds that Honeywell's proffered expert witness David O. Taylor's proposed testimony is nothing more than legal argument and opinion as to the proper interpretation of the Agreement (which is the province of the Judge, the jury and trial counsel) and thus the motion to strike his testimony will be granted. However, the Court will deny Honeywell's motion to strike OPTO's expert Greg Adams' testimony. While the specific

2

parameters and weight of his testimony will ultimately be decided at trial, the Court does not find that his testimony should be excluded, particularly where his testimony relates solely to the patent misuse counterclaim which will be decided by the Court rather than the jury.

Finally, on the two remaining discovery issues, even if the issues were not mooted because the Court finds that communications related to the Section 5.1 sales audit Honeywell relies on in seeking this discovery are no longer relevant, the Court will not permit the discovery, which appears to be nothing more than an attempt to discover OPTO's counsel's thoughts with respect to the merits of Honeywell's claims. Accordingly, OPTO's objections will be allowed and the remaining discovery requests will be denied.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*., (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

3

323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles

4

Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation and citation omitted).

## II.    FACTS AND PROCEDURAL HISTORY

Honeywell and OPTO, a Japanese company, are competitors in the market for bar code scanning equipment and technology. In 2020, the Parties purported to settle extensive patent litigation at the U.S. International Trade Commission and in the United States District Court for the District of Delaware through a patent licensing agreement. The parties agree that the Agreement is governed by and to be construed under the laws of the State of Delaware (as well as applicable federal law). In brief summary, Honeywell claims that OPTO[1] has breached the Agreement by misstating the amount of OPTO's pre-Agreement sales of certain alleged "2D" barcode scanning products and failing to pay ongoing royalties on those products. OPTO has filed counterclaims for unfair trade practices and patent misuse, alleging that Honeywell is using the Agreement to unlawfully seek royalties on features of products for which they do not have patent protection. Each side denies the other's claims.

---

[1] As reflected in the Agreement provisions quoted below, the Agreement also includes OPTICON, the name of an OPTO subsidiary, as a primary transaction party. The references to OPTO in this Order are intended to be inclusive of OPTICON and there is no contention that the proper parties are not before the Court.

5

In their respective motions for summary judgment on Honeywell's affirmative claims, (Doc. Nos. 116, 132), the parties urge the Court with equal ardor to find that the core dispute in the case – identifying the products on which royalties must be paid under the Agreement – must be answered in their favor based on the "unambiguous" language of the Agreement. Specifically, the parties ask the Court to construe the meaning of Section 1.4 of the Agreement, which defines "2D Barcode Products" as follows:

> The term '2D Barcode Products' shall mean any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text. Two-dimensional ('2D') barcode symbologies include, but are not limited to, any two-dimensional barcode symbology defined by one or more standards settings organizations such as the International Organization for Standardization (ISO), International Electrotechnical Commission (IEC), and the Association for Automatic Identification and Mobility (AIM). For the avoidance of doubt, the term '2D Barcode Product' shall include Engines and other products that include a 2D image sensor and are capable of outputting a 2D image that may be used to decode a 2D barcode symbology into human-readable text.

Doc. No. 51-2, at § 1.4.

Also, the parties have differing interpretations of Section 5.1 of the Agreement, in which OPTO provided various "Representations and Warranties," including the following representation related to the amount of OPTO's pre-agreement sales of "2D Barcode Products" and a process for Honeywell to "audit" that representation and obtain additional payments, if it chose to do so:

> OPTICON further represents and warrants that OPTICON Gross Revenue of 2D Barcode Products in (i) the United States for the past six (6) years and (ii) Europe and Japan for the past five (5) years, totals not more than one hundred and two million U.S. Dollars ($102,000,000). OPTICON will provide sales reports to HONEYWELL'S outside counsel pursuant to the governing ITC Investigation Protective Order such that the above worldwide Opticon Gross Revenue can be verified. HONEYWELL INTERNATIONAL, through an independent certified public accounting firm, shall have the right, at HONEYWELL INTERNATIONAL's expense, to audit OPTICON's records for the purpose of

6

determining the accuracy of OPTICON's worldwide sales; provided that HONEYWELL INTERNATIONAL provides OPTICON with reasonable prior notice, and such audit is conducted during OPTICON's normal business hours. Such audit may be conducted no more than one (1) time within one (1) calendar year of the Effective Date. Should an audit show OPTICON Gross Revenue of 2D Barcode Products in (i) the United States for the past six (6) years and (ii) Europe and Japan for the past five (5) years in excess of one hundred and seven million U.S. Dollars ($107,000,000), OPTICON shall (i) pay to HONEYWELL INTER.NATIONAL 8.8°/o of the difference between the audited OPTICON Gross Revenue of 2D Barcode Products and $102,000,000 and (ii) reimburse HONEYWELL INTERNATIONAL for the reasonable cost of such audit. OPTICON shall have the right to require that the independent certified public accounting firm HONEYWELL INTERNATIONAL retains to perform the audit enter into a confidentiality agreement preventing the disclosure of confidential cost and pricing data and other competition sensitive information to HONEYWELL INTERNATIONAL and Third Parties.

### III.    DISCUSSION

**A.    Motions for Summary Judgment**

**1.    Cross Motions on Plaintiff's Claims**

The governing principles of contract interpretation under Delaware law are well established and not disputed among the parties. *See Weinberg v. Waystar, Inc.*, No. 274, 2022, 2023 WL 2534004, at *3–4 (Del. Mar. 16, 2023). Recently, the Supreme Court of Delaware summarized how contracts are construed in Delaware as follows:

In construing a contract, our goal is to give effect to the intent of the parties. "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." We will read the contract as a whole and "enforce the plain meaning of clear and unambiguous language." In doing so, we endeavor "to give each provision and term effect" and not render any terms "meaningless or illusory."

Moreover, "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract." Where language is unambiguous, we "will give effect to the plain meaning of the contract's terms and provisions." "Language is ambiguous if it is susceptible to more than one reasonable interpretation." "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when

7

> entering the contract.'" "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." "The determination of ambiguity lies within the sole province of the court."

*Id*. (footnotes omitted). Courts may not consider extrinsic evidence unless the text of a contract is ambiguous. *Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714, 721 (Del. 2022).

