UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,           )
INC.; HAND HELD PRODUCTS,          )
INC.; AND METROLOGIC               )
INSTRUMENTS, INC.,                 )
                                   )
            Plaintiffs,            )      No. 3:21-cv-506
                                   )
        vs.                        )      VOLUME IV
                                   )
OPTO ELECTRONICS COMPANY,          )
LTD.,                              )
                                   )
            Defendant.             )
_____ )


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 20, 2023

APPEARANCES:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

APPEARANCES (Cont'd.)

          TYLER T. VanHOUTAN, ESQ.
          McGuireWoods, LLP
          Texas Tower, Suite 2400
          845 Texas Avenue
          Houston, Texas 77002

          CHRISTINE E. LEHMAN, ESQ.
          CONNOR S. HOUGHTON, ESQ.
          Reichman Jorgensen Lehman & Feldberg, LLP
          1909 K Street, NW
          Suite 800
          Washington, DC 20006

          YORK M. FAULKNER, ESQ.
          YorkMoodyFaulkner
          Tensho Building, 7F
          3-17-11 Shibaura, Suite 711
          Tokyo, Japan

1                         I N D E X

2  PLAINTIFF'S WITNESSES                           PAGE

3  SHIGEAKI TANAKA
       Direct Examination By Mr. Stevens          696
4

5  DAVID TAYLOR
       Direct Examination By Mr. Springer         706
6      Voir Dire Examination By Mr. McCamey       713
       Direct Examination By Mr. Springer         714
7      Cross Examination By Mr. McCamey           731
       Redirect Examination By Mr. Springer       740
8

9  RYAN N. HERRINGTON
       Direct Examination By Mr. Lareau           741
10     Cross Examination By Mr. VanHoutan         755

11

12                       E X H I B I T S

   JOINT EXHIBITS
13

   NUMBER                                     ADMITTED
14

15 2 ........................................716

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2    THURSDAY MORNING, JULY 20, 2023

3              (Court called to order at 8:58 AM.)

4              THE COURT:  Good morning.

5              ALL COUNSEL:  Good morning, Your Honor.

6              THE COURT:  You may call your next witness.

7              MR. PLEUNE:  Your Honor, we have just one brief

8    housekeeping issue that we want to raise, although you may

9    want to hear it at the end of the evidence, but the agreement

10   between the parties about damages.

11             THE COURT:  Yes.

12             MR. PLEUNE:  How would you like to receive that?

13             THE COURT:  Well, what are you going to give me?

14             MR. PLEUNE:  Fair.  We could certainly read the

15   emails into the record or we could submit something to you

16   that explains the parties' agreement on that.

17             THE COURT:  Yeah, why don't you submit something in

18   writing, some sort of joint proposed resolution, and that will

19   make the record clearer and simpler.

20             MR. PLEUNE:  Okay.  We'll do that.

21             THE COURT:  You may call your next witness.

22             MR. PLEUNE:  Call Professor David Taylor -- we'll

23   call Tanaka.  We have a video deposition that we're going to

24   start with.

25             THE COURT:  All right.

1          (The videotaped deposition of Shigeaki Tanaka was

2   played.  The transcript as reported by _____ is as

3   follows:)

4          SHIGEAKI TANAKA, PLAINTIFF'S WITNESS, SWORN,

5                      DIRECT EXAMINATION

6   BY MR. STEVENS:

7   Q.   Good morning.

8   A.   Good morning.

9   Q.   Could you please state your full name?

10  A.   Shigeaki Tanaka.

11  Q.   And, Mr. Tanaka, am I correct that you are on the board

12  of OPTO Electronics?

13  A.   Yes.

14  Q.   So you are a director of OPTO Electronics?

15  A.   Yes.

16  Q.   You're also an accountant or auditor for the company; is

17  that correct?

18  A.   Yes.

19  Q.   And so your consulting or auditing company provides the

20  auditing services for OPTO Electronics; is that correct, sir?

21  A.   My company provides tax support services, and I am on the

22  board as an external director, but I also serve as an auditor.

23  Q.   You attended the mediation in January of 2020 in Hawaii;

24  is that correct?

25  A.   Yes.

1  Q.    And you appreciate that the final agreement between the

2  companies wasn't finalized for several weeks thereafter; is

3  that correct?

4  A.    Yes.

5  Q.    And were you involved in reviewing or offering edits to

6  the License and Settlement Agreement between the date of the

7  mediation and when it was actually executed?

8  A.    Well, what I mean by "review" is I was not working --

9  interacting with attorneys to go through every single wording

10 of it.  And that as -- because I'm a board member, I was in a

11 position to check the progress of this settlement, so that is

12 what I did in the last phase.

13 Q.    Okay.  So on the day of the mediation after all day of

14 negotiation, you, your colleague who was the leader of

15 finance, your two lawyers, and the board members all decided

16 to make the agreement with Honeywell.  Is that correct?

17 A.    Yes.

18 Q.    And then again, in order to sign the contract, when it

19 was ultimately signed, the whole board, including the lawyer

20 on the board, unanimously agreed to sign that agreement with

21 Honeywell; correct?

22 A.    Yes.

23 Q.    OPTO acquired a license to many more patents than just

24 those involved in the ITC investigation.  Isn't that true,

25 sir?

1  A.   It's not that OPTO acquired rights.  My understanding is
2  that through this settlement OPTO recognized that for the
3  things that were involved in ITC, OPTO needed to pay royalties
4  to Honeywell, and OPTO recognized that, and that's what led to
5  the settlement.
6  Q.   Are you aware that there is also a litigation between
7  Honeywell and OPTO Electronics in Delaware?
8  A.   Yes.
9  Q.   And the settlement agreement resolved that litigation as
10 well, didn't it?
11 A.   I'm aware of that.
12 Q.   And OPTO Electronics' laser scanners and its CCD scanners
13 were a subject of that litigation between Honeywell and OPTO
14 Electronics in Japan -- I'm sorry, in Delaware, correct?
15 A.   I don't know what was involved in the -- that particular
16 litigation.  However, my understanding is that ITC -- the
17 conclusion of the ITC investigation brought an end to the
18 Delaware litigation.
19 Q.   Okay.  So the ITC litigation and the Delaware litigation
20 were going forward, and then the parties settled, and that
21 January 2020 settlement agreement ended both of those
22 litigations.  Is that a fair summary?
23 A.   That is the -- my understanding.  I believe that was the
24 schedule.  Yes.
25 Q.   Sir, yes or no:  In the Delaware litigation, Honeywell

asserted that OPTO Electronics' CCD and laser-based products infringe one or more of Honeywell's patents?

A. I do not remember much about the ITC matter. Sorry.

Q. Again, I asked you about the Delaware case. So do you have the Delaware action in your mind, sir?

A. I do not remember the Delaware case at all -- as well.

MR. STEVENS: For the record, we've marked as Deposition Exhibit 1 a copy of the License and Settlement Agreement effective January 22, 2020, between OPTO and Honeywell. It starts with Production Number HONEYWELL-00251961.

Q. Sir, my question for you is this is the License and Settlement Agreement between OPTO and Honeywell for early 2020; is that correct?

A. Yes.

Q. In paragraph D, each of the parties reported that they wanted to avoid further risks and litigation expenses for the legal actions, in the plural, and that they were reaching a business resolution and settlement of the two, plural, legal actions; is that correct?

A. I can answer questions through the interpreter. However, I cannot tell you straight from this document what it says.

Q. Sir, you approved this very document before it was signed; is that correct, sir?

A. I was given a brief on the content of this -- the

1  document, and then I approved it.

2  Q.   And, sir, it's true that OPTO Electronics knew it was

3  resolving all of Honeywell's claims from the ITC and all of

4  Honeywell's claims from the Delaware action when OPTO entered

5  into this settlement and license agreement.  Isn't that

6  correct?

7  A.   OPTO's understanding is that by settling the ITC, the

8  case, it would be able to resolve the Delaware case as well.

9  Q.   Let me ask you to turn your attention to page 13 of the

10  agreement, sir.  And there's a section that says "9.4.

11  Construction."  Let me just know when you see that on the

12  screen.

13  A.   Yes.

14  Q.   I'm going to read it in English so that it's translated

15  for you.  I'm going to read the first sentence in English so

16  it's translated for you.  It says, quote:

17      "This Agreement shall be construed as if equally drafted

18  by the Parties hereto."

19      Do you see that sentence, sir?

20  A.   I see where -- I think I know where you're pointing to.

21  However, this is in English, and I don't know if what I'm

22  hearing through the interpreter and my understanding are an

23  exact match.

24  Q.   What is your understanding of the sentence that says,

25  quote:  "This Agreement shall be construed as if equally

SHIGEAKI TANAKA - DIRECT

1  drafted by the Parties hereto"?

2  A.   The attorney we had at the time checked this document,

3  and the word "equally" was used from the checking.  And we

4  were in a position to approve that document.  And in this

5  document, I believe the word was used because the parties

6  involved were on the same page.

7  Q.   About a year after the parties entered into the 2020

8  agreement, they entered into the second amendment to the

9  agreement in 2021.  Is that right?

10 A.   Yes.

11 Q.   And, again, you and your board members approved that and

12 you were represented by counsel with respect to the signing of

13 the second amendment to the settlement agreement; is that

14 right?

15 A.   Yes.

16 Q.   You understand that you have been designated to speak on

17 behalf of the company with respect to:

18      "Any alleged limitation on OPTO's ability to compete in

19 an alternative market... and unlawfully supporting prices in

20 the 2D barcode reader market that Honeywell dominates by

21 raising the prices of substitute 1D barcode readers."

22      Do you understand that, sir?

23 A.   Is this question about -- related to the countersuit from

24 our side?

25           MR. STEVENS:  Counsel, can you stipulate that he's

SHIGEAKI TANAKA - DIRECT

1  been put up on Topic 31?

2         MR. McCAMEY:  Yes.

3  Q.   Sir, you appreciate that outside the United States the

4  agreement between OPTO and Honeywell results in an annual

5  payment to be made regardless of how many products OPTO or

6  OPTO Sensors Europe sells?

7  A.   Yes.

8  Q.   And in the United States, Opticon has to pay a royalty

9  for certain products that it sells.  Is that correct?

10 A.   Yes.

11 Q.   Has Opticon Inc. lost any customers in the United States

12 based on this lawsuit?

13 A.   I don't know.

14 Q.   Has Opticon Inc. lost any sales in the United States

15 based upon any changes that might have been made as a result

16 of this litigation?

17 A.   I don't know what factor contributed to the sales.  And,

18 however, I can say for sure that there was a change in sales,

19 and also the raw cost ratio went up.

20 Q.   What was the change in sales that you're referring to?

21 A.   Up and down in sales.

22 Q.   Okay.  And are any of those ups or downs as a result of

23 the removal of any barcode symbology from any of Opticon's

24 products?

25 A.   I do not know clearly that is the reason because this was

1 a time when COVID hit, so I don't know the direct reason.

2 Q.   Have any of Opticon Inc.'s customers raised any concern

3 regarding the removal of PDF417, as an example, from certain

4 of Opticon Inc.'s products?

5 A.   Overseas subsidiaries, the sales details, that is, the

6 details of the substance of the sales were not reported to the

7 board of directors, so I don't know.

8 Q.   I'm asking whether you have any knowledge as to whether

9 Honeywell has been -- has even attempted to or has been

10 successful in raising prices as a result of this litigation?

11 A.   I have no idea on that.

12 Q.   Who is the biggest provider of barcode readers in the

13 United States?

14 A.   Zebra.

15 Q.   Do you know whether Zebra is licensed to Honeywell's

16 barcode reader portfolio?

17 A.   I heard about it.

18 Q.   And what market share do you believe Honeywell has in the

19 United States for barcode reader products?

20 A.   I do know that Honeywell has a substantial share.  But I

21 don't know the exact number.

22 Q.   But as you said a moment ago, Honeywell's not even the

23 Number 1 player as far as share of demand or market share goes

24 in the United States; is that correct?

25 A.   At this point in time, that is correct.

SHIGEAKI TANAKA - DIRECT

1  Q.   And that's been true ever since you guys signed the

2  agreement in January of 2020 and that's true all the way up to

3  today, correct?

4  A.   It probably has not changed.

5  Q.   How, if at all, has this litigation adversely affected

6  Opticon's business?

7  A.   Are you talking about this particular litigation or the

8  result of the settlement?

9  A.   I'm talking about -- well, I'll ask both.  The result of

10 the settlement, how has that hurt, if at all, Opticon's

11 ability to compete in the United States market?

12 A.   So let's get to the first part about the result of the

13 settlement.  Did that impact our -- adversely impact our

14 competitiveness?  Well, we don't have numerical data to

15 support that, so I don't know.  And, however, our company, we

16 fully agreed to the terms of the 2020 settlement.  That is why

17 we signed it.  And as a result it pushed out -- pushed up our

18 raw cost ratio.  That happened as a result.

19      As for this litigation, well, we agreed to the terms of

20 the settlement.  And the cost, the laser scanner was out of

21 scope.  That was OPTO's understanding, and that is why we

22 settled, and that is why we agreed to designate the

23 specified -- the royalty rate.