However, confronted with an ambiguity, courts must consider the relevant extrinsic evidence. In doing so, the Court's ultimate goal does not change; it still must ascertain the parties' intentions at the time they entered into the contract. *Fortis Advisors, LLC v. Dematic Corp.*, No. N18C-12-104 AML CCLD, 2022 WL 18359410, at *19 (Del. Super. Ct. Dec. 29, 2022). Rather, a court construing an ambiguous contract must discern that intent from more than the language contained in the contract's four corners. *Id*. Again, according to the Delaware Supreme Court, "[t]he standard for interpreting ambiguous contracts is well settled: If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014). Nevertheless, "the private, subjective feelings of negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *XRI Inv. Holdings LLC v. Holifield*, 283 A.3d 581, 612 (Del. Ch.), *judgment entered*, (Del. Ch. 2022), quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007).

Applying these principles to the question of the interpretation of the Agreement's definition of "2D Barcode Products" in Section 1.4, the Court finds that the language of that section is unambiguous. *See* Doc. No. 51-2, at § 1.4. Honeywell asks the Court to hold that Section 1.4 should be read to define "2D Barcode Products" primarily as "any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text," tracking the first sentence of Section 1.4. Honeywell further argues that the second sentence of the definition – "Two-dimensional ('2D') barcode symbologies include, but are not limited to, any two-dimensional barcode symbology defined by one or more standards settings organizations such as the International Organization for Standardization …" – should be construed as providing a partial definition of what qualifies under the Agreement as a "two dimensional barcode symbology." And, finally, Honeywell contends that the third sentence, "For the avoidance of doubt, the term '2D Barcode Product' shall include Engines and other products that include a 2D image sensor and are capable of outputting a 2D image that may be used to decode a 2D barcode symbology into human-readable text," reflects a clarification that royalty-bearing "2D Barcode Products" also include a "niche" product – "Engine" hardware that does not itself decode 2D barcodes but may be used with additional software to do so.[2]

In contrast, OPTO asks the Court to read the third sentence of Section 1.4 as the primary, limiting sentence of the definition. OPTO contends that the first sentence is "ambiguous" because

---

[2] Honeywell calls these products "uncoded" Engines and contends that this sentence was added to prevent OPTO from selling such products without paying a royalty. At oral argument, OPTO acknowledged that at the time of the Agreement it did not sell "uncoded" Engine products, but does currently (although OPTO also offered an entirely different interpretation of the third sentence of Section 1.4 as discussed *infra*).

9

what is encompassed within "two dimensional barcode symbologies" is unclear[3] and therefore the limitations of the third sentence – primarily the requirement that the product contain a "2D image sensor"[4] – are necessary to make the definition workable. According to OPTO's view, the first sentence then plays only a supporting role in limiting the scope of the third sentence, which would otherwise sweep too broadly and include items such as a digital camera which can take a picture of a barcode.

The Court agrees with Honeywell. First, it is unreasonable to assume that the parties "buried the lead" and put the primary limitations of the definition in a ***third*** sentence that follows two otherwise clear sentences (which would then become effectively unnecessary). This is particularly true because OPTO admitted as noted above that at the time of the Agreement it did not sell any product that came within the full scope of the third sentence. Also, the fact that Section 1.4 did not define what is considered to be a two-dimensional barcode symbology (beyond the second sentence) does not require that the third sentence be read as a strict, controlling limitation on the first sentence. Rather, to the extent that the parties dispute whether a particular barcode is or is not a two-dimensional symbology then it will be up to a jury to decide that question. Finally, the Agreement defines "including" to mean "including without limitation." *See* Doc. No. 51-2, at § 9.4. While the wording "shall include" is slightly different so that the definition of "including"

---

[3] Presumably, this ambiguity is only beyond what is included within the second sentence, although OPTO also contends that sentence is ambiguous because the definitions of the various organizations listed are only referenced generally.

[4] Perhaps not coincidentally, none of the OPTO products in dispute have a 2D image sensor so they would all fall outside of the scope of the definition of royalty bearing products if Section 1.4 was read to include that requirement.

is not dispositive, the parties' clearly expressed intent to broaden the meaning of "including" lends further support to Honeywell's reading of the third sentence of Section 1.4.

In sum, the Court finds that Honeywell's proposed construction of Section 1.4 is the only reasonable way to objectively[5] read the plain language of that section and summary judgment will be granted adopting that construction.

With respect to the second disputed provision of the Agreement, the Court finds that Section 5.1 of the Agreement is also unambiguous (as relevant to this dispute). However, that plain language cuts in favor of OPTO, requiring entry of summary judgment in its favor on Honeywell's claim for breach of contract under Section 5.1. In the Complaint, Honeywell asserts that OPTO breached its representations as to the amount of its pre-agreement sales of "2D Barcode Products," thereby obligating OPTO to pay the "monetary damages specified in the Agreement." Doc. No. 1 at ¶ ¶ 24, 34. Specifically, Honeywell alleged that

- the obligation to pay a percentage of the amount of revenue exceeding the amount represented depended on the findings of a sales audit, *id*. at ¶ 21;

- Honeywell invoked its audit rights under the Agreement, *id*. at ¶ 22;

- the audit showed that OPTO's representation as to the amount of its sales was understated, *id*. at ¶ 23;

---

[5] OPTO asks the Court to construe Section 1.4 to exclude the disputed products from the definition of "2D Barcode Products" based on extrinsic evidence of what patents were to be tried in the ITC action and "claim charts" prepared in that litigation in which Honeywell lists the disputed "laser scanning" products as 1D products. While that evidence may well be relevant to the jury question of what barcodes are two-dimensional symbologies under Section 1.4, it may not be used to avoid the clear language of the Agreement.

11

- "*therefore* [OPTO] breached its representations and warranties and materially breached the Agreement…," *Id*. at ¶ 24. (emphasis added); and

- "… Honeywell is entitled to *certain monetary damages specified in the Agreement*." *Id*. at ¶ 24. (emphasis added).