24      But if that is not the case and the laser scanners are

25 actually in the scope, then if that is the case, we would not

1  have settled in the first place.  We would not have agreed to
2  the royalty rate that was agreed upon.
3      And -- because if the laser products are included, then
4  that is going to adversely affect our profitability and also
5  push -- further push up our raw cost, so that would impact our
6  business significantly more.
7  Q.  Describe for me the market for stacked linear barcode
8  decoding.
9  A.  I don't know much about it.
10 Q.  So OPTO has contended in this case that there's a
11 lucrative market for stacked linear barcode decoding.
12     As the director of OPTO Electronics, can you speak to
13 that alleged lucrative market?
14 A.  I'm not a director in charge of that part, so I don't
15 know.
16 Q.  Have you ever heard of the market for stacked linear
17 barcode decoding?
18 A.  I've seen stacked code, but never heard of market.
19 Q.  And Opticon Inc. still has plenty of products that will
20 decode stacked barcodes; correct?
21 A.  No.  I don't know the technical detail on this matter.
22 And -- because when it comes to the stacked code, the extent
23 of my knowledge is very limited.  I didn't know that the laser
24 product could read the stacked code.  And Opticon has the
25 laser products, but my understanding was that these products

1  were able to read regular barcodes, not the stacked code.  I

2  didn't know that.

3  Q.   Do you know whether Honeywell sells any laser-based

4  products in the United States that can read a stacked code?

5  A.   I don't know.

6  Q.   With respect to the laser-based or CCD-based products,

7  does Honeywell have any market power in the, quote, lucrative

8  market for stacked linear barcode decoding?

9  A.   I don't know.

10            (End of videotaped deposition.)

11            MR. PLEUNE:  That's it.

12            THE COURT:  Thank you.  You may call your next

13  witness.

14            MR. PLEUNE:  Plaintiffs now calls Professor David

15  Taylor.

16            MR. McCAMEY:  Your Honor, OPTO would reraise the

17  objection made in our MILs to Professor Taylor's testimony.  I

18  think Your Honor has partially ruled on that in the MIL order

19  and suggested that you would ask for a proffer as to what his

20  testimony would be to provide a proper scope.

21            THE COURT:  Well, I think we can just do that live;

22  and, if necessary, the Court will strike any testimony.

23            DAVID TAYLOR, PLAINTIFF'S WITNESS, SWORN,

24                     DIRECT EXAMINATION

25  BY MR. SPRINGER:

1  Q.   Good morning, Professor Taylor.

2  A.   Good morning.

3  Q.   Could you please introduce yourself to the Court.

4  A.   Yes.  I'm David Taylor.  I'm a professor at the SMU

5  Dedman School of Law in Dallas, Texas.

6  Q.   Can you tell us a little bit about yourself.

7  A.   Sure.  I'm a native Texan.  Was born in Irving, Texas.  I

8  attended Texas A&M University for my bachelor's degree and

9  then attended Harvard Law School.  I worked at Baker Botts, a

10 law firm in Dallas, Texas.  And ultimately ended up at SMU

11 where I work today.

12 Q.   What did you study in college?

13 A.   In college my degree is in mechanical engineering.

14 Q.   And did you graduate?

15 A.   I did.

16 Q.   What did you do after graduating from Texas A&M?

17 A.   After graduating I went to work for National Instruments

18 Corporation in Austin, Texas.  They provide computer hardware

19 and software products, and I did technical support for those

20 products.

21 Q.   Did you also go to law school?

22 A.   Yes.  After leaving National Instruments, I went to

23 Cambridge to Harvard Law School and graduated with my JD

24 there.

25 Q.   What did you do after graduating from Harvard?

DAVID TAYLOR - DIRECT

1    A.    After graduating I went to Dallas and started working at
2    the law firm of Baker Botts in the intellectual property
3    department doing primarily patent prosecution, but that
4    involves obtaining assignments from vendors, drafting patent
5    applications, filing patent applications, corresponding with
6    the patent office.  During that time I became a registered
7    patent attorney.  And also during that time I edited
8    intellectual property agreements.
9    Q.    And how long were you at Baker Botts at that point in
10   time?
11   A.    At that point it was a year.  Then I left Baker Botts to
12   go clerk for the U.S. Court of Appeals for the Federal Circuit
13   in Washington, DC.
14   Q.    And could you tell me about your experience there.
15   A.    Yes.  At the federal circuit they have exclusive
16   jurisdiction over appeals in patent cases, so I worked on --
17   helped my judge with appeals on patent cases both from
18   district courts and from the International Trade Commission.
19   The court also has the exclusive jurisdiction over appeals in
20   government contract cases filed at the Court of Federal
21   Claims, and so I helped my judge with those types of cases as
22   well.  Many other types of cases beyond those.
23   Q.    And how long was that clerkship?
24   A.    I clerked for about a year.
25   Q.    And what did you do after that?

DAVID TAYLOR - DIRECT

1    A.    After my clerkship I went back to Baker Botts and went
2    back to the intellectual property department in Dallas, and
3    from that time I was primarily doing patent litigation which
4    involved all aspects of litigation and district court.
5    appeals.  That work also involved negotiating, drafting,
6    editing settlement agreements and license agreements.
7    Q.    And how long were you in that role?
8    A.    After my clerkship, I think it it was about five and a
9    half years before I then left the firm to join the law school
10   at SMU.
11   Q.    And could you tell me about that.
12   A.    Sure.  I've been at SMU since 2011, and I teach patent
13   law, selected topics in intellectual property, intellectual
14   property, patent law institutional choice, contracts one,
15   contracts two.  I think that covers the classes I teach.  Then
16   I do research in the area of intellectual property.
17   Q.    Could you tell us a little bit about your research.
18   A.    So I've written parts of two books.  One book is on
19   patent remedies for complex products, complex products meaning
20   products that use multiple technologies covered by multiple
21   patents.  And I have another portion of a case book I drafted
22   a chapter on patent utility.
23        I drafted -- I've done research, surveys, drafted many
24   articles on various aspects of intellectual property.  An
25   example would be an article I wrote on using reasonable

DAVID TAYLOR - DIRECT

1  royalties to value patented technology.  But there are many
2  articles.
3  Q.   And I neglected to ask you, what is your current position
4  at SMU?
5  A.   So I'm a professor of law, but I'm also the co-director
6  of the Tsai Center for Law, Science and Innovation.
7  Q.   And what is that?
8  A.   The Tsai Center is an academic center I helped found.  It
9  now has about a $5 million endowment.  It funds the research
10 that I do in the area of intellectual property.
11 Q.   And going back to your time at Baker Botts, did you work
12 on patent licensing agreements?
13 A.   Yes.  Patent licensing agreements in my first stint as
14 well as in my second stint, including in the context of
15 settling litigation.
16 Q.   And in your current role at SMU, do you interact with
17 patent licensing agreements?
18 A.   Yes.  I mentioned an article that's about royalties and
19 that involves analyzing license agreements.
20 Q.   Have you ever served as an expert witness before?
21 A.   I have.  In about the last seven years I think I've
22 worked on about 15 cases.
23 Q.   Could you tell me a little bit more about those cases.
24 A.   So they really fall into two camps.  One is domestic
25 cases whether it's in state court or federal court in the

1    United States and then another set of cases is the
2    international cases.  The state and federal cases, about 12
3    cases.  The international cases, about three.  And they're
4    very different.
5        In the international cases I'm typically recognized as an
6    expert with respect to law, U.S. law, whether it's U.S. patent
7    law, intellectual property law, state contract law.
8        In the domestic cases I'm typically offering opinions on
9    factual questions typically related to licensing and
10   assignments in the patent context.  Basically assisting the
11   trier of fact with respect to complex corporate transactions.
12   Q.   And you understand that today we're not asking you to
13   opine on any legal questions.
14   A.   I understand that.
15   Q.   Have you ever testified at trial?
16   A.   I have testified at trial twice.
17       Once was in the Eastern District of Texas in a patent
18   infringement case.  The testimony related to a license
19   defense.  And I was recognized by the Court as an expert in
20   that case.
21       And then the other case was before an administrative law
22   judge at the International Trade Commission and that case
23   involved ownership and assignment of patents.  And again, I
24   was recognized as an expert in that proceeding as well.
25   Q.   And what was the scope of your expertise in that

1  proceeding?

2  A.    In the ITC proceeding?

3  Q.    In both of them, sorry.

4  A.    In the Eastern District of Texas, it was on licensing.

5  And in the International Trade Commission, it was on

6  assignments and ownership of patents.

7  Q.    And have you ever served as a special master in any

8  patent cases?

9  A.    Yes.  I'm currently serving as a special master in a

10 patent infringement case in the Northern District of Texas.

11 And I'm actually in the process of being appointed in another

12 patent infringement case as a special master with another

13 judge in the Northern District of Texas.

14         MR. SPRINGER:  Your Honor, at this time we would

15 tender Professor Taylor as an expert in the fields of patent

16 licensing agreements and patent procedure.  We do not intend

17 to offer him as an expert as it relates to the ITC.  And so we

18 understand with respect to patent licensing agreements and

19 patent procedures OPTO has stipulated to his qualifications.

20         THE COURT:  All right.  With that stipulation the

21 Court will recognize him in those areas.

22         MR. McCAMEY:  I certainly agree with that.  I would

23 just note we don't read that tender as incorporating

24 competition and analysis of competition.  So with that note, I

25 would -- we certainly stipulate to that tender.

DAVID TAYLOR - VOIR DIRE

1    THE COURT:  Will you be soliciting testimony on

2  those subjects?

3    MR. SPRINGER:  So we intend to solicit testimony

4  related to the procompetitive benefits of the License and

5  Settlement Agreement in this case which Professor Taylor has

6  expertise based on his years of experience with license and

7  patent agreements.

8    THE COURT:  And do you challenge his qualifications

9  to render that opinion?

10    MR. McCAMEY:  Yes, Your Honor.  If I can have three

11  or four questions, I can do this very quickly.

12    THE COURT:  Yes, you may.

13              VOIR DIRE EXAMINATION

14  BY MR. McCAMEY:

15  Q.    Professor Taylor, your bachelor's degree is in mechanical

16  engineering, true?

17  A.    True.

18  Q.    And then you went to Harvard Law School and got your JD,

19  correct?

20  A.    Correct.

21  Q.    And that's the only university level education that

22  you've pursued or received, true?

23  A.    I attended the University of Texas at Arlington summer

24  school for physics.  But other than those schools, those are

25  the only schools I've attended, yes.

DAVID TAYLOR - DIRECT

1   Q.   Never sought or achieved an economics degree, true?

2   A.   True.

3   Q.   Same answer for an accounting degree?

4   A.   True.

5   Q.   Didn't perform any economic analysis of the agreement

6   that's actually at issue in this case to determine the

7   competition -- or the competitive effects that it actually had

8   on the market, right?

9   A.   Well, I think my report discloses the procompetitive

10  benefits of the agreement at issue in this case and I

11  identified four procompetitive benefits, so...

12  Q.   But you didn't conduct any economic tests, no HHI test,

13  for example, right?

14  A.   No HHI test.

15  Q.   No accounting tests either?

16  A.   No accounting tests.

17          MR. McCAMEY:  Your Honor, with that, the objection

18  would be he's not an economist.  He's not an accountant.  He

19  would be opining on just the legal impact of a licensing

20  agreement, which we don't think is the proper subject for

21  expert testimony.

22          MR. SPRINGER:  If I may briefly redirect.

23          THE COURT:  Yes, please, because I'm not there yet.

24              DIRECT EXAMINATION (Cont'd.)

25  BY MR. SPRINGER:

DAVID TAYLOR - DIRECT

1  Q.   Professor Taylor, based on your experience, do you need
2  to conduct an HHI test in order to evaluate the procompetitive
3  benefits of a license and settlement agreement?
4  A.   In all my study of procompetitive benefits related to
5  license agreements, I've never seen HHI being used in that
6  context.
7  Q.   Could you tell us a little bit more about your study of
8  procompetitive benefits of license and settlement agreements.
9  A.   Right.  So I just read the literature on the impact of
10 license agreements on markets and companies that agree to
11 those agreements.  Various law review articles, for example.
12          THE COURT:  All right.  The Court will hear the
13 evidence and determine whether his education, training, and
14 background is sufficient to support whatever opinions he
15 provides.
16          MR. SPRINGER:  Thank you, Your Honor.
17          Let's start by looking at what is JX1, if we could
18 pull that up.
19 Q.   Professor Taylor, what is this document?
20 A.   This is the License and Settlement Agreement that's in
21 dispute in this case.
22 Q.   And have you reviewed this document and relied upon it as
23 part of forming your opinions in this case?
24 A.   Yes.
25 Q.   We're going to come back to this, but just briefly.  Do

1  you know if this amendment -- if this agreement was amended?

2  A.   Yes, I understand this amendment -- or this agreement was

3  amended twice.