OPTO argues that Honeywell cannot recover the additional payments "specified in Section 5.1" because Honeywell did not conduct the audit on which the payments must be based within the time required by the Agreement. The Court agrees. As stated above, if Honeywell does not want to accept OPTO's represented amount of sales, Section 5.1 gives Honeywell the right to audit OPTO's records to determine the accuracy of OPTO's representations, but specifically limits how many audits may be conducted and the time during which the audit may take place: "Such audit may be conducted no more than one (1) time within one (1) calendar year of the Effective Date." Doc. No. 118-2 at §5.1. And, it is similarly clear that the agreement to make the additional payment sought by Honeywell depends on an audit being conducted, with the words "[s]hould an audit show" … [a certain amount of sales]," directly preceding the terms of that payment obligation. *Id*.; *see also* Doc. No. 1 at ¶ 21 ("The Agreement provides that if the audit shows actual revenues exceeded the represented amount … then Opticon must pay Honeywell …")

The parties do not dispute that the audit on which Honeywell bases its claim was "conducted," (i.e. "occurred") at least in part, outside of one year of the Effective Date. Nevertheless, Honeywell suggests that the audit should be considered timely (that is, the audit was "conducted" within one year of the Effective Date) because Honeywell "noticed" the audit in December 2020, approximately one month before the end of the period, and selected an auditor by January 2021, before the year ran out. Even assuming, without deciding, that such events reflect

12

"conducting" the audit, it is not disputed that the audit was not started in time to reasonably be completed within the one-year period and was still being actively "conducted" months after the one-year anniversary of the Effective Date.

Moreover, in the Agreement, it is clear that "conducted" means, with respect to time limitations, "to pursue within the allotted time." "Conducted" is used twice in Section 5.1, in consecutive sentences.[6] Doc. No. 118-2 at §5.1. In the first, the parties agreed that the audit must be "conducted during OPTICON'S normal business hours." *Id.* Plainly, this means audit work must take place *during* normal business hours, not simply that Honeywell was only obligated to begin work within those hours but could conclude at any time later. Similarly, when the parties agreed that "[s]uch audit may be conducted no more than one (1) time within (1) calendar year of the Effective Date" they meant that the audit work was required to take place *during* the first calendar year following the Effective Date.

Also, if the Court accepts Honeywell's position that the Agreement is satisfied because only one auditor conducted only one audit between the Effective Date of January 22, 2020, and one year later, on January 22, 2021 (even if the same audit was also "conducted" later), it would lead to the absurd result that the Agreement limits only the number of audits conducted during the first year and sets no time limit at all on the completion of an audit "initiated" within that year. In other words, under Honeywell's proposed interpretation, multiple audits would be permissible outside the one year period and all audits, whenever started, could go on for years without any limitation. This is simply not a reasonable reading of Section 5.1. *See Weinberg,* 2023 WL

---

[6] It is normally presumed that a given word or phrase is used to mean the same thing throughout an agreement or statute. *See Brown v. Gardner,* 513 U.S. 115, 119, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

13

2534004 at *3–4. ("An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"). Rather, the parties plainly intended to allow only one audit and set, in effect, a period of limitations[7] during which the audit could be conducted.

Finally, Honeywell argues that the Court should permit its Section 5.1 claim to proceed because the audit was "optional," and Honeywell is allegedly entitled to pursue a claim for OPTO's allegedly inaccurate representations for "damages" independent of any audit. Indeed, for the first time at oral argument, Honeywell informed the Court that it did not intend to seek to recover damages for its Section 5.1 claim based on the specific audit remedy in Section 5.1 (notwithstanding its repeated and clear statements to the contrary in its Complaint) but instead planned to seek an amount of damages based on an 8.8% payment on pre-Agreement sales in excess of $102 million, which it calculates based on dividing $9 million (the amount of the two first year payments required by Section 4.2 of the Agreement) by the amount of represented sales, $102 million. Counsel then acknowledged that this 8.8% payment was the exact same amount as the 8.8% audit remedy in Section 5.1.

Of course, this is hardly a coincidence. While the Agreement does not specifically connect the $9 million payments to past sales, the audit remedy percentage is no doubt derived from this same calculation. (In contrast, the post-Agreement royalty percentage is 7%). Such an obvious end run around the audit requirement and limitations will not be permitted. If Honeywell wants to

---

[7] The Court notes that the one-year period is consistent with the due date of the "second payment" under Section 4.2 (which – although not directly connected in the Agreement – appears to reflect the payments that the parties intended to compensate Honeywell for OPTO's pre-Agreement sales).

14

enforce the parties' agreement to pay 8.8% of underreported sales (either as specified in Section 5.1 or by simply "doing the math" to replicate the calculation from which the percentage in Section 5.1 was derived) then it must comply with the parties' agreement on how additional payments will be made (i.e. after a timely audit), which was not done.

Finally, even if Honeywell now sought to pursue a contractual claim for "breach of representation and warranty" against OPTO completely untethered to the Agreement's audit remedy (or a facsimile of it as proposed during oral argument),[8] it would be inappropriate for the Court to allow it. First, properly construed, the Agreement precludes a claim of breach related to the reporting of sales in Section 5.1 outside of the agreed detailed process for pursuing additional payments. In Section 5.1, the parties agreed that before OPTO had an obligation to make any additional payments on unreported sales, the audit must show sales in excess of $107 million, $5 million more than the $102 million in sales represented. In other words, if OPTO's sales representation was within $5 million of the actual amount found by the audit then OPTO owed no additional payments.[9]

Thus, the parties agreed to a specific formula for determining additional payments that would differ materially from a standard damages remedy in which a party may recover all its damages, not only when a proven false representation is off by more than $5 million. In other words, if the Court were to permit Honeywell to pursue a "breach of representation and warranty

_____

[8] For example, Honeywell speculates that it could have come to believe that OPTO's representation as to the amount of its sales was inaccurate without an audit and immediately filed a claim for breach.