4        MR. SPRINGER:  Can we pull up JX2.

5  Q.   What is this document?

6  A.   I understand this was the First Amendment to the

7  agreement we just looked at.

8  Q.   Okay.  And have you reviewed this document as part of

9  preparing for your testimony today?

10 A.   I have.

11       MR. SPRINGER:  We move to admit JX2.

12       THE COURT:  I thought it was already in, but if it's

13 not, it is now.

14       (Joint Exhibit Number 2 was received into evidence.)

15       MR. SPRINGER:  And can we pull up JX3.

16 Q.   What is this document?

17 A.   This is the Second Amendment to the same agreement we've

18 been looking at.

19 Q.   And did you review this document as part of preparing for

20 your testimony today?

21 A.   Yes, I did.

22       MR. SPRINGER:  Let's turn back to JX1.

23 Q.   If we could direct your attention to Section 2.1 -- and

24 pull that out on the screen -- what is this provision?

25 A.   So this is the license agreement between the parties.

DAVID TAYLOR - DIRECT

1  This is the license provision within the license agreement.
2  And it's actually a cross-license agreement, so each party was
3  granting to the other a license to certain patents.
4  Q.   And can you explain generally the function that patent
5  licenses serve.
6  A.   My understanding is that a license is a promise not to
7  sue, and I believe in this case it's in exchange for payment.
8  And it kind of works like an insurance, you know, in the sense
9  that if you're sued for patent infringement but you have a
10  license, you can assert the defense.  And sometimes the
11  agreements have attorney fee provisions.  If somebody granted
12  a license and yet sues for infringement or even if they don't
13  include that, there might be damages in terms of attorney's
14  fees.  So in some sense it works like an insurance agreement.
15  Q.   And what types of patent licenses exist?
16  A.   I mean, there's all types of licenses.  It depends on
17  exactly what the contract says, of course, but there could be
18  exclusive, non-exclusive.  There could be a license of one
19  patent or multiple patents or what we call a portfolio
20  license.  There could be license to one product, multiple
21  products.  It just depends on the agreement.
22  Q.   And can parties to an agreement structure payment for
23  patent licenses in various ways?
24  A.   Right, yes.  So there could be a lump sum payment.  There
25  could be running royalties that depend on use of the patented

DAVID TAYLOR - DIRECT

1  technology during the term of the agreement.  There could be

2  some combination.

3  Q.   You also just mentioned portfolio licenses.  Is

4  Section 2.1 a portfolio license?

5  A.   Yes, I would say it's a portfolio license.  U.S. Patent

6  Portfolio is capitalized there.  It's defined.  But it's a

7  collection of patents.  In fact, I think it's all of the U.S.

8  patents owned by these parties at the time of the agreement.

9  So I would call that -- well, it's called a portfolio

10 patent -- portfolio license, sorry.

11 Q.   And in general, what is a portfolio license?

12 A.   A portfolio license is a license to a large set of

13 patents.  Sometimes it's all of the patents owned by an

14 entity.  And that's a collection -- usually a large collection

15 of patents.

16 Q.   And why might someone want a portfolio license instead of

17 a license targeted at just one specific product or patent?

18 A.   Right.  So in my experience, you know, the companies that

19 enter into these agreements are looking for peace with respect

20 to the other party and not typically just with respect to one

21 patent.  Any of the patents that were being asserted against

22 them they would want to have covered in the license.  And

23 often when there's a portfolio license, any other patents,

24 they just want peace with respect to that patent portfolio,

25 the larger group of patents, and that provides more benefits

DAVID TAYLOR - DIRECT

1  than just a license to one patent.

2  Q.   And does the portfolio cross-license in Section 2.1 here

3  on the screen benefit the parties?

4  A.   Yes.  It's a portfolio cross-license so both parties are

5  licensing.  And I think there's four benefits that we see.

6       One is that it clears blocking positions.

7       One is -- another is it allows integration of

8  complimentary technologies.

9       It certainly eliminates litigation costs with respect to

10 patent litigation.

11      And then it also eliminates risk and the cost associated

12 with potential infringement liability whether through an

13 injunction or through damages if there was litigation and you

14 lost that litigation in the future.

15      So in all four of those ways it provides benefit to the

16 recipient of a license.

17 Q.   Thank you for that.  And I'd like to just kind of break

18 those down a little bit more.

19      The first one that you mentioned was I think you said

20 clearing blocking patents.  Could you explain what you mean by

21 that.

22 A.   Right.  So a blocking situation is where there are two

23 technologies and they're both covered by patents but they're

24 covered by different entities.  One of the technologies we

25 would call a basic technology.  The other technology we would

1  call an improvement technology.  And if different entities own
2  patents on the basic technology and the improvement
3  technology, then neither party has the right to use or sell
4  the improvement technology.  And so that technology -- without
5  infringing patents, it will not get to the market and cannot
6  be used to gain a profit.
7  Q.   Can you give me an example of how that might work.
8  A.   Sure.  The typical example I use is a chair.  So if I own
9  a patent on a chair but you own a patent on a reclining
10  chair -- and let's just assume these are novel and meet all
11  the patentability requirements.  These are valid patents.  So
12  I own the patent on the chair.  You own the patent on the
13  reclining chair.
14      If neither of us have licensed the other, neither of us
15  under the law at least, are able to sell the reclining chair.
16  If I try to sell the reclining chair but you own the patent on
17  the reclining chair, I have infringed your patent.  If you try
18  to sell the reclining chair, I own the patent on the chair --
19  it's still a chair even if it's reclining -- and so you would
20  infringe my patent if you sold the reclining chair.  So in
21  that situation, without a cross-license, neither of us under
22  the law can sell the reclining chair.
23      So a cross-license allows you to clear the blocking
24  position.  And when it's a cross-license, actually, we compete
25  in that market with respect to the reclining chair.  We both

DAVID TAYLOR - DIRECT

1  can sell in the market a reclining chair, absent any other

2  patents that other entities own.

3  Q.   And how does Section 2.1 of this agreement clear blocking

4  positions?

5  A.   This is a cross-license agreement, so a cross-license

6  agreement is what clears blocking positions.  And it clears

7  the blocking positions with respect to the U.S. patent

8  portfolios of both of the parties.

9  Q.   The second benefit you mentioned earlier relates to the

10  integration of technologies.  What do you mean by that?

11  A.   The integration of complimentary technology.  I think an

12  example is helpful here too.

13       What I'm talking about is if there was, for example, a

14  computer that would run an algorithm that analyzed data to try

15  to cure diseases.  Sounds very useful and beneficial for

16  society.  But imagine that the algorithm is novel and it's

17  patented.  And imagine that the -- but it takes a lot of

18  processing power to run that algorithm.  And with a slow

19  processor, it might -- let's just say it takes a year to

20  identify and cure a disease.  With a very fast processor, it

21  perhaps could identify and cure the disease in a day, right?

22       So it's the combination of the technology and the

23  processor and combined with the technology and the algorithm

24  used to identify and cure the disease that really provides the

25  benefit that benefits society, right?  So it's the combination

DAVID TAYLOR - DIRECT

1   of the technologies in end use.

2   Q.   And how does Section 2.1 allow for the integration of

3   complimentary technologies?

4   A.   When it's a patent portfolio license, there's multiple

5   technologies.  And when it's a cross-license, both parties

6   have access to either party's inventions and so they get to

7   combine those technologies into their devices and allow for

8   the -- you know, the compliments between those technologies to

9   exist and to provide those benefits.

10  Q.   And are you aware of a specific example of that occurring

11  in this case?

12  A.   Well, I understand in this case the '783 patent was

13  asserted in the prior litigations prior to the settlement and

14  there was a data edit function that -- in the OPTO products

15  that was accused of infringement.  And so that would be an

16  example of technology, you might call it improvement

17  technology, but it could be combined with other technologies

18  in the 2D Barcode Products or the 1D Barcode Products that the

19  parties sell and that would provide some benefit beyond just

20  the ability to scan barcodes.  I understand that it allowed

21  for the editing of the data that came out of the barcodes.

22  That's what I heard testimony on.

23  Q.   And the third benefit you mentioned is elimination of

24  litigation costs.  A lot of lawyers in the room.  I think we

25  are familiar with that.  But anything to expand on there?

DAVID TAYLOR - DIRECT

1  A.   Well, certainly any settlement agreement eliminates
2  litigation costs, but there's some unique aspects of a license
3  agreement.  A license provides these rights going forward.
4  And so it's the -- litigation in the future should not exist,
5  the patent infringement litigation should not exist.  So a
6  license going forward should eliminate the cost.  Patent
7  litigation is notoriously expensive.
8      Beyond that, it eliminates the need to monitor the other
9  party's products and services to try to analyze whether
10 they're infringing because, well, they have a license.  We
11 don't need to do that anymore.
12         On the other side, you don't have to be worried
13 about the other party's patents because if you received a
14 license to those, you don't have to get opinion of counsel,
15 which can be very expensive.  You don't have to get a
16 freedom-to-operate analysis.  And so it can eliminate costs
17 going forward as well.
18 Q.   And does the license in Section 2.1 provide that benefit?
19 A.   Yes.  It's a cross-license agreement.
20 Q.   And the fourth benefit you identified earlier was risk
21 reduction in investment.  Can you expand on that.
22 A.   Yes.  I mean, working with, you know, inventors I know
23 that taking products to market is risky.  But one of the risks
24 in particular is the risk of patent infringement injunctions
25 and whatever remedies, damages, even attorney's fees.  And so

DAVID TAYLOR - DIRECT

1  by agreeing to a license, you also eliminate that risk:  risks
2  that you are liable for infringement, but also risks that you
3  assert a patent and the patent is invalidated in litigation,
4  really.  That can be damaging to the value of your patent
5  portfolio.
6       So a license agreement -- a cross-license agreement
7  provides significant value in that respect as well.
8  Q.   And does Section 2.1 of this agreement provide that
9  benefit?
10 A.   Yes.  It's a cross-license agreement with multiple -- you
11 know, a patent portfolio, large number of patents, so it
12 provides significant benefit.
13 Q.   And I think a few times you've mentioned the phrase
14 "improvements."  Can you explain what an improvement is in the
15 context of a patent license.
16 A.   Well, I think in this agreement there's -- I know there's
17 a definition of improvements.  But generally in patent license
18 context, when we talk about improvements, we really talk about
19 changes to patented technology.  We don't necessarily mean,
20 like, it's better.  It's just a change.  But it depends on
21 what the agreement says.  We can look at this definition of
22 improvement.
23      But, you know, when you're negotiating a license
24 agreement, you're often concerned with improvements because
25 you wonder, if you're the recipient of a license, if I change

1  this product, am I outside the scope of my license?  Can I be

2  sued for patent infringement?  You'd be worried about that.

3      Often, as well, one of the things that comes up is you're

4  wondering if I make an improvement or they make an

5  improvement, who owns any patented improvement to the extent

6  it's patentable?  I don't think that's in dispute, but that's

7  another concern that often arises.

8  Q.  And you mentioned that improvements is defined in this

9  agreement.

10      MR. SPRINGER:  Could we flip to Section 1.7.

11  Q.  What is this provision?

12  A.  Yes.  This is the improvements provision I was talking

13  about.  I'm not going to read it, but I notice the -- I think

14  it's "(i) revision, change, modification, alteration" -- I'm

15  not going to read the whole thing, but there's that part of

16  the definition.

17      Then the last sentence was important, it seemed to me.

18  "Improvement" -- I'll -- well, that language is something I

19  also considered in analyzing this license agreement.

20  Q.  And so why is that last sentence important?

21  A.  Well, this provides significant benefits to the parties.

22  As I discussed, when you're thinking about taking a license,

23  if it doesn't cover improvements, you'd be worried that you're

24  stuck with the technology that exists at the time of the

25  agreement.  And what would be better and provide you more

DAVID TAYLOR - DIRECT

1  competitive benefit in the market is to be able to improve
2  your product and not worry about infringing a patent.  And
3  this does that for both parties.  It allows them to change
4  their products, modify their products.
5       But also, in this last sentence -- and I'm not trying to
6  interpret the agreement.  Just trying to understand its
7  application.  But it allows the parties to combine
8  technologies that may exist in one product at the time of the
9  effective date and move them into other products within
10 their -- all of their products that they're selling.  And so
11 that's just another benefit that the parties agreed to give
12 each other in this agreement.
13      MR. SPRINGER:  Could we also turn next to
14 Section 2.4
15 Q.   What is this provision?
16 A.   I understand this is the covenant not to sue provision in
17 this License and Settlement Agreement.
18 Q.   And I'm not going to ask you to read the whole thing or
19 read the whole thing into the record, but how does this
20 provision differ from the license in Section 2.1?
21 A.   Well, a license -- I think I described earlier a license
22 is a promise not to sue.  A covenant not to sue is a covenant
23 not to sue.  It's a promise not to sue one-sided.  Typically,
24 in my experience, covenants are not accompanied with
25 royalties.  If you accompany a promise not to sue with a

1   running royalty, we would call it a royalty -- we'd call it a
2   license, sorry.
3       But one difference also between a license and a covenant
4   not to sue is that typically -- depends on the wording of the
5   agreement.  Typically a license runs with a product.  You
6   license a product.  But a covenant not to sue is personal to
7   the entity or entities that receive the covenants not to sue.
8   So in that way -- and again, it depends on how it's defined,
9   obviously, but that's one difference.
10  Q.   And were you present in the courtroom yesterday when
11  Mr. VanHoutan was asking questions of Mr. Whitley?
12  A.   Yes.
13  Q.   Do you remember Mr. Whitley testifying that, you know,
14  under this provision OPTO could add all sorts of things to its
15  1D Barcode Products that might infringe a Honeywell patent?
16  A.   I remember that.
17  Q.   And wouldn't have to pay any additional fee if they did
18  so?
19  A.   Right.
20  Q.   Does that ability to do that under this provision benefit
21  OPTO?
22  A.   Yeah.  I mean, this is a significant benefit to OPTO.
23  Before this agreement they did not -- they were accused of
24  infringement -- it's my understanding they were accused of
25  infringement with respect to all of their 1D and 2D products.