[9] If the amount found by the audit exceeded $107 million then the additional payments were required on the difference between the actual amount and $102 million, the original amount.

claim" totally removed from the audit remedy (or any related calculation) then Honeywell would be able to assert a claim for damages[10] that effectively negates the $5 million "buffer" that OPTO bargained for and received in the Agreement. Under Delaware law, the Court is not permitted to construe the Agreement as permitting claims that write out provisions of the Agreement. *See Weinberg v. Waystar, Inc.*, No. 274, 2022, 2023 WL 2534004, at *3–4 (Del. Mar. 16, 2023) ("In construing a contract, … [we] endeavor 'to give each provision and term effect' and not render any terms 'meaningless or illusory.'"). Therefore, properly construed, while the audit was "optional" in the sense that it was not required unless Honeywell chose to request it, the Agreement required that Honeywell conduct a timely audit to recover additional payments based on any misrepresentation of prior sales by OPTO.

Also, even if Honeywell is correct that the Agreement does not limit its ability to make a claim of breach unrelated to the audit remedy, Honeywell chose to pursue the audit remedy and asserted only a claim based on that remedy. As discussed in detail above, Honeywell acted in accordance with the Agreement in requesting an audit (albeit belatedly) then tied its claim to the audit that was conducted and sought to recover "certain monetary damages specified in the Agreement." *See* Doc. No. 1 at ¶¶ 21-24. Again, to recover those "specified" damages, a timely audit was required, but simply did not occur here. Therefore, applying the plain language of Section 5.1, Honeywell's asserted claim for an additional payment as specified under Section 5.1 cannot proceed.

---

[10] For purposes of this analysis, it does not matter that Honeywell claims tens of millions of dollars in underreported sales. Rather, the issue is whether the Court can interpret the Agreement to allow an independent claim that effectively (and impermissibly under Delaware law) reads out of the Agreement a bargained for limitation on OPTO's liability, even if that limitation might not apply in a particular case.

16

Moreover, it is too late in the litigation for Honeywell to amend the Complaint to assert a different claim, thereby requiring discovery to be reopened, etc. *See Faulconer v. Centra Health, Inc.,* 808 F. App'x 148 (4th Cir. 2020); *Cloaninger v. McDevitt,* 555 F.3d 324, 336 (4th Cir. 2009); *Wahi v. Charleston Area Med. Ctr., Inc.,* 562 F.3d 599, 617 (4th Cir. 2009); *Duke Energy Fla., Inc. v. Westinghouse Elec. Co. LLC*, No. 3:14-cv-00141-MOC-DSC, 2016 U.S. Dist. LEXIS 134453, at *12 (W.D.N.C. Sep. 29, 2016). The parties have focused their (considerable) efforts on the claims asserted and it would be wrong to allow a material change now, after summary judgment.

Therefore, applying the plain language of the Agreement, the Court will grant summary judgment in favor of OPTO on Honeywell's claim under Section 5.1.

### 2. Cross Motions on Defendant's Patent Misuse Counterclaim

The parties have each moved for summary judgment on OPTO's counterclaim alleging that the Agreement reflects "patent misuse." Doc. Nos. 161, 168. Specifically, OPTO contends that Honeywell's demand that OPTO pay patent royalties on OPTO's disputed laser scanning products is *per se* patent misuse for two reasons.[11] First, it argues that the Agreement requires OPTO to pay ongoing royalties on Honeywell's '783 Patent, which has now expired. Second, it claims that Honeywell is unlawfully attempting to extract royalties for functionality (here, the ability to decode stacked barcode symbologies) that is not covered by an active Honeywell patent. In turn, Honeywell seeks summary judgment on the patent misuse counterclaim on the grounds that it is

---

[11] In its motion, OPTO seeks an order dismissing Honeywell's Complaint in this case and declaring the royalty collection provisions of the Agreement unenforceable. *See* Doc. No. 169 at 4. However, in oral argument, OPTO clarified that it was not seeking to avoid the payment of royalties on its "2D Barcode Products" that are not in dispute, only the approximately 50 "laser scanning" products that encompass the parties' disagreement.

entitled to royalties on OPTO's products under the licensed "package" of patents, which includes numerous unexpired patents, and "scores" of its unexpired patents cover OPTO's royalty bearing products. For the reasons discussed below, the Court finds that neither party is entitled to summary judgment on their motion.

"The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to ... Inventors the exclusive Right ...' to their 'new and useful' inventions." *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 492 (1944) (quoting United States Constitution, Art. I, § 8, Cl. 8, 35 U.S.C.A. § 31). "But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant." *Morton Salt Co.,* 314 U.S. 488, 492 (1942).

Accordingly, to ensure that the patentee does not prosper from an impermissible broadening of the "physical or temporal scope" of the patent grant, the courts long have recognized the doctrine of patent misuse as an affirmative defense to a suit for patent infringement. *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001 (Fed. Cir. 1986) (quoting *Blonder–Tongue Labs. Inc. v. University of Ill. Found.,* 402 U.S. 313, 343 (1971)); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1321 (Fed. Cir. 2010). The doctrine is an extension of the equitable doctrine of unclean hands, *Qualcomm Inc. v. Broadcom Corp*., 548 F.3d 1004, 1025 (Fed. Cir. 2008), and, as an equitable doctrine, the ultimate question of patent misuse must be decided by the

Court. *Va. Panel Corp. v. MAC Panel Oc.,* 133 F.3d 860, 868 (Fed. Cir. 1997) (holding that patent misuse is "an equitable issue normally reserved for the court").

In the licensing context, the doctrine limits a patentee's right to impose conditions on a licensee that exceed the scope of the patent right. *Princo*, 616 F.3d at 1321. Thus, the "basic rule of patent misuse [is] that the patentee may exploit his patent but may not use it to acquire a monopoly not embraced in the patent." *Id*. at 1327. When the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant, courts have held that an accused infringer may invoke the doctrine of patent misuse to defeat the patentee's claim. *Princo*, 616 F.3d at 1327–28; *Monsanto Co. v. McFarling,* 363 F.3d 1336, 1341 (Fed. Cir. 2004). What patent misuse is about, in short, is "patent leverage," i.e., the use of the patent power to impose overbroad conditions on the use of the patent in suit that are "not within the reach of the monopoly granted by the Government." *Zenith Radio Corp. v. Hazeltine Research, Inc.* 395 U.S. 100, 136–38 (1969).