DAVID TAYLOR - DIRECT

1  And then after this agreement I understand they received a
2  covenant not to sue that covered their 1D products.
3      So as between before the agreement and after the
4  agreement, that is a significant benefit for the reasons I
5  discussed earlier in the four areas of benefits I described.
6  Q.   And so, I guess, why are you comparing before the
7  agreement with after the agreement?
8  A.   I'm trying to understand whether this agreement has
9  procompetitive benefits.  I understand, at least, that's what
10  I've been asked to do.
11  Q.   And so did all of the provisions of the agreement take
12  effect at the same time?
13  A.   Right, yeah.  They took effect when the agreement was
14  signed.  And then there's an effective date within the
15  agreement.
16  Q.   And so to summarize, in your opinion did the license in
17  this agreement provide benefits to OPTO?
18  A.   It provided, yes, benefits.  I mentioned the four
19  benefits that were provided to OPTO.  I think they were
20  also -- they were also provided to Honeywell.  But yes.  As
21  compared to OPTO's position before the agreement and after, I
22  think I've described the four benefits I see that OPTO
23  received.
24  Q.   And do those benefits impact the public?
25  A.   Yes.  They're procompetitive efficiencies.  And I would

1  couple the first two, right?  Allowing OPTO to use technology

2  it arguably was not otherwise able to use before the agreement

3  in light of the allegations of infringement before the

4  agreement.  So those -- it allowed OPTO to bring to market

5  technologies that the public would not have been -- otherwise

6  been able to, at least arguably had they been found liable of

7  infringement, bring to market.  So that's the first two,

8  right, in terms of clearing blocking positions and allowing

9  integration of complimentary technologies.

10      But then the other benefit that the public receives is

11  the reduction of costs to OPTO, you know, in terms of reduced

12  litigation expense, reduced risk of injunctions and damages.

13  The reduced costs theoretically flow through to consumers as

14  well.

15  Q.   And does the License and Settlement Agreement require

16  OPTO to buy anything?

17  A.   I'm not aware of the agreement requiring OPTO to buy

18  anything.

19  Q.   And does it prevent OPTO from selling any barcode

20  scanning products?

21  A.   I guess when you say anything, I should say I'm not aware

22  of it requiring OPTO to buy any products.  I mean, they have

23  an obligation to pay royalties, but I'm not aware of them

24  requiring them to buy any product, I'm sorry.

25  Q.   No, no.  Thank you for that clarification.

1    Does the license agreement require OPTO to buy any
2  Honeywell products?
3  A.    I'm not aware of that, no.
4  Q.    And does it prevent OPTO from selling any barcode
5  scanning products?
6  A.    No.  My understanding is the opposite.  It allows OPTO,
7  through a license and a covenant not to sue, to sell all kinds
8  of products and technology.
9  Q.    Were you here for the testimony of Dr. Adams yesterday?
10 A.    I was, although I did leave for about 30 seconds to get
11 water.
12 Q.    And did Dr. Adams offer any opinion about whether the
13 agreement has procompetitive benefits?
14 A.    For the time I was here, I did not hear that.  In fact, I
15 heard him say -- I won't repeat what he said, but I heard
16 him -- I did not hear any discussion -- or hear him offer any
17 testimony offering opinions on procompetitive benefits of the
18 agreement.
19 Q.    Okay.  And other than those 30 seconds you stepped out,
20 were you here throughout OPTO's case in chief yesterday?
21 A.    Yes.
22 Q.    Did you hear any evidence from OPTO weighing the
23 procompetitive benefits of the agreement against the -- any
24 alleged anticompetitive harm?
25 A.    No.

DAVID TAYLOR - CROSS

1  Q.   Have you seen any evidence in this case that suggests
2  that Honeywell has broadened the scope of its patents?
3  A.   No.
4  Q.   Why do you say that?
5  A.   Well, before -- I'm comparing before the agreement and
6  after the agreement was signed.  And before the agreement OPTO
7  was alleged to be infringing.  They were involved in
8  litigation.  And patents are presumed valid, I guess, and so
9  they did not have the ability under the law to -- at least
10  arguably, to have these products go to market, or if they did
11  they were infringing.  And then after -- importantly, my
12  understanding is that every product covered by the covenant
13  not to sue in the license was alleged to infringe before the
14  agreement was signed.  And the agreement does not go beyond
15  that scope.  That's my understanding.
16          MR. SPRINGER:  With that, we'd pass the witness.
17          THE COURT:  You may cross examine.
18          MR. McCAMEY:  Thank you, Your Honor.
19                  CROSS EXAMINATION
20  BY MR. McCAMEY:
21  Q.   Professor Taylor, I want to pick up right where you left
22  off.  I think you opined that it's your opinion that
23  Honeywell -- the agreement does not broaden the scope of
24  Honeywell's patent portfolio; is that right?
25  A.   That's correct.

DAVID TAYLOR - CROSS

1  Q.   And you didn't look at all of the patents that are in

2  Honeywell's patent portfolio, did you?

3  A.   No.  I understand -- I did ask about how many patents we

4  were dealing with and I was told it was about ten thousand

5  patents.

6  Q.   And you didn't do any infringement analysis to determine

7  whether OPTO's products actually did or did not infringe any

8  of those ten thousand patents, right?

9  A.   Correct.

10 Q.   You can't tell the Court sitting here this morning even

11 one patent that you have individually analyzed to say this

12 product infringes that patent, true?

13 A.   True.  I did not do that.

14 Q.   Now, sir, you spent a lot of time on direct talking

15 about -- you were calling it benefits, I think, in your

16 report.  You called it procompetitive efficiencies, right?

17 A.   Right.

18 Q.   I think you said you had four benefits for them, and I

19 wrote them down here.  I just want to make sure I've got them

20 right.

21      Clearing blocking patents is the first one.

22 A.   Correct.

23 Q.   And then allowing the integration of complimentary tech;

24 is that right?

25 A.   Yes.

DAVID TAYLOR - CROSS

1  Q.   And then risk related ones.  Litigation costs and risk of
2  investment, right?
3  A.   Yes.
4  Q.   Okay.  I want to start with the complimentary tech, and I
5  think you provided an example both in your report and this
6  morning about the data edit function, right?
7  A.   Right.
8  Q.   And relying on 1.7 of the agreement, I think you said --
9  it's your understanding that the data edit function may or may
10 not have infringed one or more of Honeywell's patents at the
11 effective date, right?
12 A.   I understand it was asserted to be infringing in, I
13 think, both litigations prior to the settlement agreement.
14 Q.   Sure.  So because that functionality existed at the date
15 of the effective date, it's your opinion that OPTO is now able
16 to incorporate that into any of its products, true?
17 A.   True, pursuant to the agreement.
18 Q.   Pursuant to the agreement.  And actually, it would result
19 in zero -- in no additional royalty payment, right?
20 A.   No add -- just by incorporating that existing technology,
21 it would not increase the royalty payments.  The royalty
22 payments were based on, I guess we all know at this point, the
23 definition of 2D Barcode Products, not that particular patent.
24 Q.   Sure.  So because that functionality existed at the
25 effective date, it can now be incorporated.  No additional

DAVID TAYLOR - CROSS

1  royalty payment, right?

2  A.   As a result of the agreement, correct.

3  Q.   And that's one of the procompetitive benefits that --

4  your efficiencies, depending on what word you want to use,

5  right?

6  A.   Correct.

7  Q.   You don't have an understanding -- you certainly don't

8  have all of OPTO's products memorized, right?

9  A.   Correct.

10 Q.   And you certainly don't have all their functionalities

11 memorized.

12 A.   Correct.

13 Q.   So I'm not going to turn this into a memory test or even

14 try to.  So I want to just use a hypothetical product so that

15 we can all be talking apples to apples.  Is that fair?

16 A.   Okay.

17 Q.   So I want you to imagine OPTO product A.  It's a laser

18 scanner.  It cannot read stacked code.  It cannot read any

19 other 2D code.  Everyone agrees that it falls within the 1D

20 Barcode Product under the agreement.  And it always has.  It

21 never has been able to do any of this stuff.

22      Do you understand the hypothetical so far?

23 A.   I understand.

24 Q.   OPTO would have to pay zero dollars on any of its revenue

25 for the sales of that product.  You agree with me on that,

1  right?

2  A.   Depends on the time frame.  Before the agreement, I

3  disagree.  After the agreement, I agree.

4  Q.   Under the agreement OPTO would never -- well, hold on.

5  Let's back up.

6       You haven't -- of course, you haven't conducted any

7  infringement analysis on a hypothetical product, right?

8  A.   Of course.  No.

9  Q.   Okay.  And you haven't conducted any infringement

10  analysis on any product, right?  So you have no idea sitting

11  there today whether any product, hypothetical or not, of

12  OPTO's actually infringes any of Honeywell's patents, right?

13  A.   Depends on the time.  So before the agreement, these

14  questions matter.  And I did not do any analysis so I don't

15  have an opinion one way or the other whether they infringed

16  before the agreement.  I mean, I'm looking at the agreement

17  trying to understand its effect.  I'm not trying to interpret

18  it.  I'm just trying to understand its effect.

19       And after the agreement, I agree if it's a 1D product, no

20  royalty is owed.

21  Q.   Okay.  So zero dollars on this product as it exists in

22  this hypothetical world.

23       Now, the only thing that I'm going to change about that

24  product is now everything is the exact same, but it can read

25  stacked code.  Okay.

DAVID TAYLOR - CROSS

1  A.   Okay.

2  Q.   Do you understand the hypothetical as presented?

3  A.   Yes.

4  Q.   You understand that Honeywell's position in this case is

5  that that is now a 2D Barcode Product, right?

6  A.   Yes, I understand that.

7  Q.   Okay.  And you understand that it's Honeywell's position

8  that because it's a 2D Barcode Product, it's now subject to a

9  7 percent royalty, right?

10  A.   Under the agreement now, yes.

11  Q.   Okay.  So just by changing that one functionality, this

12  product went from zero percent royalty owed to 7 percent

13  royalty owed, right?

14  A.   No, I disagree.  Just by changing the functionality,

15  that's incorrect.  You have to look at the right time period.

16  Before the agreement it didn't matter whether it was 1D or

17  2 --

18  Q.   Sir, let me make sure --

19  A.   It didn't matter whether it was 1D or 2D.  I don't know

20  whether it infringed or not.  I'm not offering opinions on

21  that.  I understand from the testimony all 1D and 2D products

22  were accused of infringement before the agreement was signed.

23  I'm not saying that they infringed or not.

24  Q.   And I'm not asking you about before the agreement.  Let

25  me make sure my question is clear.

1      After the agreement.  Zero percent royalty owed before
2  the change; 7 percent royalty owed after the change, yes?
3  A.   After the agreement, yes, that's my understanding.
4  Q.   Okay.  And you're aware that OPTO's products -- on the
5  effective date of the contract, certain of OPTO's products,
6  both some of its laser scanners, some of its CCD scanners, and
7  then its area image sensors, had the ability to read stacked
8  code, true?
9  A.   That's my understanding from the testimony I've heard.
10  Q.   Okay.  So that's one of the technologies that can be
11  incorporated under your definition of this improvement into
12  any other technology -- or excuse me, into any other product,
13  right?
14  A.   No, that's not my understanding of the effect.  I mean,
15  that would make it a 2D product, I think.
16  Q.   Well, sir, you agree with me that it's a technology that
17  existed at the time of the effective date, yes?
18  A.   That's my understanding from the testimony, yes.
19  Q.   Sorry, I missed your answer.  You agree with me that that
20  is a technology that existed at the time of the effective
21  date, yes?
22  A.   That's my understanding.  You're talking about the 1D
23  stacked barcode technology, whether that was existing at the
24  time of the agreement?
25  Q.   Yes.