Patent misuse "requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." *Virginia Panel,* 133 F.3d at 868–71 (internal citation omitted). "Courts have identified certain specific practices as constituting *per se* patent misuse, including so-called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good" and "arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." *Va. Panel Corp.*, 133 F.3d at 869 (citations omitted). However, unless a licensing arrangement has been held to be *per se* anticompetitive by the Supreme Court, a factual

19

determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market.[12] *See Princo*, 616 F.3d 1334.

OPTO's first allegation of *per se* patent misuse is that the '783 Patent, which OPTO contends is the only Honeywell patent potentially covering the decoding of stacked barcodes, has expired so any ongoing royalty payments for those products are unlawfully extending the life of that patent. *See Brulotte v. Thys Co.*, 379 U.S. 29, 32-33 (1964). In response, Honeywell argues that under *Kimble v. Marvel Entm't*, 576 U.S. 446, 454 (2015), "royalties may run until the latest-running patent covered in the parties' agreement expires"; therefore, because the licensed Honeywell portfolio spans thousands of patents, the majority of which remain unexpired, the Agreement is enforceable. While Honeywell exaggerates the holding of *Kimble*, the Court agrees that OPTO's concession that there are a number of unexpired Honeywell patents that cover the disputed products means that OPTO's claim of *per se* patent misuse based on the expiration of the '783 Patent cannot succeed.

In *Brulotte*, the Supreme Court considered whether a license covering a farm machine was enforceable even though all of the patents incorporated into the machine[13] had expired. *See Brulotte*, 379 U.S. at 29-30. The Court held that the post-patent royalty provision was

---

[12] While not directly controlling here, in 1988, Congress amended the Patent Act to limit the scope of "patent misuse" with respect to certain licensing practices by including the concept of "market power." 35 U.S.C. § 271(d) ("No patent owner … shall be … deemed guilty of misuse … [by] "(5) condition[ing] the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.").

[13] Significantly, of the twelve patents licensed to the *Brulotte* petitioners only seven were incorporated into the machine. The decision noted that all of those seven patents had expired prior to the end of the license, but was silent as to whether any of the other five were still active. *See Brulotte*, 379 U.S. at 30.

20

"unlawful *per se*," *id.,* at 30, 32, because it continued "the patent monopoly beyond the [patent] period," *id.,* at 33, and, in so doing, conflicted with patent law's policy of establishing a "post-expiration ... public domain." *Id.* at 30, 34 ("We conclude that the judgment below must be reversed insofar as it allows royalties to be collected which accrued after the last of the patents incorporated into the machines had expired."); *see Kimble*, 576 U.S. at 446. Fifty-one years later, despite *Brulotte* having received substantial criticism from legal commentators and economists, the Supreme Court upheld the decision in *Kimble*, strictly on the grounds of *stare decisis*. *Id.* at 455-459. Thus, the *Brulotte* rule – that a patent license may run until the expiration of the last of the patents covering the product or practice at issue – remains binding on this Court. *See Scheiber v. Dolby Lab'ys, Inc.*, 293 F.3d 1014, 1018 (7th Cir. 2002) (Posner, J) (declaring, with respect to *Brulotte*, "we have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us, or even how out of touch with the Supreme Court's current thinking the decision seems").

Neither party here properly applies *Brulotte*. OPTO asks the Court to find that *Brulotte* does not apply to "package licensing" agreements that contain expired patents, citing *A.C. Aukerman Co. v. R.L. Chaides Construction Co*., No. CIV. 88–20704 SW, 1993 WL 379548, at *6 (N.D.Cal. Sept.13, 1993). The Court finds *Aukerman* wholly unpersuasive. Beyond the fact that it is a thirty year old unpublished decision outside this Circuit, the entirety of the "analysis" of the *Brulotte* licensing issue in *Aukerman* runs a single conclusory sentence, citing for authority only a 1968 Tenth Circuit decision that does not even mention *Brulotte*. Indeed, in *Scheiber* the Court specifically noted that *Aukerman* "misreads *Brulotte*." *Scheiber*, 293 F.3d at 1021.

21

For its part, Honeywell misreads *Kimble* as expanding *Brulotte* beyond its facts to allow a patent owner to enforce a license of multiple patents so long as any of those patents remained active, regardless of whether any of the unexpired patents covered the product or practice being licensed. *Kimble*[14] plainly intended no change in *Brulotte*; indeed, that was the point of its *stare decisis* analysis. Further, accepting Honeywell's enlargement of *Brulotte* would allow a patent owner to too easily evade its holding by including within a "package license" a recent patent, no matter how irrelevant. The Court thus declines to change the *Brulotte* rule, either as proposed by OPTO or Honeywell.

Rather, the Court will enforce *Brulotte* according to its terms. Here, OPTO admitted at oral argument (albeit reluctantly) that the products in dispute are covered by non-expired Honeywell patents. Therefore, regardless of whether the use of those non-expired patents is the basis for the payment of royalties in the Agreement, under *Brulotte*, OPTO cannot succeed on a claim that the Agreement constitutes patent misuse *per se* based on the expiration of one or more of the patents initially licensed. The life of the license in the Agreement has not and will not exceed the life of all the patents covering the products in dispute so no patent misuse (in this regard) has been committed.

OPTO's second asserted ground for its counterclaim is also not patent misuse *per se*; however, the Court finds that the counterclaim should survive Honeywell's cross motion. Whether or not Honeywell has unlawfully conditioned the payment of royalties on the ability of OPTO's products to decode stacked barcode symbologies (a practice over which it has no patent rights)

---

[14] Also, *Kimble* involved only a single patent so any comment related to multiple patent licenses would be purely *dicta*.

cannot be decided at summary judgment, where there remains (at least) a dispute over Honeywell's economic power over such technology.

Most simply put, the parties portray the nature of the Agreement's royalty requirements differently, with their desired outcomes flowing from their respective characterizations. Consistent with Honeywell's representations, OPTO describes the royalty provisions (as they relate to the disputed products) as turning solely on if the products can decode stacked barcode symbologies. In OPTO's telling, the Agreement in practical effect provides that OPTO can license Honeywell's patents only if OPTO pays royalties for selling products that decode stacked bar code symbologies, which OPTO says is patent misuse because Honeywell has no active patents that cover that decoding technology. Honeywell in turn emphasizes that all the disputed products are covered by numerous Honeywell patents – which gives Honeywell the right to not allow the products to be sold or to obtain a royalty for the use of the patents. So, according to Honeywell, it cannot be patent misuse for the parties to agree that OPTO only has to pay royalties for a subset of those products, regardless of how the Agreement determines which products are royalty bearing.