DAVID TAYLOR - CROSS

1  A.    Yes, I understand that that technology existed at that
2  time.
3  Q.    Okay.  And just to make sure we're clear, incorporating
4  just that technology post-agreement, that's the only thing
5  we're changing -- laser scanner can't do it, laser scanner can
6  do it -- percent to 7 percent, yes?
7  A.    No.  That would make it a 2D Barcode Product, is my
8  understanding.  I think that's what the jury found.  I was
9  here for the jury verdict.  I think that would make it a 2D
10  Barcode Product and so it would be subject to the 2 percent
11  royalty -- 7 percent royalty in light of that.
12  Q.    I think --
13  A.    I'm not sure if I'm misunderstanding the question.
14  Q.    No, I think we said the same thing in two different ways.
15  A.    Okay.
16  Q.    Zero percent to 7 percent just by changing that one
17  functionality, yes?
18  A.    Oh, yes.
19  Q.    Now, sir, you also discussed on direct the concept of
20  blocking patents, right?
21  A.    Yes.
22  Q.    I think you used a chair example to describe what a
23  blocking patent was to the Court.
24  A.    Yes.
25  Q.    Sir, you've been retained in this case for quite some

1  time, right?

2  A.   I don't know when I was retained.  I think it was in

3  2022.

4  Q.   2022 you produced two expert reports?

5  A.   That's correct.

6  Q.   Had access to Honeywell's patent portfolio to review it

7  if you wanted to.

8  A.   Correct.

9  Q.   And at the time I took your deposition a couple months

10  ago, whenever that was, you hadn't identified even one

11  blocking patent that was cleared by this agreement, true?

12  A.   By patent number, no, I did not identify one number.

13  Although I identify in my report, I think, the '783 patent

14  which could be a blocking patent.

15  Q.   I want to make sure I ask the question correctly.  Sir,

16  did you identify any specific patents that may be considered

17  blocking patents in this case?

18  A.   I mean, I looked at the '783 patent.  It could be a

19  blocking patent.  But what I did not find, I didn't analyze is

20  looking for the other patent owned by OPTO that would create

21  the blocking scenario because you have to have patents owned

22  by different companies.  So it could be a blocking patent, but

23  I did not identify that kind of a corresponding patent by

24  OPTO.

25  Q.   And, sir, you do remember giving a deposition in this

DAVID TAYLOR - REDIRECT

1   case, right?

2   A.   Yes.

3          MR. McCAMEY:   John, can we pull up page 150 of Mr.

4   Taylor's deposition.

5          And if we can blow up lines 14 through 17, please.

6   Q.   Sir, I'm going to read this and if you'll read along with

7   me and make sure that I read it correctly.

8          "Question:   Did you identify any specific patents that

9   may be considered blocking patents in this case?

10         "Answer.   I did not.   That's why I said it 'clears

11  possible blocking patents.'"

12         Did I read that correctly?

13  A.   Yes.

14  Q.   Did I ask you that question and did you give me that

15  answer at your deposition?

16  A.   I trust the transcript, yes.

17          MR. McCAMEY:   Thank you, Professor Taylor.

18          Nothing further, Your Honor.

19          THE COURT:   Any redirect?

20          MR. SPRINGER:   Briefly, Your Honor.

21                     REDIRECT EXAMINATION

22  BY MR. SPRINGER:

23  Q.   Professor Taylor, Mr. McCamey was asking you several

24  questions about a hypothetical scenario where, you know, OPTO

25  product A, you know, was not a 2D Barcode Product and then it

RYAN HERRINGTON - DIRECT

1  changed its functionality and became a 2D Barcode Product.

2  But for the agreement, would those products have infringed

3  Honeywell's patents?

4  A.   Again, I didn't do an infringement analysis.

5           MR. McCAMEY:  Objection, Your Honor.  Speculation.

6           THE COURT:  Well, he's about to answer correctly.

7           THE WITNESS:  I didn't do an infringement analysis

8  so -- but I understand they were alleged -- I understand from

9  the testimony, whether it was the jury trial or the bench

10  trial, that all of the 1D and 2D Barcode Products were accused

11  of infringement by Honeywell.  But I did not do an

12  infringement analysis.

13           MR. SPRINGER:  Thank you.  No further questions.

14           THE COURT:  Thank you.  You may step down.

15           (Witness stepped down.)

16           THE COURT:  Any additional witnesses?

17           MR. PLEUNE:  Yes, Your Honor.  Plaintiff calls Ryan

18  Herrington.

19           RYAN N. HERRINGTON, PLAINTIFF'S WITNESS, SWORN,

20                      DIRECT EXAMINATION

21  BY MR. LAREAU:

22  Q.   Good morning, Mr. Herrington.  Would you please state

23  your name.

24  A.   Yes.  Ryan N. Herrington.

25  Q.   And where do you live, Mr. Herrington?

RYAN HERRINGTON - DIRECT

1  A.    I live in Dallas, Texas.

2  Q.    And what is your current position?

3  A.    I'm the senior managing director at FTI Consulting,

4  specifically in the Forensic and Litigation Services Practice.

5  Q.    And how long have you worked at FTI?

6  A.    I've worked there for over 17 years now.

7  Q.    And how long have you been in the forensic and litigation

8  services field generally?

9  A.    Over 20 years at this point.  Ever since I came out of

10  undergrad in 2001 I've continuously worked in the damage

11  quantification field and providing those types of services to

12  clients.

13  Q.    And what are your responsibilities at FTI?

14  A.    What I normally do is provide financial, economic, damage

15  quantification consulting services to clients primarily in the

16  fields of intellectual property disputes as well as breach of

17  contract cases like this.

18  Q.    And have you prepared any demonstratives today to aid in

19  your testimony?

20  A.    I have.

21        MR. LAREAU:  If we can go ahead and display those,

22  please.

23  Q.    Mr. Herrington, could you please briefly describe your

24  educational background.

25  A.    Sure.  So I received my BBA magna cum laude from Texas

RYAN HERRINGTON - DIRECT

1  A&M University in finance and then I subsequently went on and
2  received a Master's of Business Administration from the
3  University of Texas at Dallas.
4  Q.    And do you have any professional certifications?
5  A.    I do.  I hold three.  I'm a Certified Licensing
6  Professional, I'm a Certified Valuation Analyst, and I'm a
7  Certified Fraud Examiner.  And in holding those three
8  certifications, I'm also part of three professional
9  associations.  I'm part of the Licensing Executives Society,
10 I'm part of the National Association of Certified Valuators
11 and Analysts, and I'm part of the Association of Certified
12 Fraud Examiners.
13 Q.    And have you ever published or presented in your field?
14 A.    I have over 20 times at this point on economic topics,
15 damages topics.  And then I have published over five times,
16 including a chapter in the *Litigation Services Handbook* which
17 is actually a leading treatise for damages experts such as
18 myself.
19         MR. LAREAU:  Your Honor, we'd offer Mr. Herrington
20 as an expert in accounting, economics, and competitive
21 analysis.
22         THE COURT:  Any objection?
23         MR. VanHOUTAN:  No objection, Your Honor.
24         THE COURT:  The Court so recognizes him.
25 Q.    Mr. Herrington, have you been retained to provide expert

1  opinions in this matter?

2  A.   Yes.  I was retained by Alston & Bird on behalf of

3  Honeywell to assess the analyses and opinions of Dr. Adams

4  specifically related to OPTO's claim of patent misuse.

5  Q.   And what is your understanding of the alleged patent

6  misuse claims against Honeywell by OPTO?

7  A.   Essentially, it's my understanding that OPTO is claiming

8  that by Honeywell seeking a royalty of 7 percent on OPTO's 2D

9  Barcode Products, that is essentially patent misuse.

10  Q.   Now, have you formed any opinions with respect to

11  Dr. Adams' conclusions regarding this alleged patent misuse?

12  A.   I have.  Based on what I've reviewed of Dr. Adams'

13  analysis, his analysis is flawed and essentially

14  inappropriate.  These are three high level critiques that I

15  have of his opinion.

16      Number one, that he fails to assess demand for laser

17  scanners that read what he refers to as stacked linear

18  barcodes.

19      Number two, that he fails to offer evidence to conclude

20  that Honeywell has the ability to exclude competition.

21      And number three, that he fails to proffer any evidence

22  or analysis regarding his -- or OPTO's alleged lack of

23  profitability.

24  Q.   Let's talk about this first one.  What conclusion does

25  Dr. Adams reach regarding demand?

RYAN HERRINGTON - DIRECT

1  A.    So in his expert report -- and we heard it yesterday as
2  well from Dr. Adams -- he states that there's demand for
3  scanners that can read what he terms stacked linear barcodes.
4  Q.    Now, is that conclusion regarding scanners relevant?
5  A.    No.
6  Q.    Can you explain to the Court why not.
7  A.    Absolutely.  So what's at issue here is really laser
8  scanners that can read what he terms stacked linear barcodes,
9  not scanners.  I haven't -- I sat there this entire week and I
10 haven't heard any testimony where Honeywell has disputed the
11 fact that there may be demand for a scanner such as an image
12 scanner to read what Dr. Adams refers to as stacked linear
13 barcodes.  But again, I think what's at issue here is whether
14 there's demand for laser scanners.
15 Q.    And did Dr. Adams provide any evidence of the alleged
16 demand for the laser scanners that can read at least one
17 two-dimensional barcode?
18 A.    No.
19 Q.    What does the evidence that you reviewed in this matter
20 suggest regarding the demand for laser scanners that can read
21 at least one two-dimensional barcode?
22 A.    So the evidence that I saw in this case would suggest
23 there's actually a lack of demand for laser scanners that can
24 read this stacked linear barcode, as Dr. Adams calls it.  We
25 heard from Mr. Tanaka actually earlier today.  And when he was

1  asked if Opticon or OPTO could identify any customers in the
2  United States that they actually lost based on this lawsuit,
3  he was not able to identify any.
4  Q.   And what about Dr. Adams; did Dr. Adams identify any
5  customers that were lost?
6  A.   No.  We heard this yesterday.  Dr. Adams testified that
7  he couldn't identify a single customer, a single dollar that
8  OPTO had lost.  But he also admitted as much in his
9  deposition.
10 Q.   Now, has OPTO continued to sell its laser scanner
11 products after it decided to turn off the ability in these
12 products to read at least one two-dimensional symbology?
13 A.   Yes.  Based on the information I received, which I
14 believe was the first seven months of 2022, OPTO sold over $1
15 million of laser scanners.
16 Q.   Now, is there any other evidence in this matter to
17 suggest a lack of demand for laser scanners that can read at
18 least one two-dimensional symbology?
19 A.   I think, again, from OPTO -- we heard from Mr. Stoop
20 earlier this week.  And when he was asked what OPTO would tell
21 a customer if a customer came to them and asked why did they
22 turn off this functionality, he said, quote, "It's extremely
23 unlikely that a customer will ask for this."  So this
24 functionality is not used for many years already.
25       And again, when he was asked how many people this would

1  affect, he says, "The amount of people that are actually using
2  that functionality, I cannot say zero, but it is not very
3  big."
4      So again, this goes towards the basis of me concluding
5  there seems to be a lack of demand for laser scanners that can
6  read these, what Dr. Adams referred to as stacked linear
7  barcodes.
8  Q.   And do you recall that Dr. Adams testified about a
9  product that he alleged competed with the relevant OPTO
10 products?  It was the -- I believe it was the Voyager 1400 1D
11 plus PDF417.
12 A.   Yes, I recall that testimony.  I believe Dr. Adams stated
13 that sales were low, but I don't think he ever actually gave
14 the number.
15     And so here I'm giving the number of the Honeywell
16 product that Dr. Adams identified actually competes with
17 OPTO's laser scanners that can decode what he calls stacked
18 linear barcodes.  You'll see that over a three-year period
19 from 2020 to 2022, that product made a grand total of $11,148
20 in sales.
21 Q.   Now, Mr. Herrington, I want to be very clear what we're
22 looking at in your demonstrative and let's unpack this a
23 little bit.
24     First, did I hear you correctly that there's only been
25 $11,148 in sales for the product that Dr. Adams alleges

1  competes with the disputed products in this case?

2  A.   Correct.  And that's over a three-year period it's

3  $11,148.

4  Q.   Okay.  Let's unpack the graph that we see here on the

5  screen.

6      Now, I see there's a scale at the bottom.  It's a little

7  small and there's a lot of characters.  So the product that

8  Dr. Adams relied on to evaluate demand is the one that's the

9  blue bar.  And the product that's the red bar that you can see

10 much more of is the 1D plus PDF417 plus 2D product; is that

11 correct?

12 A.   Correct.  So the blue bar, which I'm honestly having a

13 really hard time seeing here because I know it's so small.

14 There we go.  It's been circled.  Thank you.  That represents

15 the sales of the Voyager 1400 product that Dr. Adams

16 identified competes with OPTO's laser scanners that can decode

17 what he calls a stacked linear barcode.  And these other sales

18 are the Voyager 1400 product when it has its full

19 functionality and can read other 2D barcode symbologies.

20 Q.   All right.  So just to be clear, is Dr. Adams relying on

21 the red bar as the product that competes with OPTO's disputed

22 products in this case?

23 A.   No, no, no.  He's relying on the bars we can't even

24 really see because it's, again, $11,148 over a three-year

25 period.