Both parties are correct, but only partially. Again, the "basic rule of patent misuse [is] that the patentee may exploit his patent but may not use it to acquire a monopoly not embraced in the patent." *Princo Corp.,* 616 F.3d at 1327. Thus, if a patent owner uses its patent and economic power to exact royalties for inventions or goods outside the scope of the patent, it commits patent misuse but does not do so "[i]f convenience of the parties rather than patent power dictates a … royalty provision …" *Zenith,* 395 U.S. at 138; *Bayer AG v. Housey Pharms., Inc.*, 228 F. Supp. 2d 467, 470 (D. Del. 2002). These principles apply to separable features of products like the ability to decode stacked barcode symbologies – which the parties agree can be turned on and off – as

23

well as "whole" products. Whether the Agreement was the product of unfair patent leverage exerted by the patentee rather than mutual convenience of the parties is a question of fact. *See Sunrise Med. HHG, Inc. v. AirSep Corp.*, 95 F. Supp. 2d 348, 458 (W.D. Pa. 2000). Moreover, the extent of Honeywell's economic power over the "tied" technology – which OPTO must prove to establish patent misuse in these circumstances – is admittedly disputed.

In sum, the merits of OPTO's counterclaim for patent misuse cannot and should not be determined on cross-motions for summary judgment. Instead, the answers must be found at trial, where there will be a full opportunity to weigh the evidence and assess the credibility of the witnesses. *See Reetz v. Lowe's Companies, Inc.*, No. 518CV00075KDBDCK, 2021 WL 535160, at *1–2 (W.D.N.C. Feb. 12, 2021). Therefore, the Court finds that none of the parties have proven an entitlement to summary judgment on OPTO's counterclaim alleging patent misuse, and the Court will deny the parties' cross-motions for summary judgment on that claim.

### B. Motions to Strike Expert Testimony

#### 1. David Taylor

OPTO has moved to exclude the testimony of David O. Taylor, one of Honeywell's proffered expert witnesses. Doc. No. 137. Mr. Taylor is a Professor of Law at the SMU Dedman School of Law who teaches and researches in the area, among others, of patent law, including patent law transactions. Honeywell represents that it intends to offer Professor Taylor's testimony "as an expert in intellectual property transactions" for two purposes: (1) affirmative "factual testimony" in support of Honeywell's breach of contract claim  and (2) rebuttal testimony in opposition to OPTO's patent misuse counterclaim and affirmative defense. *See* Doc. No. 155 at 1. Mr. Taylor's expert reports have been provided to the Court at Doc. Nos. 138-1 and 138-2. Broadly

stated, OPTO asks the Court to exclude Professor Taylor's testimony because 1) his reports reflect his intention to testify as to his view of the law and OPTO's legal liability under the Agreement and 2) as to his rebuttal report related to OPTO's counterclaims, that it is procedurally improper.[15]

The Court need not and will not belabor its analysis of Mr. Taylor's proposed testimony,[16] as it is clearly outside the bounds of permissible "legal" testimony, notwithstanding the "complexity" of the Agreement at issue. It is the responsibility of the Court to advise the jury on the governing law.[17] *See United States v. Savage*, 885 F.3d 212, 222–23 (4th Cir. 2018) ("[T]aken as a whole, the instruction [must] fairly state[ ] the controlling law."); *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018) (instructions must "adequately inform[ ] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the opposing party.").

---

[15] Although the Court will grant the motion to exclude Mr. Taylor's legal opinions as discussed, the Court disagrees with OPTO's contention that his rebuttal report was untimely. The fact that OPTO chose not to offer an expert on the subject of its counterclaims, on which it bears the burden of proof, does not convert any proper Honeywell expert testimony on those claims into an "affirmative" rather than a "rebuttal" report.   *See Hynix Semiconductor v. Rambus*, 2008 U.S. Dist. LEXIS 12195, at *16–17 (N.D. Cal. Feb. 3, 2008) (where a court "defined the rounds of expert disclosure based on which side had the burden of proof on an issue," a rebuttal report "does not have to 'rebut' another side's specific expert witness to be considered a 'rebuttal witness.'"); *see also FLOE Int'l Inc. v. Newmans'Mfg.*, 2006 U.S. Dist. LEXIS 97170, at *17–20 (D. Minn. Feb. 23, 2006) ("When the expert report disclosure deadlines are staggered, such that the party bearing the burden of proof is afforded the opportunity to provide an initial expert report, the party which does not bear the burden of proof can still submit an expert report in 'rebuttal,' even in the absence of an initial report produced by the party which bears the burden of proof, so long as it is within the established time frame set by the Scheduling Order.").

[16] OPTO does not challenge Mr. Taylor's expertise in patent law or patent transactions, and the Court does not mean to suggest by the exclusion of his testimony that he is in any manner unqualified in the areas he is expected to testify. Rather, as explained above, it is the role of the Court to instruct the jury on the relevant law, and it is improper for a "legal" witness to be called simply to offer his opinion as to which side should prevail in a contractual dispute.

[17] The Court is, of course, informed in that task by the parties' trial briefs and proposed jury instructions. However, the parties are not permitted to independently present testimony to the jury on the applicable law.

25

Therefore, expert testimony that merely reflects the expert's legal conclusions about disputed issues should be excluded. *See In re Zetia (Ezetimibe) Antitrust Litigation*, No. 2:18-md-2836, 2021 WL 6690337, at *2 (E.D. Va. Aug. 16, 2021). Testimony in the form of legal conclusions is not helpful to the jury because:

> it "supplies the jury with no information other than the witness's view of how the verdict should read." Determining when legal conclusions would be helpful to the jury must also take into account the role that the judge has in instructing the jury on the law. . . . [F]or example, [] when a witness gives opinion about the meaning of a specialized legal term, the witness is giving a legal conclusion that is better handled by the judge and, coming from the witness, will be of little assistance to the jury.