RYAN HERRINGTON - DIRECT

1  Q.   Let's take a step forward.  What does Dr. Adams conclude

2  regarding Honeywell and its market power?

3  A.   He concludes that Honeywell has market power based on its

4  ability to exclude competition.

5  Q.   And what is Dr. Adams' support for this conclusion?

6  A.   That, again, because Honeywell has asked for the

7  7 percent royalty as spelled out in the agreement on these 2D

8  Barcode Products, that that has somehow forced OPTO to exit

9  the market and therefore has excluded competition.

10 Q.   Now, in your work on this case, have you seen any

11 evidence to suggest that Honeywell forced OPTO to disable the

12 ability of its laser scanners to read any code at all?

13 A.   No.

14 Q.   Does Dr. Adams discuss other business decisions that OPTO

15 could have made?

16 A.   He does.  So Dr. Adams, he talked about it yesterday, but

17 he also mentioned it in his report, that there were other

18 decisions that OPTO could have made.  OPTO could have

19 increased its price for its products.  Or it could have

20 accepted a lower profit margin on those products.  Or it could

21 have done what OPTO ultimately chose to do which is withdraw

22 the products or remove the functionality.

23 Q.   Now, what do Honeywell's past actions actually suggest to

24 you regarding its stance on competition?

25 A.   Its past actions would suggest to me that it encourages

1 competition.  It doesn't really seek to exclude it.

2 Q.   And what's your basis for that conclusion,

3 Mr. Herrington?

4 A.   So we've heard lots of testimony about this this week,

5 but Honeywell's actually licensed its patent portfolio to

6 other competitors, including Zebra who I think Dr. Adams

7 recognizes as the market leader.  And they've also licensed to

8 Code and I believe Datalogic, which I think Dr. Adams also

9 talked about as a major player in the industry.  So to me that

10 would suggest that they are willing to encourage competition,

11 not necessarily seek to exclude it.

12 Q.   And circling back, Mr. Herrington, how much in sales in a

13 three-year period did Honeywell have of the product that

14 Dr. Adams alleged competed with OPTO's products at issue in

15 this litigation?

16 A.   So again, $11,148 over a three-year period.

17 Q.   And I want to be clear.  Did Dr. Adams use these sales

18 figures as the basis for his HHI analysis regarding market

19 concentration?

20 A.   No, he did not.  He looked at the handheld scanner market

21 overall in those market share numbers.

22 Q.   So when Dr. Adams testified about the 20 percent safety

23 zone and the guidelines and was doing his analysis and math in

24 his testimony, he wasn't basing it on these sales, was he?

25 A.   No.

RYAN HERRINGTON - DIRECT

1  Q.   And these sales, as I believe Dr. Adams called them low,
2  suggest what to you regarding Honeywell's market power in this
3  market?
4  A.   It would suggest in this market they have a lack of
5  market power.
6  Q.   And have you seen any evidence presented by Dr. Adams to
7  suggest that Honeywell has power over price, namely the power
8  to raise price and restrict output?
9  A.   No.
10 Q.   And have you ever heard of a test to see if a potential
11 seller of a product might exert a small but significant and
12 non-transitory increase in price?
13 A.   I have heard.
14 Q.   What is that commonly referred to?
15 A.   The SSNIP test.
16 Q.   Just generally, why would someone do that?
17 A.   I think it's to define a relevant market of products.
18 Q.   And did Dr. Adams perform a SSNIP test in his report?
19 A.   No, not in his report, and he admitted that yesterday in
20 his testimony.
21 Q.   Now, do you agree with Dr. Adams' assertion that, quote,
22 Honeywell royalty demands are a restraint of OPTO's ability to
23 compete and that exercising patent rights is a restraint on
24 competition?
25 A.   No.  I think what we've heard from both sides this week

1  is that a patent by its very definition is giving someone a
2  right to exclude someone else from making or using an
3  invention.
4  Q.   So is there anything wrong with licensing -- excuse me,
5  licensing intellectual property rights?
6  A.   Not that I'm aware of.  And in fact, in some of the
7  guidelines that Dr. Adams was pointing to yesterday, I don't
8  believe you're going to find anything in there that talks
9  about a restraint on competition is when someone is exercising
10  their patent rights.
11  Q.   Let's take another step forward.  Does Dr. Adams offer
12  any evidence or analysis on the unprofitability of OPTO's
13  products?
14  A.   No, he doesn't.
15  Q.   And does Dr. Adams discuss various business decisions
16  that OPTO could have made in response to its royalty
17  obligations?
18  A.   Again, I went over these a little bit earlier, but I'll
19  repeat them.  So OPTO could have chosen to increase the price
20  of its products.  They could have chosen to decrease the
21  profit margin on those products.  Or they could have chosen to
22  disable the ability of those products to read the symbologies
23  and therefore remove those products from the market.  They
24  could have made any of those choices.
25  Q.   Now, what business decision did OPTO choose not to make?

1  A.    They didn't, as far as I see, increase the price of the

2  products or decrease the profit margins of those products.

3  That's not what they did.  That's not what they chose to do.

4  Q.    And what business decision did OPTO choose to make?

5  A.    OPTO chose to disable the ability of those products to

6  read.  And you can see by the earlier testimony I gave, there

7  was no evidence that any customers came to them and asked, you

8  know, why.

9  Q.    And what does Dr. Adams conclude based on this business

10  decision?

11  A.    He concludes that because OPTO made that business

12  decision, that somehow that was Honeywell's forcing them to

13  exit the market.

14  Q.    And does Dr. Adams cite to any documentary evidence that

15  OPTO disabled its products from reading at least one 2D

16  barcode symbology due to a lack of profitability?

17  A.    No.

18  Q.    Did Dr. Adams proffer any profitability calculations or

19  analysis on OPTO's products at issue to establish whether a

20  7 percent royalty rate would have made these products

21  unprofitable?

22  A.    No.

23  Q.    Did Dr. Adams testify about OPTO's profit margins at his

24  deposition and yesterday?

25  A.    He did.  In both places he admitted that he didn't know

RYAN HERRINGTON - DIRECT

1  what OPTO's profit margins were.  His idea of a profit margin

2  was more theoretical in nature and he wasn't looking at any

3  actual accounting data to see if that -- what he was supposing

4  was true.

5  Q.   To summarize, Mr. Herrington, has Dr. Adams demonstrated

6  that Honeywell has market power?

7  A.   No, not in my opinion.  These are three of my overarching

8  opinions that render his analysis flawed.

9  Q.   And I have one final housekeeping issue for

10  Mr. Herrington.  Did you offer an opinion in this case

11  regarding the proper calculation of damages for OPTO's breach

12  of 4.3 and 4.6 of the settlement agreement?

13  A.   Yes, I had an expert report with that opinion.

14  Q.   And do you understand whether OPTO has stipulated to

15  those damages?

16  A.   I understand -- I understand that OPTO has stipulated to

17  the damages number that was in my report.

18        MR. VanHOUTAN:  Your Honor, this is outside the

19  scope of this witness's knowledge.  We're happy to discuss the

20  stipulation, but we don't need to do it through this witness.

21        THE COURT:  Yes, it's unnecessary for these

22  purposes.

23        MR. LAREAU:  One final question, Your Honor, that

24  doesn't relate to the stipulation.

25  Q.   In the damages that you calculated, Mr. Herrington, did

RYAN HERRINGTON - CROSS

1  you rely on any sales for products sold by OPTO in 2023?

2  A.   No.

3        MR. LAREAU:  No further questions, Your Honor.  Pass

4  the witness.

5        THE COURT:  You may cross examine.

6        MR. VanHOUTAN:  May I approach the witness?

7        THE COURT:  You may.

8                    CROSS EXAMINATION

9  BY MR. VanHOUTAN:

10 Q.   Good morning, Mr. Herrington.

11 A.   Good morning.

12 Q.   It seems like all of Honeywell's experts today are from

13 Dallas.  I'm from Houston so I guess we can't be friends.

14 A.   And from Texas A&M it seems like.

15 Q.   Now, you don't have an economics degree, correct?

16 A.   I don't have a degree; although, I've been recognized as

17 an economic expert numerous times.

18 Q.   And you are not an antitrust expert, correct?

19 A.   I wouldn't classify myself as an antitrust expert;

20 although, I obviously have given opinions in the past on

21 competition, which is the opinions I'm giving here.

22 Q.   Your company FTI has a website, correct?

23 A.   Oh, yes, we have a website.

24 Q.   And on that website it lists some individuals who are

25 antitrust experts and it doesn't identify you, correct?

RYAN HERRINGTON - CROSS

1  A.   Oh, as I said in my deposition, I think the website lists
2  individuals that may have that particular expertise, but there
3  are countless individuals at FTI that aren't on the website
4  that also have antitrust experience.
5  Q.   You talked a lot about demand.  I want to ask some
6  questions about markets.  You agree that a market exists for
7  laser and CCD scanners with the ability to read stacked
8  barcode symbologies like PDF417, correct?
9  A.   A market exists in the sense that sales have clearly been
10 made in that market.  Now, the level of sales, I think, is
11 what is in question and whether that constitutes demand.
12 Q.   And based on sales alone, you're not able to tell me what
13 is demand versus lack of demand, right?  You're just making
14 that up.
15 A.   Oh, I'm not making it up.  I think there's no bright line
16 test.  I think Dr. Adams would agree there's no bright-line
17 test.  You have to look at everything in totality.  So I think
18 looking at all the evidence here would suggest there's a lack
19 of demand.
20      And what Dr. Adams did is he didn't actually look at even
21 demand for laser scanners.  His opinion was there was a demand
22 for scanners that can read that symbology.  So he wasn't even
23 looking at the right thing.
24 Q.   It's your opinion there's a lack of demand, correct?
25 A.   My opinion is the evidence would suggest there's a lack

1  of demand.  I certainly didn't see evidence put forward that

2  there is demand.  And really, that's the failure of proof on

3  Dr. Adams.  That's ultimately his burden, is my understanding.

4  Q.   And you couldn't tell me in your deposition at what sales

5  level in your opinion would be demand versus lack of demand,

6  correct?

7  A.   I agree, there's no bright-line test.

8  Q.   But you agree there is a market for these products with

9  the functionality we've discussed, stacked barcode

10  symbologies, right?

11  A.   I believe that there have been sales made in that

12  marketplace.  But if there was a true demand for laser

13  scanners that could decode 2D Barcode Products or 2D barcode

14  scanners, I would have expected the testimony from OPTO's own

15  30(b)(6) witnesses to be very different than the testimony I

16  relied on for my opinion.

17  Q.   You agree that OPTO was selling laser and CCD scanners

18  with the ability to read stacked barcode symbologies like

19  PDF417 to customers before this lawsuit, right?

20  A.   Yes.

21  Q.   It was selling in the neighborhood of $5 million a year

22  worth of those products, correct?

23  A.   I don't remember the exact number; but if that's what

24  you're stipulating to, then that wouldn't surprise me that

25  they may have made sales like that.

RYAN HERRINGTON - CROSS

1  Q.   And over the past five years, it's roughly $90 million
2  worth of sales that OPTO's made in this market to these
3  customers, correct?
4  A.   Again, I don't have that number memorized; but if that's
5  what you're saying they did, it wouldn't necessarily surprise
6  me.  But again, I think if the demand, then, was for a laser
7  scanner to be able to read that symbology, when that
8  functionality was removed, I would have again expected
9  different testimony from OPTO's 30(b)(6) witnesses and I would
10 expect to see Dr. Adams identify customers or sales that were
11 lost because there was so much pent-up demand for these
12 products.  And that's not what I saw.
13 Q.   And you didn't analyze the sale of OPTO's laser or CCD
14 scanners with the capability to -- strike that.
15       You didn't analyze OPTO's laser or CCD scanners after the
16 ability to decode stacked barcode symbologies was removed,
17 correct?
18 A.   Well, I think I said in my direct that in 2022 I think
19 they still sold 1 million laser scanners in the first seven
20 months of 2022, I believe.
21 Q.   As compared to 5 million the year before when that
22 capability was there?
23 A.   That's potentially true.  Although, what I would say is I
24 think -- and I said this in my deposition -- there are a lot
25 of reasons that could affect sales numbers.

RYAN HERRINGTON - CROSS

1   Q.   After this lawsuit was filed, OPTO removed the capability
2   to decode stacked barcode symbologies from its laser and CCD
3   products, correct?
4   A.   I think that's what OPTO contends and I believe I relied
5   on OPTO's contentions for that understanding.  But I think as
6   we all saw yesterday, there may be a question on why OPTO
7   removed that functionality, at least based on a couple of
8   exhibits that were put up yesterday.
9   Q.   If you can go to your rebuttal expert report in your
10  binder there.
11  A.   Sure.
12  Q.   And turn to page 4.
13  A.   Okay.
14  Q.   At the bottom of paragraph 6 of page 4, you state,
15  "Specifically, OPTO alleges that," quote -- sorry, "that
16  'after Honeywell filed the complaint, OPTO was forced to turn
17  off the stacked linear barcode decoding function in its laser
18  scanner products in light of Honeywell's allegations.'"
19       Did I read that correctly?
20  A.   Yes.  And I cite defendant's supplemental and amended
21  objections and responses.  So I'm quoting OPTO's allegations,
22  correct.
23          MR. VanHOUTAN:  Just for the record, that's been
24  admitted into evidence.  It's Plaintiff's Exhibit 61, response
25  to rog 11.