*Merrill v. McCarthy*, No. 7:14-cv-4, 2016 WL 1258472, at *2 (E.D.N.C. Mar. 30, 2016) (quoting *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (citations omitted) (alterations in original).

Indeed, Mr. Taylor's expert reports are indistinguishable from legal briefs. He describes in great detail his "understanding" of the governing law and facts (apparently mostly gleaned from Honeywell's counsel) then concludes on each point that Honeywell wins under his legal analysis. *See, e.g.*, Doc. No. 138-2 at ¶ 65 ("I disagree with OPTO's contentions concerning patent misuse on several grounds."). Such "testimony" does not "assist" the Court or the jury; rather, it supplants their primary roles in the trial (while also duplicating the role of counsel in closing argument). Accordingly, OPTO's motion will be granted and Mr. Taylor will not be permitted to testify as to his legal analysis or opinions as to either OPTO's alleged breach of contract or Honeywell's alleged patent misuse.[18]

---

[18] Honeywell suggests that Mr. Taylor could assist the jury with information on the nature of patents and patent licensing agreements. To the extent that Mr. Taylor has expressed such views

### 2. Greg Adams

Plaintiffs have moved to strike and exclude the testimony of Greg Adams, an economist who OPTO intends to offer as an expert witness to testify "concerning the economic prong of OPTO's patent misuse counterclaim." Doc. No. 189 at 1. Dr. Adams holds degrees from Wake Forest University, the University of Maine-Orono, and the University of California at Berkeley, and has more than 20 years of experience in applied microeconomic analysis and consulting. *Id*. at 3. Honeywell does not challenge his qualifications. Rather, it seeks his exclusion based on the timing of the disclosure of sales information on which he relies, the discussions with OPTO's "consulting" expert that were identified in his expert report, and Honeywell's contention that he uses the incorrect standard for proving patent misuse in formulating his opinions. For the reasons discussed below, the Court will deny the motion.

Plaintiffs' first argument is that Dr. Adams relies on OPTO sales records and market-share information that was not timely produced in discovery. In response, OPTO represents that although the data was not produced in the same form as presented by Dr. Adams, Honeywell had access to the relevant numbers during discovery or soon after they were made available to OPTO. *Id*. at 2. At oral argument, the parties continued to dispute the nature and timing of OPTO's disclosures. The Court observes that while Plaintiffs are entitled to receive timely disclosures, Plaintiffs are not entitled to disclosure of information organized in the same manner as Defendant's expert; instead, they are only entitled to the underlying data. Further, without a far more detailed review of documents that are not currently in the record, the Court cannot make a factual determination of

---

in discovery, the Court will consider permitting him to testify on general background or other specific information that may be helpful to the jury so long as he very carefully refrains from any testimony related to his legal analysis of the Agreement or the parties' legal disputes.

where the full truth lies with respect to what was disclosed and when it was disclosed (although it suspects given the history of the discovery disputes among the parties that there may be evidence supporting both positions). In any event, the Court is persuaded that the timing of the report and nature of the information is such that any alleged "failure was substantially justified or is harmless." *See* Fed. R. Civ. P. 37(c)(1); *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017). Honeywell can effectively cure any "surprise," the trial will not be disrupted, the evidence may be important and OPTO's explanation supports allowing the testimony. *See id.* Therefore, the Court will not exclude Dr. Adams' testimony on the basis of the untimely disclosure of information.

Second, Honeywell complains that Dr. Adams relies on conversations with Mr. Sprague Ackley, another "expert in bar code technology and related AIDC fields," even though OPTO never identified Mr. Ackley as a fact or expert witness. Mr. Ackley is a consulting, non-testifying expert retained by OPTO to help OPTO's counsel better understand various technology and market issues, but OPTO was under no obligation to disclose Mr. Ackley independent of Dr. Adams' report. *See* Fed. R. Civ. P. 26(a)(2)(A) ("In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence"); 26(b)(4)(D) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.").

Dr. Adams was entitled to speak to Mr. Ackley as part of forming his opinions (as he would be to consult a treatise, document or any other bit of authority or evidence). And, because Dr.

Adams considered his conversations with Mr. Ackley in forming his opinions, OPTO was required to disclose that information, Fed. R. Civ. P. 26(a)(2)(B), and did so properly. Therefore, the Court finds no reason to exclude Dr. Adams testimony based on his talking with Mr. Ackley or any inadequate disclosure of Mr. Ackley's role with respect to Dr. Adams' opinions.

At oral argument, Honeywell argued that Dr. Adams could not serve as a "mouthpiece" for Mr. Ackley. OPTO does not disagree (as a general matter), but denies that Dr. Adams intends to merely parrot the views of a different expert. This risk of improper testimony appears low and can easily be monitored by the Court. Honeywell has an opportunity at Dr. Adams' deposition and on cross-examination at trial to explore with Dr. Adams his conversations with Mr. Ackley and how he relies on those discussions in reaching his opinions. Further, because the patent misuse claim will be tried to the Court rather than the jury, the Court can and will consider how much of Dr. Adams' testimony reflects his own opinions rather than others' and take that into account in deciding how much weight to give to his testimony. In sum, the Court finds no reason to exclude Dr. Adams testimony because of his discussions with Mr. Ackley.

Finally, Honeywell contends that the Court should exclude Dr. Adams' opinions under its *Daubert* "gatekeeping" role because he allegedly "applies the wrong legal test." Doc. No. 175 at 5. As noted above, the claim of patent misuse will be – at least in so far as experts are concerned – solely tried to (and decided by) the Court. Suffice it to say the parties disagree on the particulars of the relevant legal tests and how they have been applied by Dr. Adams. Because the Court will have a full opportunity to consider Dr. Adams' testimony in light of its determination of the governing legal standards and accord it such weight as it finds appropriate, the Court will also reject this objection.

29

Under Federal Rule of Evidence 702, "[a] district court considering the admissibility of expert testimony exercises a gate-keeping function to assess whether the proffered evidence is sufficiently reliable and relevant." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease v. Ford Motor Co*., 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 591 (1993)). "Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Westberry*, 178 F.3d at 261 (citing *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th Cir. 1996)). Therefore, the court "need not determine that the expert testimony ... is irrefutable or certainly correct.... As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Id.* (citation omitted) (quoting *Daubert*, 509 U.S. at 596).