RYAN HERRINGTON - CROSS

1  Q.   You didn't do any comparison to determine how OPTO's

2  sales of the products that we've been discussing, laser and

3  CCD scanners, with the capability we've been discussing, the

4  ability to decode barcode -- stacked barcode symbologies,

5  compared to when the functionality was there and when it was

6  removed, correct?

7  A.   I think we just went over that a little bit when you

8  asked me sales before and after.  And what I would say is -- I

9  think I answered this in my deposition.  There are many

10  reasons sales can be different, but I didn't do a formal

11  analysis of that.

12  Q.   And you don't know whether any of those reasons apply,

13  correct?

14  A.   I don't know why any of the reasons apply.  I guess what

15  I would be asking is I would have expected to see, like I

16  said, different testimony from OPTO on if it was truly because

17  of the removal of functionality and that was -- that was the

18  demand was for this functionality, I would have expected

19  different responses from OPTO.

20  Q.   So you don't have a firm opinion either way, correct?

21  A.   No, I was rebutting Dr. Adams' analysis and this is a

22  basic tenet of his analysis; that when it falls, it causes the

23  rest of his opinion to fail.

24  Q.   You agree that there is a demand in the market for area

25  image scanners with the ability to read stacked barcode

RYAN HERRINGTON - CROSS

1  symbologies like PDF417, correct?

2  A.   I would not disagree that -- and I don't think anybody

3  has said in this case that there's not a demand for scanners

4  to read it, and that was the point.  Because I understand that

5  PDF417 is used on driver's licenses, as we've heard.  It's

6  used for boarding passes.  So there may be a demand for

7  scanners and specifically image scanners like you point out.

8  But again, I was being specific to laser scanners which is the

9  products that were at issue here.

10  Q.   Honeywell's Voyager 1400 is an area image scanner with

11  the capability to decode stacked barcode symbologies, correct?

12  A.   Careful.  So there's three different Voyager 1400s in the

13  sense of what they turn on and turn off.  And so my

14  understanding would be, if you saw my demonstrative exhibits,

15  the large amount of sales that were in red that dwarfed what

16  Dr. Adams said actually competes with the laser-based

17  scanners, those would be what would be called an image scanner

18  that has its full functionality turned on.  Whereas, the one

19  that Dr. Adams said competes of the Voyager 1400s is the one

20  that's just labeled 1D plus PDF417, and that's where sales

21  were only $11,148 over a three-year period.

22  Q.   But you agree that there's demand in the market for an

23  area image scanner like the Voyager 1400 with the capability

24  to decode stacked barcode symbologies like PDF417, correct?

25  A.   There's clearly demand for the 1400 that has the ability

1  to do the 2D, the full 2D because you can see that in some of
2  the sales.  As compared to the 1D PDF417, I would say that
3  shows a lack of demand.  $11,000 over a three-year period
4  seems low to me.  And honestly, Dr. Adams agreed.  He said
5  they were low sales.
6  Q.   So I want to just be clear on this and your opinion.  If
7  you could turn to your deposition transcript.
8  A.   Sure.
9  Q.   And let's go to page 208.
10 A.   Okay.
11 Q.   Starting at line 13.
12 A.   Okay.
13 Q.   Give me one moment.
14 A.   Okay.
15 Q.   I want to switch gears a little bit.
16      You never asked anyone at Honeywell in this case whether
17 there was a demand or a lack of demand for laser and CCD
18 scanners that could read PDF417, did you?
19 A.   No.  I looked at OPTO's own testimony.
20 Q.   And you don't have an opinion on whether a large base of
21 installed laser CCD scanners would create a continuing demand
22 for that product, correct?
23 A.   I would have expected if there was a large installed base
24 to have very different answers when that functionality was
25 turned off.

RYAN HERRINGTON - CROSS

1  Q.   Let me ask my question again.

2  A.   Sure.

3  Q.   You don't have an opinion on whether a large base of

4  installed laser scanners would create a continuing demand for

5  that product, correct?

6  A.   I don't think I have an exact opinion on that in my

7  report; although, I obviously point out what OPTO said when

8  asked if any customers had come to them with any -- did they

9  lose any customers when they turned it off and the answer was

10  no.  The number that would even use this functionality is

11  not -- is not zero, but not very big, I think is the quote.

12  Q.   Are you done?

13  A.   Yes.

14  Q.   And you don't have an opinion on what would be required

15  for a customer with laser or CCD scanners to switch to using

16  image scanners, correct?

17  A.   I don't think I have an opinion on that, no.

18  Q.   Mr. Herrington, now that I have my house in order a

19  little bit, if we can go back to your deposition transcript.

20  A.   Okay.

21  Q.   Let's go to page 207, please.

22  A.   Okay.

23  Q.   And we were talking about demand in the market for area

24  image scanners that can read PDF417.  Do you recall that?

25  A.   Yes.

RYAN HERRINGTON - CROSS

1  Q.   And I asked you at line 13, "So, I want to -- I want to
2  ask -- before we talk about laser scanners -- in your opinion,
3  is there a demand for area image scanners that can decode at
4  least one of PDF417 or MicroPDF417?"

5       And you said, "Yeah, I wouldn't disagree with that.  I
6  think there's probably a demand for that."

7       And then you went on, and please feel free to read the
8  rest of it.

9  A.   Yeah, I think we should keep going all the way through
10 208, which is where you went to first, and I think you'll see
11 a full answer there that's very consistent with what I gave.

12 Q.   Okay.  There was no qualification regarding it having to
13 have the full complement of stacked symbologies and 2D, like
14 QR symbologies, anything like that, right?

15 A.   I guess I'd have to read this in its entirety to
16 understand.  In your question there wasn't a qualification of
17 that.

18 Q.   Okay.

19 A.   But I think that's the way I would understand it.  I
20 mean, I don't think anywhere in this report I said that I
21 thought $11,000 of sales is demand.

22 Q.   And you can't tell me if it was $30,000, whether that
23 would be demand, or if it was $45,000, if that would be
24 demand.  You're just saying that the number you've seen shows
25 a lack of demand, correct?

RYAN HERRINGTON - CROSS

1  A.    There's no bright-line test.  I mean, obviously you can

2  see just between the two products that I put up in my

3  demonstratives, the one that is the area image scanner that

4  had the ability to read all 2D barcode symbologies obviously

5  had -- I don't know.  It was definitely over a million dollars

6  in sales in just one year, I think.  Meanwhile, the one that

7  could only read 1D plus PDF417 sold by Honeywell had $11,148

8  over a three-year period.

9  Q.    You have no basis to disagree with Dr. Adams that there

10  are price-sensitive customers for whom the best option is

11  often a laser or CCD scanner product rather than a typically

12  more expensive area image scanner, correct?

13  A.    I don't think I have an opinion on that.  Again, but

14  that's not consistent with OPTO's testimony about what they

15  did or what customers did when they removed the functionality.

16  Q.    I just want to be clear.  You don't have an opinion on

17  that, correct?

18  A.    I think that's what I said.  It's not consistent with

19  what I saw.  That's my opinion.  But I don't have a specific

20  opinion on the price sensitivity.

21  Q.    Okay.  Let me just try to -- so we're speaking the same

22  language.

23  A.    Sure.

24  Q.    If you have an opinion, you have an opinion --

25  A.    Okay.

RYAN HERRINGTON - CROSS

1  Q.   -- and I'm happy to hear what that opinion is.

2       If you don't have an opinion, then you don't have an

3  opinion.

4  A.   Okay.

5  Q.   So let me ask my question again.

6  A.   Sure.

7  Q.   Do you have a basis to disagree with Dr. Adams that there

8  are price-sensitive customers for whom the best option is

9  often a laser or CCD scanner product rather than a typically

10 more expensive area image scanner?

11 A.   Directly, no, besides what I just previously stated.

12 Q.   You understand Honeywell is seeking a royalty in this

13 case on OPTO's laser and CCD scanning products that can decode

14 stacked barcode symbologies like PDF417, correct?

15 A.   Can you repeat your question, I'm sorry.

16 Q.   Sure.  I'll try to speak slower.

17 A.   Okay.

18 Q.   You understand Honeywell is seeking a royalty in this

19 case on OPTO's laser and CCD scanning products that can decode

20 stacked barcode symbologies like PDF417, correct?

21 A.   Yes.  I think they've already sought to.  It's already

22 been ruled.  But yes.

23 Q.   And once the feature allowing those products to read

24 PDF417, for example, is turned off, Honeywell is no longer

25 seeking a royalty on those products, correct?

1  A.   There may not be an ongoing royalty because it wouldn't

2  fall into the definition of 2D Barcode Products; but I think

3  based on the settlement agreement, License and Settlement

4  Agreement that I reviewed, there were lump sum payments that

5  were made pre the agreement that would, I assume, encompass

6  part of the benefit of being able to sell 1D products as

7  defined in the agreement.

8  Q.   I think you said this in your answer, but just to be

9  clear.  On a go-forward basis, if OPTO removes its

10 functionality from its products, Honeywell is no longer

11 seeking a royalty payment, correct?

12 A.   I think they're not seeking a royalty payment

13 specifically related to those products if they're not defined

14 as 2D Barcode Products as the jury defined it.

15 Q.   In your opinion, there is a lack of demand in the market

16 for the ability for a laser or CCD scanner to read stacked

17 barcode symbologies like PDF417, correct?

18 A.   It would suggest there's a lack of demand.  The main

19 opinion is that Dr. Adams didn't even look at that to see if

20 there was demand for laser scanners.  His opinion was there

21 was a demand for scanners.  That's the main thrust of the

22 opinion.

23 Q.   And you prepared -- I think your counsel started to

24 allude to it -- a damages report for effectively the jury

25 trial in this case, correct?

RYAN HERRINGTON - CROSS

1   A.   Yes, I did prepare a damages report for the jury trial.

2   Q.   How many -- let me say that again.  How much Honeywell

3   was demanding in this case, correct?

4   A.   Yes.

5   Q.   And you agree that Honeywell was seeking millions of

6   dollars in damages in this case from OPTO for the very

7   products that you say have no demand in the marketplace,

8   correct?

9        MR. LAREAU:  Objection, Your Honor.  Counsel is

10  referring to the portions of the report that were stricken or

11  ruled on through summary judgment.  He's referring to

12  Section 5 which was excluded by Your Honor in the summary

13  judgment order.

14       MR. VanHOUTAN:  Your Honor, this is just allegations

15  in their complaint.

16       THE COURT:  To the extent -- well, I mean, I

17  understand the distinction so I will not be misled, I assure

18  you.  But I would appreciate, if you're going to talk about

19  actual dollars, that you do make the differentiation between

20  the two areas of damages.

21       MR. VanHOUTAN:  I'm not going to ask any further

22  questions about that.

23  Q.   Let's talk about market power a little bit.

24  A.   Okay.

25  Q.   You agree that market power can be determined from direct

RYAN HERRINGTON - CROSS

1  evidence, including supracompetitive prices, restricted
2  output, and excluding competition.
3  A.   I don't think I disagree with that.
4  Q.   You don't know how to determine whether a company has
5  real market power, which you classify as real, or just regular
6  market power, correct?
7  A.   I think real market power was just citing what was in a
8  supreme court decision in talking about power over price, so
9  the ability to exclude competition.
10  Q.   So real market power is just regular market power,
11  correct?
12  A.   I mean, power over price, excluding competition, I think
13  you -- the point is you have to prove either, and I don't
14  think that's what Dr. Adams did.
15  Q.   So power over price and the ability to exclude, that's
16  real market power, right?
17  A.   I don't know if I would use just real.  My understanding
18  is that's a definition of how you try to determine if there's
19  market power.
20  Q.   I'm just under -- trying to understand your definition of
21  real versus not real.
22       So would you agree that market power, real, regular,
23  otherwise, is the power over price and the ability to exclude
24  competition?
25  A.   I don't think I define real market power.  I think I'm

1    just citing it.  If we go to my report, I think I'm just

2    making a cite there.  I don't think I'm trying to define real

3    market power.

4    Q.    Okay.  Fair enough.

5         So market power is the power over price or the ability to

6    exclude competition, correct?

7    A.    I think that's what's in the literature.  But again, I'm

8    not putting forth a formal definition.  That's not part of my

9    opinion per se.

10   Q.    You agree that power over price is the power to force a

11   purchaser to do something that it would not do in a

12   competitive market and/or the ability of a single seller to

13   raise price and restrict output, correct?

14   A.    That sounds reasonable, but I would probably want to see

15   the formal definition before I just agree.

16   Q.    And you understand that OPTO removed the functionality to

17   decode stacked barcode symbologies like PDF417 from its laser

18   and CCD products as a result of this litigation, correct?