Although Rule 702 applies in bench trials, "the Court has increased discretion in how to perform its gatekeeping role." *Acosta v. Vinoskey*, 310 F. Supp. 3d 662, 667 (W.D. Va. 2018). The thrust of Rule 702 is to protect the jury from "evidence that is unreliable for reasons they may have difficulty understanding." *Quality Plus Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. 3:18-cv-454, 2020 WL 239598, at *13 (E.D. Va. Jan. 15, 2020) (quoting 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6270 (2d ed. 2019)); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious testimony."). However, when the judge serves as the decisionmaker, this risk of confusion presents significantly less of a concern, if any at all. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There

is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Thus, the Court has discretion to admit the expert evidence "subject to the ability later to exclude it or disregard it" at trial. *Hewett v. City of King*, 2014 WL 7642093, at *1 (M.D.N.C. Sept. 8, 2014) (quotation omitted); *see also Pender v. Bank of Am. Corp.*, 2016 WL 6133850, at *3 (W.D.N.C. Oct. 20, 2016) ("As this is a bench trial, the Court can freely accept or reject an expert's testimony at trial as the trier of fact."); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.").

The Court understands that Dr. Adams will testify in accordance with his / OPTO's understanding of the relevant legal tests. In turn, the Court expects Honeywell to vigorously challenge the relevance and weight of his testimony. In light of the discretion afforded the Court by a bench trial on the claim of patent misuse, the Court will not decide Honeywell's "legal standard" objections and arguments at this time. Instead, the Court will deny Honeywell's motion to exclude Dr. Adams, allowing him to testify and deferring a final ruling on the admissibility and weight to give his testimony until it can evaluate it at trial.

### C. Remaining Discovery Disputes

In its recent Order, Doc. No. 154, ruling on OPTO's Objection to Magistrate Judge's Decision, Doc. No. 125, the Court deferred its decision as to two discovery disputes related to a "litigation loss contingency" included by OPTO's independent auditor in the company's financial statements. Honeywell based its discovery requests related to this information on discovery

requests made by OPTO in connection with the sales audit undertaken pursuant to Section 5.1 of the Agreement, which is discussed at length above. *See* Doc. No. 148 at 11. Having now ruled that the audit was untimely (and granting summary judgment on the related claim), the primary basis for Honeywell's discovery of OPTO's communications with its auditor has been negated. Thus, the discovery dispute has become moot. And, in any event, the Court would allow the objections as the requests appear to directly seek to discover OPTO's counsel's opinions of the case without any substantial basis.

**Issue 6**: **Attorney Communications and Documents Related to OPTO's Independent Auditor's Statements About this Litigation**

Honeywell seeks documents related to a litigation loss contingency (in the amount of Honeywell's litigation demand of $5.3 million), which was included in one of OPTO's public audits in Japan. Specifically, Honeywell seeks the following:

> [T]he public audit report specifically identifies several categories of documents the auditor relied on: (1) the complaint, the documents that form the basis of the lawsuit, and records of consultations with attorneys; (2) Board of Director meetings and other documents to examine the appropriateness of estimated amounts; (3) the views of legal counsel; and (4) the amount of the provision for litigation losses was reviewed by comparison and the like against the evidentiary documents.

According to OPTO, Honeywell has the public audit report along with all non-privileged communications with the auditors. However, it objects to producing attorney prepared evaluations of the case, which it contends are privileged. *See United States v. Deloitte LLP*, 610 F.3d 129, 143 (D.C. Cir. 2010) (finding that documents need not be produced where party has not proffered any good reason for wanting the documents other than its desire to know what the opposing party's counsel thought about the case). In response, Honeywell relies on the Court's earlier finding that

32

attorney communications related to the independent sales audit that was conducted under the Agreement are relevant and not privileged.

As noted above, the Court has ruled that the sales audit was untimely and thus irrelevant to Honeywell's remaining claims. This makes the "reciprocal discovery" grounds for Honeywell seeking this information no longer applicable. Therefore, the Court finds this discovery dispute is moot and will allow the objection and hold that OPTO need not produce the requested documents.

Also, the Court would allow the objection even if the issue was not moot. Although the full scope of the waiver of the attorney-client privilege in the context of communications with independent outside auditors is uncertain, most courts have found that disclosing attorney work product to an independent auditor does not constitute a waiver. *See United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010) (collecting cases). Here, as in *Deloitte*, it appears that the documents and information are being requested simply to reveal OPTO's counsel's evaluation of the case. Accordingly, the Court will not order the production of the requested information, which directly seeks opposing counsel's analysis of this litigation.

**Issue 8: The Deposition of Mr. Tanaka**

OPTO designated Mr. Tanaka as a 30(b)(6) deponent to testify as to the corporation's knowledge of the Agreement and the underlying litigations. Thus, his deposition is tied to the issue of the production of additional information with respect to the litigation loss contingency described in Issue No. 6. *See* Doc. No. 149 at 14. For the same reasons discussed above, the Court will allow the objection as to this discovery request and hold that Mr. Tanaka need not testify on the topic of the litigation loss contingency.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 116) is **GRANTED** as to the construction of Section 1.4 of the Agreement but **DENIED** as to their claims under Section 5.1. Summary judgment is entered in favor of Defendant on Plaintiffs' "Section 5.1" breach of representation and warranty claim;

2. Defendant's Motion for Summary Judgment (Doc. No. 132) is **DENIED**, except as described above;

3. The parties' cross Motions for Summary Judgment on Defendant's Patent Misuse Counterclaim (Doc. Nos. 161, 168) are **DENIED**;

4. Defendant's Motion to Strike (Doc. No. 137) is **GRANTED** to the extent described above;

5. Plaintiffs' Motion to Strike (Doc. No. 173) is **DENIED**;

6. Defendant's Objections to Issues 6 and 8 of the Magistrate Judge's ruling on discovery disputes (Doc. Nos. 115, 125) are **ALLOWED** as described above; and

7. This case shall proceed to trial on the merits of the remaining claims in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: April 20, 2023

Kenneth D. Bell
United States District Judge

34