19   A.    I don't know if it's as a result of this litigation.  I

20   would say that's what OPTO alleges.  But as we all saw

21   yesterday, that may not be the case why they removed it.

22   Q.    And you haven't seen any evidence that OPTO turned off

23   this functionality or removed this functionality for any

24   reason outside of this litigation, correct?

25   A.    Well, I think we saw two exhibits so --

RYAN HERRINGTON - CROSS

1    Q.   Other than -- sorry.

2    A.   -- I disagree.

3    Q.   Other than that, have you seen anything else?

4    A.   Other than that, no.  But I haven't seen anything that

5    says that they did remove it because of -- this functionality

6    except for their own contentions.

7    Q.   I think you testified to this, but correct me if I'm

8    wrong.  One of the options OPTO had from Honeywell's royalty

9    demands in this litigation was to remove the functionality

10   from the products; and that's what they did, right?

11   A.   That was one option among at least three that Dr. Adams

12   and I both agree they had those choices; and they chose to do

13   the third, correct.

14   Q.   And you don't have an opinion about whether continuing to

15   pay a 7 percent royalty on the products accused in this case,

16   laser and CCD scanners, would have made them unprofitable for

17   OPTO, right?

18   A.   I don't have an opinion because I didn't see any evidence

19   or analysis put forward by Dr. Adams to show that -- what the

20   profit margins were.  So I would have expected -- if that's

21   the reason, I would have expected to see an analysis of that,

22   of what he calls the accounting profitability, but what I call

23   the real dollars and cents.

24   Q.   So let me just be clear in my question again.  You don't

25   have an opinion yourself, do you?

RYAN HERRINGTON - CROSS

1  A.    No.  I didn't -- I don't have an opinion.  I have a -- I

2  didn't see any profitability numbers to do that calculation.

3  Q.    You have no criticism of Dr. Adams' HHI calculations or

4  other market concentration analyses, do you?

5  A.    Just outside of the fact what I pointed out in my direct

6  was that he clearly was using the wrong market.

7  Q.    And you didn't ask anyone at Honeywell for any market

8  share data, correct?

9  A.    No, I don't believe so.  I think, as Dr. Adams said,

10 there was some market share data that had been produced.

11 Q.    And you acknowledge that the Voyager product that

12 Honeywell sells in one of the versions competes with OPTO's

13 laser and CCD scanners, correct?

14 A.    In one of the versions.  Yeah, I think Dr. Adams says

15 that the Voyager 1400 1D plus PDF417 is the product that

16 specifically competes with the laser scanners.

17 Q.    And that Voyager product is an image scanner, correct?

18 A.    It's an image scanner, as I understand it, with the

19 functionality turned off to just allow for 1D and PDF417.

20 Q.    Okay.

21 A.    So it's what Honeywell deems as competitive with the

22 laser scanners.

23 Q.    And it competes with -- I think you just said it there.

24 It competes with OPTO's laser and CCD scanners with that same

25 functionality, correct?

1  A.   I think that's what Honeywell meant to do with that
2  device, correct.
3  Q.   So the two products that are competing are just scanners:
4  One's a laser scanner; one's an image scanner, correct?
5  A.   One's a laser scanner -- that would be OPTO's -- but with
6  the ability to read a 2D Barcode Product, which we now
7  understand means it's a 2D Barcode Product under the License
8  and Settlement Agreement.  That competes with a scanner that
9  has all functionality removed except for the ability to read
10 1D and PDF417.  That's the way I understand it.
11 Q.   Okay.  Let's focus on the hardware.  One is a laser
12 scanner; one is an image sensor scanner, right?
13 A.   I think it is an image sensor scanner that has the
14 functionality removed.
15 Q.   They're both scanners, correct?
16 A.   Yes, I think they are both scanners.
17 Q.   You talked about the low sales of a particular version of
18 the Voyager Honeywell product, correct?
19 A.   Yes.
20 Q.   Honeywell has no plans to discontinue that product, do
21 they?
22 A.   Not that I know of.
23 Q.   And just to be clear, you're not offering an opinion on
24 whether Honeywell did or did not impermissibly broaden the
25 scope of its patent rights, correct?

RYAN HERRINGTON - CROSS

1    A.    No, I'm not offering that opinion, to answer your
2    question.
3    Q.    Thank you.
4         You were talking about Honeywell's licensing and license
5    agreements.
6    A.    Yes.
7    Q.    And some of those licenses relate to a mandate by the FTC
8    that Honeywell go out and license some of its patents, right?
9    A.    Possibly.
10   Q.    You talked about, again, the low sales of the Voyager
11   product.  Are you sure you added up everything correctly?
12   A.    I thought I did.
13   Q.    Okay.  You got both the ivory model and the black model,
14   correct?
15   A.    I would have to look at my exact exhibit to see.
16   Q.    Okay.
17   A.    I think what Dr. Adams said in his report was it's 15,000
18   annually.  And I think what I said was it's $11,148 over that
19   three-year period.  But either way, clearly it's a very low
20   amount of sales because Dr. Adams thought it was low even at
21   15,000 annually, so I wouldn't disagree.
22   Q.    Okay.  Let's go to your rebuttal report at Footnote 31.
23   A.    Okay.
24   Q.    And at the top -- I'm not going to read it out loud, but
25   can you read it for yourself, please, and just let me know

1  when you're ready.

2  A.   Footnote 31?  I've read Footnote 31.

3  Q.   So it states -- and I just want to read the material

4  names.  "Scanner 1400G 1D PDF417, IVORY or USB Kit 1400G:

5  1D/PDF417/IVORY," correct?

6  A.   Yes.

7        MR. VanHOUTAN:  If we could bring up DX127, please.

8        And if we could go to page 3 to the hardware

9  scanner.

10 Q.   And we see here under SKU types "1D, PDF417, ivory" --

11 I'm looking at the bottom -- and "1D, PDF417, black."

12     Do you see that?

13 A.   Yes.

14 Q.   You didn't include the black, did you?

15 A.   It doesn't appear that I did.  I don't know if those

16 sales are made in the United States or not.

17 Q.   Assuming they are, you don't know what that brings the

18 sales of this particular Voyager product to, do you?

19 A.   If they're made in the United States, no, but -- I would

20 assume, if that's what Dr. Adams did and how he got 15,000, as

21 we both agree, they're still low.  They don't compare at all

22 to the demand that we see for Honeywell's full 2D product, the

23 Voyager 1400.

24     MR. VanHOUTAN:  No further questions.  Thank you,

25 Mr. Herrington.

```
1              THE COURT:  Any redirect?

2              MR. LAREAU:  No, Your Honor.

3              THE COURT:  Thank you.  You may stand down.

4              (Witness stepped down.)

5              THE COURT:  Additional evidence for Honeywell?

6              MR. PLEUNE:  No further witnesses from plaintiff,

7   Your Honor.

8              THE COURT:  Evidence for OPTO?

9              MR. VanHOUTAN:  Your Honor, would it be appropriate

10  to take a short break so we can confer and see if we've got

11  any rebuttal?

12             THE COURT:  All right.  We'll take a 15-minute

13  break.

14             MR. VanHOUTAN:  Thank you.

15             (Brief recess at 10:45 AM.)

16             (Court back in session at 11:01 AM.)

17             THE COURT:  Will there be rebuttal evidence from

18  OPTO?

19             MR. VanHOUTAN:  No, Your Honor.

20             THE COURT:  Care to make or renew your motion?

21             MR. PLEUNE:  Yeah, we'd like to renew our motion

22  under 52(c).

23             THE COURT:  Would you like to be heard on it any

24  further?

25             MR. PLEUNE:  No, Your Honor.
```

1          THE COURT:  Would you like to respond any further?

2          MR. VanHOUTAN:  We'd like to make our own motion

3   which arguably would be a response.

4          THE COURT:  Yes.

5          MR. VanHOUTAN:  Very briefly, Your Honor.

6          Impermissibly broaden the scope of the patent grant,

7   we think we've shown that.  The evidence has shown that.

8   There are two categories of products in the agreement.  One is

9   subject to a covenant not to sue.  One is subject to a

10  license.  According to Honeywell, only one product

11  functionality transforms one product to the next, but they

12  don't have patents on that.

13         And then as far as the anticompetitive effect, we've

14  now heard the evidence.  OPTO was selling a lot of these

15  beforehand.  And after this litigation, in response to the

16  litigation, OPTO is not selling very many and they're not

17  available to the consumers.  That's direct evidence of

18  anticompetitive effect.  We've talked about market

19  concentration and how Honeywell is a big player; has more of

20  an impact on the market than somebody who has 1 or 2 percent.

21         And then finally, the anticompetitive effect

22  evidence we've heard, it's not competitive efficiencies when

23  subject to an impermissible extension of a patent grant it

24  requires a consumer or someone to take something out of the

25  market, which OPTO was forced to do here, or otherwise pass on

1  a 7 percent profit increase -- price increase to the consumer
2  and it's really the consumer that's harmed.  And that's sort
3  of the anticompetitive effect analysis.
4         So we would move under Rule 52(c).
5         THE COURT:  All right.
6         MR. PLEUNE:  And I'll just briefly respond to that,
7  Your Honor.
8         OPTO's statutorily precluded from patent misuse
9  under 35 U.C.S. Section 271.  They're contractually precluded
10 under Section 5.3 of the agreement.  And I think, as we saw
11 from the testimony today, they have failed to show any market
12 power by Honeywell.  I think what we have seen is that there
13 is a significant lack of evidence of anything that would
14 actually prove market power, particularly for the market as
15 Dr. Adams defined it.  If anything, we saw that that was an
16 extremely small market for which there was no demand and
17 certainly no evidence of demand.
18        THE COURT:  The Court finds that there is
19 insufficient evidence from which the Court could find by clear
20 and convincing evidence that OPTO has established that the
21 license agreement had anticompetitive effects even if it had
22 the effect of impermissibly broadening the scope of
23 Honeywell's patents, which the Court is not deciding.
24        The Court finds as fact that there is not clear and
25 convincing evidence why OPTO removed the ability to decode 2D

symbologies from the laser scanner products in dispute, which
is quite curious to the Court because if there was such
evidence, it would be easily presented.

Nor is there clear and convincing evidence of
anticompetitive effects in the market.  Dr. Adams testified
based on the HHI analysis that there is a risk of
anticompetitive harm in the context of what he described as
the closest market for which he has data.  But OPTO did not
present any evidence of increased prices, limitations in the
availability of the products, or other anticompetitive effects
in any relevant market.

Mr. Herrington further described some of the
deficiencies in the evidence with respect to anticompetitive
effects in the market.

In the absence of proof of anticompetitive effects,
which the parties agree is required to prove patent misuse,
the Court concludes as a matter of law that OPTO has not
established patent misuse.  So Honeywell's motion is granted
and OPTO's motion is denied.

Now, one last thing, at least on my list.  Honeywell
has requested fees and costs pursuant to 4.7.  Have the
parties discussed that?  Is that part of your resolution?

MR. PLEUNE:  No, Your Honor, that's not part of the
resolution.  My understanding is that we would address that in
the post-trial briefing.

1          THE COURT:  All right.  And I would appreciate both

2     sides addressing the very issue whether that -- what fees that

3     covers because the provision -- or the phraseology in 4.7 is

4     fees and costs.  The Court notices, I think, at least two

5     other places the agreement references attorney's fees.  So I

6     don't know whether the parties dispute whether 4.7 covers

7     attorney's fees.  Based on the history of this case, I assume

8     you do.  But I would ask both sides to address what fees and

9     costs it actually covers under 4.7 in your post-trial

10    briefings.

11          Anything further for us to discuss today?

12          MR. STEVENS:  Your Honor, as I try to do in all

13    these cases, thank you and all of your staff's time this week

14    and leading up to this case.  We certainly appreciate it.

15    It's been an honor to try a case in your courtroom.

16          THE COURT:  Appreciate that.

17          MR. MUCKENFUSS:  I echo that, Your Honor.

18          Nothing further.

19          THE COURT:  Yeah, I was going to say, look, I know

20    and remember the effort it takes to get ready for a trial like

21    this and to try a case like this.  The long nights, the long

22    weekends -- absence of weekends, actually.  And so I always

23    appreciate not only the effort involved, but the art of trying

24    a case, which, you know, is dying, unfortunately.  Just --

25    there are not enough opportunities to try cases.  Not that I'm

1    encouraging things go to trial.

2              And I do appreciate both sides giving some of your

3    younger attorneys the opportunity to participate actively in

4    the litigation.  I think that's very important.  You know,

5    we're all going to age out at some point and we need the next

6    generation to take up where we leave off.  So thank you all

7    very much for your collective efforts.

8              You know, the Fourth Circuit used to have a practice

9    of the judges would come down off the high and greet counsel,

10   as they called it.  Now, when COVID hit, they stopped doing

11   that.  I don't know if they've taken that back up.  Not to

12   pretend to be the Fourth Circuit, I would like to come down

13   and do the same.

14              (End of proceedings at 11:08 AM.)

15                        *****

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 6th day of August 2023.

17

18

19                          s/Cheryl A. Nuccio

20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter
21

22

23

24

25